Brett G. Evans (Bar No. 244213)
brett@eklawpc.com
Jeffrey S. Kob, Esq. (Bar No. 147971)
jeff@eklawpc.com
EVANS & KOB, PC
1172 Orange Avenue, 2nd Floor
Coronado, CA 92118
Telephone:   (657) 210-2114
Facsimile:   (888) 956-7890
*Counsel to Plaintiff Probility Media Corporation*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PROBILITY MEDIA CORPORATION, a Nevada Corporation,<br><br>                                    Plaintiff,<br><br>v.<br><br>LAWRENCE D. ISEN, an individual, MESA STRATEGIES, INC., a Nevada corporation, ALLAN J. LIGI, an individual, ALPINE SECURITIES CORPORATION, a Utah Corporation, FSC, LLC, a California limited liability company, and DOES 1-10, inclusive,<br><br>                                    Defendants. | Case No.: **'17 CV 2583 CAB WVG**<br><br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

1

Plaintiff Probility Media Corporation ("ProBility") makes the following allegations upon knowledge with respect to itself and upon information and belief with respect to all other matters:

## I.     NATURE OF THE ACTION

1. This case arises from the fraudulent inducement and deceptive scheme to acquire the stock of a publicly-traded company, ProBility Media Corporation, and then artificially manipulate its price and volume to reap significant financial rewards by several defendants in a "pump and dump" scheme thwarted only by the intervening criminal action by the Department of Justice ("DOJ") and civil suit by the Securities and Exchange Commission against one of the principal orchestrators and Defendants in the instant action. ProBility may have dodged the bullet, but neither ProBility nor its shareholders remain unscathed, both financially and reputationally. To add insult to injury, the other Defendants nonetheless receive a significant windfall, despite the ultimate scheme being obstructed, in the form of "short-swing" profits of 750% to 1,500% return on their investment in just over one month on the sale of ProBility's stock.

2. This is an action by ProBility to recover short-swing profits illegally obtained by Defendants through improper trading in ProBility's stock, enjoin Defendants from further trading in the stock without required disclosure, recover damages for fraud based upon the deceits committed by Defendants in inducing ProBility to enter into purported contracts with Defendants, rescission of the purported contracts, damages caused by Defendants' ongoing frauds and misrepresentation against ProBility and breach of contract, breach of contract and the return of ProBility's improperly-obtained stock now held by certain Defendants and/or their broker firms in accounts controlled by Defendants.

3. ProBility hereby seeks immediate relief including, among other things: (a) a declaration that Defendants failed to file full and accurate disclosures required by Sections 13(d) of the Exchange Act; (b) an order enjoining the further sale of ProBility's stock by Defendants; and (c) such preliminary and/or permanent injunctive relief as may

be necessary (1) to prevent the Mesa Defendants from enjoying any rights or benefits from ProBility securities that were acquired in violation of law, and (2) to prevent irreparable injury to ProBility and/or its stockholders arising out of Defendants' unlawful conduct.

4.   This suit is brought pursuant to Section 13(d) of the Securities Exchange Act of 1934 (the "Exchange Act"), Section 16(b) of the Exchange Act, common law fraud, breach of contract, rescission and other common law claims, seeking injunctive and other relief. ProBility seeks the termination and/or rescission of certain agreements fraudulently induced by Defendants Isen and Mesa. Any association by ProBility, or its shares, with Isen or any common enterprise with Isen, including Mesa and Alpine, causes irreparable injury and damage to ProBility's reputation, decreases the probability of executing its business plan, impedes ProBility's to capitalize its continuing operations (difficult, impossible or severely weakened bargaining position), disrupts ProBility's execution of acquisitions of potential targets, and restricts the availability of favorable long-term financing. As a result, the investment and existing value of existing shareholders (or beneficial owners of shares) will be put at significant risk as a result of Defendants' conduct. ProBility was fraudulently induced to enter into a series of transactions and contracts with a group of Defendants that, on subsequent discovery and investigation, turned out to have a colorful histories as serial microcap/penny stock promoters, brokers repeatedly accused of violating securities laws and regulatory rules relating to the sale of unregistered securities and an alleged mastermind behind a $147 million "pump and dump" scheme that appears eerily familiar to the path that ProBility was fraudulently induced to follow. While Defendants' histories were unknown to ProBility at the time, the company is nonetheless learning the hard lesson: "**If you lie down with dogs, you get up with fleas**."

## II.   JURISDICTION AND VENUE

5.   This Court has federal question subject matter jurisdiction over this case under § 27 of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. § 78aa),

which confers exclusive federal jurisdiction over Plaintiff's federal securities claims under § 16(b) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. § 78p(b) to obtain disgorgement of profits obtained by defendants in violation of that statute and § 13(d) (15 U.S.C. § 78m(d)) to enforce beneficial reporting obligations. This Court also has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a) by virtue of the fact that these claims form part of the same case or controversy under Article III of the United States Constitution as Plaintiff's federal securities claims.

6. Additionally, this Court has subject matter jurisdiction over this proceeding pursuant to 28 U.S.C. § 1332 because there is complete diversity among the parties and the amount in controversy exceeds $75,000.

7. Venue is proper in this district pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391. In addition, one or more of the Defendants conducted business in this district and a substantial part of the acts and omissions giving rise to the claim occurred in this judicial district.

### III. **PARTIES**

**1. Plaintiff**

8. ProBility Media Corporation ("ProBility") (formerly known as Panther Biotechnology, Inc., formerly known as NEF Enterprises, Inc. and formerly known as New Era Filing Services, Inc.) is a Corporation organized under the laws of the State of Nevada with its principal place of business at 1517 San Jacinto Street, Houston, Texas 77002.

9. ProBility is an online global provider of compliance, career advancement and training content for tradesmen and technical experts.

10. Probility is a public company whose stock is traded over-the-counter ("OTC") under the trading symbol "PBYA."

4

### 2. Defendants

11. Lawrence D. Isen ("Isen") is an individual, residing in San Diego, California. From approximately 1987 to 1995, Isen was associated with three different broker-dealers as a registered representative. During that time, Isen held Series 7, 24 and 63 licenses. On May 18, 1995, the Securities and Exchange Commission ("SEC") barred Isen from associating with any broker or dealer for violations of the antifraud provisions of the Federal securities laws, and on November 16, 2000, Isen was convicted by a jury in the United States District Court for the Southern District of New York of conspiracy to commit securities fraud and wire fraud. On December 19, 2001, Isen was sanctioned by the SEC for violations of Section 17(a) of the Securities Act of 1933 ("Securities Act") and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder based on the conduct underlying his criminal conviction. On December 20, 2007, Isen was sanctioned by the SEC and permanently enjoined from violating Sections 5(a), 5(c), 17(a)(2), and 17(a)(3) of the Securities Act in *SEC v. Isen*, No. 07-CV-11386 (S.D.N.Y. Dec. 19, 2007). On or about July 12, 2017, ProBility became aware that Isen was the subject of criminal charges by the Department of Justice ("DOJ") (U.S. v. Chartier, *et al*., case number 1:17-cr-00372) and a civil enforcement action brought by the Securities and Exchange Commission ("SEC") (Securities and Exchange Commission v. PowerTradersPress.com Inc., *et al*., case number 1:17-cv-04133), both in the U.S. District Court for the Eastern District of New York. The DOJ and SEC allege that, between January 2014 and July 2017, Isen together with thirteen other defendants and others, engaged in a $147 million scheme to defraud investors and potential investors in, among other companies, one or more of the following microcap, publicly traded companies: NWMH, CESX, GRLD, HECC, and ICEIF (**all of which, like ProBility were over-the-counter securities**), with criminal charges by the DOJ including conspiracy to commit securities fraud, conspiracy to commit wire fraud, conspiracy to commit money laundering, and substantive securities fraud in connection with the stock manipulation. **To execute this scheme, the Isen and others obtained shares from corporate insiders at below-market prices, engaged in**

**manipulative trading patterns to drive up the price of the shares by controlling the price and volume of the traded shares, made material misrepresentations and omissions in their communications with victim investors about the stock of the companies and fraudulently concealed their control of shares of the companies that were held in brokerage accounts in the names of other individuals or entities (similar to Mesa's role as represented by Mesa)**.  As the price climbed, members of the ring called and emailed potential investors, many of them elderly, pressuring them to buy the stocks, while concurrently, Isen and others sold off their own stakes, without telling investors (a "**pump and dump**").

12. Mesa Strategies, Inc. ("Mesa") is a corporation organized under the laws of the State of Nevada with is principal place of business located at 18145 Old Coach Drive, Poway, California, 92064.

13. Allan J. Ligi ("Ligi") is an individual, residing in the County of San Diego, California and the sole officer, director, and majority shareholder of Mesa. Mesa is the alter ego of Ligi. While Ligi may present himself as a simple businessman focused on his retail auto body and muffler and brake storefronts that occasionally invests in small cap companies, he uses or has used these alter ego entities such as Mesa and others, to operate as a player in the cottage securities industry negatively referred to as "shell packager," "penny stock promoter" or "shell company operator." For example, Ligi himself or through his alter ego entities, has previously:

    a. Performed investor relations services for one or more public OTCBB/penny stock companies, similar to those services promised to ProBility by Isen (as discussed below), in exchange for significant shares or warrants in the OTCBB company (like Isen), which services included, but was not limited to: (i) assisting with development and creation of materials and communications tools to create awareness of the company in the investment community and to promote positive relations between the company and the investment community; (ii) assisting the Company with the development and

drafting of press releases; (iii) identifying opportunities and coordinating the company's participation in investor conferences and industry interviews; (iv) assisting the company with communications to its shareholders and developing strategies for broadening the company's investor base; and (v) assisting the company in the transition of the trading of its shares to a major exchange.

b. Similar to Isen, acted as an unlicensed broker/finder whereby Ligi, or his alter ego, was paid a finder's fee (in cash or the company's equity securities) of 10% of all debt or equity funds raised and, like Isen, called for the issuance of up restricted common shares and five year warrants.

c. Similar to Isen, used other straw men to sign of his alter ego companies to execute various investor relations and finder fee agreements, with public companies in which Ligi was listed as executive officer.

d. Similar to the pending civil and criminal action against Isen (as discussed below), Ligi and/or his alter ego entity, is listed as a one of "straw men" of another individual with permanent injunctions by the SEC (statutorily barred former broker), whereby the defendant created a false appearance of active trading by making manipulative trades from those accounts to inflate the stock prices. According to the pending complaint by the Securities and Exchange Commission ("SEC"), the defendant brokers subsequently dumped their own shares into the open market at the expense of innocent investors, who were left with stock that is virtually worthless. Further, the SEC alleges that Ligi and/or his alter ego entity, as was a "close associate" of one of the defendants and "instructed…to purchase certain quantities of [the] stock at certain prices and times." Thus, similar to the allegations herein, Ligi and/or his alter ego, the defendant was "effectively directly [his] trading" and "had direct access to [his] trading account, and made trades in the account."

e. Named as a defendant in a civil complaint alleging an orchestrated "pump and dump" scheme with several individuals that have a history of participating in securities violations and fraud, including multiple individuals permanently enjoined by the SEC, similar to Isen.

f. Temporarily used his retail muffler and brake business to enable a public company avoid classification as a "shell company" within the meaning of Rule 405 promulgated under the Exchange Act. Absent such short-term merger and subsequent spin-off of his muffler and brake business, the company would have been severely restricted in its capital raising and business goals as its shares could not have been resold under the safe harbor of Rule 144 (even if the company was reporting under the Exchange Act).

g. Former executive officer of two public reporting companies with knowledge and experience related to beneficial ownership limitations, reporting and restrictions related thereto, such as the allegations alleged in this Complaint.

14. Alpine Securities Corporation ("Alpine") is a corporation organized under the laws of the State of Utah with is principal place of business located at 39 Exchange Place, Salt Lake City, Utah 84111. Both Alpine, and Scottsdale Capital Advisors Corp. under common control with Alpine,[1] are and at all times mentioned herein was, a registered broker-dealer under the Securities Exchange Act of 1934 ("Exchange Act"), licensed and authorized to transact business in California pursuant to section 25210 of the Corporations Code, and member firms of the Financial Industry Regulatory Authority ("FINRA"), the self-regulatory agency for broker-dealers authorized under the Exchange Act. Alpine is a self-clearing broker-dealer and has been registered with the SEC since

---

[1] Scottsdale Capital Advisors Corp. ("Scottsdale") is a retail and institutional broker-dealer located in Scottsdale, Arizona. It has been registered as a broker-dealer with the SEC since 2002 and is currently registered as an investment adviser with the states of Arizona and California. Scottsdale introduced customers to Alpine and similar to Alpine, Scottsdale's business focuses on microcap stock transactions.

1984. The majority of its business involves clearing microcap over-the-counter ("OTC")

stock transactions for other firms (securities similar to ProBility). Both Alpine and

Scottsdale have a history of disciplinary actions brought against them by FINRA for

various violations, including failure to maintain adequate written supervisory procedures

and for participating in unregistered offerings and sales of securities in violation of

Section 5 of the Securities Act of 1933 ("Securities Act"), with Alpine subject to 40

regulatory disclosure events. For example, on December 22, 2009, Alpine executed an

Acceptance, Waiver and Consent based on FINRA's review of 2,157,000 unsolicited sale

orders in one OTC stock over a period of approximately one year finding that the Alpine

violated former NASD Rule 2010, by selling unregistered securities in violation of

Section 4 of the Securities Act of 1933 and former NASD Rules 3010 and 2110 by failing

to establish, maintain and enforce a system, to supervise the activities of its associated

persons that were reasonably designed to detect and prevent the sale of unregistered

securities. On March 31, 2017, FINRA's Department of Enforcement found that

Scottsdale violated FINRA Rule 2010 by selling securities without registration and

without an exemption, in contravention of Section 5 of the Securities Act of 1933, and

permanently barred John J. Hurry (pending review), [2] who indirectly through a trust and

holding company, owns both Alpine and Scottsdale, based on findings that Hurry

engaged in activities designed to enable the unlawful transactions and evade regulatory

scrutiny when Scottsdale engaged and participated in sales of securities that were not

registered with the SEC, in transactions that were not exempt from registration. The

findings stated that Hurry, the firm's indirect owner, acted in contravention of Section 5

of the Securities Act of 1933 by being a necessary participant and substantial factor in the

---

[2] On April 26, 2017, this matter was appealed to the National Adjudicatory Council (NAC) and the sanctions are not in effect pending review. On June 20, 2017, an Amended Extended Hearing Panel Decision was issued to correct a factual error. The amendment does not change the substance of the decision and remains on appeal with the NAC.

sales of unregistered securities, though his indirect ownership and control of Scottsdale, Alpine (Scottsdale's clearing firm), and the Cayman Island broker-dealer, allowed suspect microcap stock liquidations to be facilitated without the scrutiny that the transactions demanded. On June 5, 2017, the Securities and Exchange Commission ("SEC") initiated a civil enforcement action against Alpine charging them with securities law violations related to its alleged practice of clearing transactions for microcap stocks (or over-the-counter securities similar to ProBility) that were used in manipulative schemes to harm investors alleging that "[s]ince 2011, Alpine has cleared thousands of deposits of microcap securities, most of them involving [Scottsdale] as the introducing broker, and **many of which were used as part of various stock manipulation and other schemes**." (*Securities and Exchange Commission v. Alpine Securities Corporation*, Civil Action No. 7:17-CV-4179) (S.D.N.Y., filed June 5, 2017) (emphasis added). The SEC's complaint charges Alpine with thousands of violations of Section 17(a) of the Securities Exchange Act of 1934 and Rule 17a-8 based on allegations that Alpine routinely and systematically failed to file Suspicious Activity Reports (SARs) for stock transactions that it flagged as suspicious, and when it did file, Alpine frequently omitted the necessary information that formed the bases for Alpine knowing, suspecting, or having reason to suspect that a transaction was suspicious. Further, the SEC alleged that "[m]any Scottsdale and Alpine customers have been charged with violations of the federal securities laws, including violations relating to transactions that cleared through Alpine[,]" "seldom…refused to clear trades generated by such accounts...Alpine instead allowed Scottsdale's customers to engage in suspicious transactions [in exchange for] fees that were significantly higher than those charged by other clearing firms."

15. FSC, LLC ("FSC") is a limited liability company organized under the laws of the State of California located at 10673 Hunters Glen, San Diego, California, 92130. On information and belief, Isen is a managing member or person in control or both of FSC, or otherwise, FSC is the alter ego of Isen.

16. ProBility does not know the names and identities of Does 1 through 10, inclusive, and therefore sues those defendants by such fictitious names. ProBility is informed and believes, and on that basis alleges, that Does 1 through 10, inclusive, are responsible for the acts alleged in this Complaint. When the true names of such fictitious defendants are ascertained, ProBility will seek leave of this Court to amend this Complaint to name those individuals or entities.

17. ProBility is informed and believes, and on the basis of that information and belief alleges, that at all times herein mentioned in this Complaint, Defendants, and each of them, were the agents, representatives, employees, successors and/or assigns, each of the other, and at all times pertinent hereto were acting within the course and scope of their authority as such agents, representatives, employees, successors and/or assigns and acting on behalf of, under the authority of, and subject to the control of each other.

## IV.   GENERAL ALLEGATIONS

### 1.   Background on ProBility Media Corporation

18. ProBility was incorporated in the State of Nevada on July 11, 2011 refocusing its business subsequent to its consummation of a business combination with Brown Technical Media Corporation ("Brown") on or about November 8, 2016 ("Brown Transaction").

19. ProBility is an e-commerce company building training and career advancement brand for the skilled trades. Additionally, ProBility is an online aggregator of e-learning and training content, exam preparation, testing, certification, continuing education, compliance and career advancement tools for engineers, tradesman and offers technical solutions in a range of professions. The company offers advisory services to both small businesses and large corporations and online subscription services for enterprise level companies.

20. ProBility through its divisions and prior acquisitions provides a comprehensive set of immersive technologies, digital learning and compliance solutions for global industrial customers and academic institutions.

21. ProBility sought to raise capital for future growth, expand the operations of Brown, pursue acquisitions of complementary companies and growing the content to its eLearning operations by adding online training content to its offerings and licensing and acquiring additional training content.

**2. ProBility is Fraudulently Induced into 3(a)(10) Transaction and Resulting Agreements**

22. In early 2017, to accomplish this goal, ProBility began exploring financial public relations, marketing and investor awareness providers. ProBility was placed in touch with Isen, who was represented to ProBility as being a knowledgeable and reputable businessman with experience in raising capital. Unknown to ProBility, Isen was previously involved in other pump and dump schemes, but failed to disclose this material fact. It did not take long for ProBility, and presumably others acting in concert with him, to see the potential to scam ProBility.

23. In or about early 2017, ProBility initially engaged Isen through an oral agreement, to among other things, market ProBility. Isen represented he would effectively market the shares through, among other things, social media broadcasts, newsletters, and the use of electronic mailing lists, which he represented could eventually lead to additional sources of capital for ProBility.

24. On January 27, 2017, ProBility responded to SEC correspondence on dated December 12, 2016 addressing the SEC's position that ProBility was a "shell company." ProBility responded that it was not "a shell company within the meaning of Rule 405 prior to the" Brown transaction as it began biotechnology operations in May 2014 with the "goal of identifying, licensing, and acquiring undervalued molecules that were designed to heal without causing harm and are either optimized derivatives of existing products, repurposed approved products, products that did not meet clinical endpoints and also new classes of drugs." If ProBility accepted the SEC's determination, it would be severely restricted in its capital raising and business goals, as its shares could not be

resold under the safe harbor of Rule 144 until the earlier of November 8, 2017 (one year after the Brown transaction).

A. Scheme Concocted by Isen and Mesa Defendants

25. Isen presented a workaround, that would allegedly allow ProBility to concede to the SEC's position, through an exemption under Section 3(a)(10) of the Securities Act, while continuing to market ProBility. A Section 3(a)(10) exemption of the Securities Act is meant to exempt securities transactions where a fairness hearing by a judge or government agency's ruling replaces usual registration requirements. Isen represented that many over-the-counter traded securities (over-the-counter bulletin board or OTCBB), like ProBility, have been utilizing the exemption found in Section 3(a)(10) to convert all forms of debt into freely tradable common stock. Isen represented that the conversion of debt into common stock could assist ProBility by eliminating certain debt from its balance sheet and increase its liquidity and solvency, convince lenders to make investments into a company without the investor relying solely on the company cash flows for repayment, and critical for ProBility, allow for a certain amount of freely tradeable common stock upon the eventual conversion of a promissory note into its common stock to generate investor and investment professionals awareness and interest in ProBility as well as a public float to support further financing and acquisition transactions.

26. In connection with the oral agreement with Isen, Isen represented that, he could structure a convertible promissory note with takedowns of the debt by a creditor (Mesa) priced at a discount to market and subject to an ownership limitation to avoid affiliation, which upon conversion to common stock of ProBility, Isen would have the authority and/or ability to direct another company, Mesa, to market and sell shares of the common stock of ProBility in conjunction with his marketing strategy.

27. In negotiation with Isen for his services, Isen represented that the only way that it would be possible for him to provide investor relations services to ProBility and successfully implement his marketing strategy was for ProBility to execute his plan for a

13

Section 3(a)(10) exemption by transferring the shares to a third-party company that he would effectively have the authority to control or which he had apparent authority over, Mesa (hereinafter, Isen with his apparent agency/authority over Mesa, the "Mesa Defendants").

28. Isen represented that by control and direction of Mesa, including the timing of conversion and subsequent sale of shares, whereby through his control of Mesa, ProBility could substantially eliminate the common risk/tendency in such convertible promissory note structures under Section 3(a)(10), which for many over-the-counter traded securities drives down the company's stock price and results in substantial dilution to existing stockholders, while Isen, through Mesa, could stabilize the price of ProBility's stock through generating interest with investors and investment professionals through his marketing strategy and limiting the amount of public float through strategic, gradual sales of Mesa's stock in ProBility.

29. At all relevant times, Isen represented that he was the agent of and could direct the actions of Mesa.

30. Isen represented that, if shares were transferred to Mesa, he had authority to market the shares and sell them through Mesa or to direct principals of Mesa with respect to the sale of shares in accordance with his instructions.

31. The sole representative of Mesa communicating to and negotiating with ProBility was Isen.

32. Isen represented he had actual authority to negotiate and enter agreements on behalf of Mesa.

33. Isen represented Mesa would sell shares only at his direction.

34. Isen represented Mesa would sell shares into the open market in a manner that would ensure a stable market for Probility's shares.

B. Reliance on Concocted Plan of Mesa Defendants and Prior Court History

35. In furtherance of the plan of the Mesa Defendants and in detrimental reliance on Isen's promises and representations, ProBility withdrew its position with the SEC that

ProBility was a "start-up company" and accepted, without alteration, that ProBility was a "shell company" up to the date of the Brown transaction on November 8, 2016. Thus, absent Isen's promises related to the Section 3(a)(10) exemption and the execution thereof through Mesa (as a "straw man"), ProBility would be severely restricted in its capital raising and business goals, as its shares could not be resold under the safe harbor of Rule 144 no earlier than November 8, 2017 (one year after the Brown transaction).

36. In furtherance of the plan of the Mesa Defendants and in detrimental reliance on Isen's representations, Mesa, through Isen, and ProBility, entered into a series of pre-arranged transactions whereby ProBility would transfer securities in connection with the marketing agreement for ProBility with Isen and Mesa, including:

a. On or about May 12, 2017, Mesa entered into a Note Purchase Agreement with Typenex ("Note Purchase Agreement"), in which Isen communicated the demands of Mesa on its behalf, pursuant to which Mesa purchased the Note from Typenex, as restructured pursuant to the Note Settlement Agreement. Pursuant to the Note Purchase Agreement, the outstanding balance of the Note was reduced to $188,250. The Note was transferred from Typenex to Mesa pursuant to an Assignment Agreement dated May 12, 2017 ("Assignment Agreement").

b. On May 31, 2017, Mesa, at Isen's direction, filed a complaint with this Court against ProBility for breach of contract on the Note (*Mesa Strategies, Inc. vs. Probility Media Group, Inc.*, Case No. 37-2017-00019738-CU-BC-CTL) ("California State Court Action").

c. On or about June 9, 2017, Mesa and ProBility executed a Settlement Agreement ("Settlement Agreement"), contingent on the Court's approval of the Settlement Agreement in the California State Court Action. A true and correct copy of the Settlement Agreement is attached hereto as Exhibit A and incorporated herein by this reference. Pursuant to the Settlement Agreement, ProBility agreed to "issue to MESA the 10% Convertible Note

dated June 9, 2017" ("Convertible Note") that "allows MESA to convert all or any part of the Convertible Note into shares of" ProBility at a price of $0.04 per share in full satisfaction of the debt in the 3(a)(10) Action. A true and correct copy of the Convertible Note is attached hereto as <u>Exhibit B</u> and incorporated herein by this reference.

d. On June 12, 2017, ProBility and Mesa filed a Joint Ex Parte Application for Order Approving the Settlement Agreement in the California State Court Action. The Ex Parte Application, along with the declarations of both parties, were drafted by Mesa's counsel at the direction of Isen.

e. On June 20, 2017, the Court ordered: (1) the Settlement Agreement was "approved in its entirety;" (2) Mesa "owns bona fide outstanding claims against [ProBility], and the terms and conditions of the issuance and exchange of such claims for free-trading shares of common stock of [ProBility], as set forth in the Settlement Agreement and Release, are approved after a hearing upon the fairness of such terms and conditions at which [Mesa], the only person to whom it is proposed to issue securities in such exchange, appeared by counsel[;]" and (3) the Court would "retain jurisdiction to enforce the terms of this Order by motion under California Code of Civil Procedure Section 664.6." ("June 20th Order"). A true and correct copy of the June 20th Order is attached hereto as <u>Exhibit C</u> (redacting the Settlement Agreement and Convertible Note submitted previously) and incorporated herein by this reference.

37. On June 20, 2017, the Settlement Agreement and Convertible Note became effective by court's execution of the proposed order, drafted by the Mesa Defendants' counsel, the June 20th Order.

38. The Settlement Agreement and Convertible Note, and subsequent written contract with Isen, were entered into by ProBility on the basis of Isen's representations regarding his control of Mesa and his ability to effectively and legally market ProBility stock.

**3.  Post-California State Court Action/3(a)(10) Hearing**

39. On or around June 21, 2017, in furtherance of the Mesa Defendants' plan, Mesa tendered the Notice of Conversion (attached as Exhibit A to the Convertible Note) directly to Signature Stock Transfer, Inc. (ProBility's former transfer agent) **not to ProBility** pursuant to the terms of the Convertible Note, Settlement Agreement and the beneficial ownership limitation provisions. A true and correct copy of the certificates for the shares issued by exercise of the Notice of Conversion sent to Ligi by Signature Stock Transfer, Inc. is attached hereto as <u>Exhibit D</u>. The certificates for the shares provided the following legend:

> RULE 144 – RESTRICTED SHARES
>
> The shares represented by this certificate have not been registered under the Securities Act of 1933 (the "Act"), and are Restricted Securities as that term is defined in Rule 144 under the Act, and **requires written release from either the issuing company or their attorney prior to legend removal**.
>
> (emphasis added).

**4.  Discovery of Scheme/Bad Actor**

40. On or about July 12, 2017, ProBility became aware that Isen was the subject of criminal charges by the Department of Justice ("DOJ") (U.S. v. Chartier, *et al*., case number 1:17-cr-00372) and a civil enforcement action brought by the Securities and Exchange Commission ("SEC") (Securities and Exchange Commission v. PowerTradersPress.com Inc., *et al*., case number 1:17-cv-04133), both in the U.S. District Court for the Eastern District of New York. The DOJ and SEC allege that, between January 2014 and July 2017, Isen together with thirteen other defendants and others, engaged in a $147 million scheme to defraud investors and potential investors in, among other companies, one or more of the following microcap, publicly traded companies: NWMH, CESX, GRLD, HECC, and ICEIF (**all of which, like ProBility were over-the-counter securities**), with criminal charges by the DOJ including conspiracy to commit securities fraud, conspiracy to commit wire fraud, conspiracy to

commit money laundering, and substantive securities fraud in connection with the stock manipulation. **To execute this scheme, the Isen and others obtained shares from corporate insiders at below-market prices, engaged in manipulative trading patterns to drive up the price of the shares by controlling the price and volume of the traded shares, made material misrepresentations and omissions in their communications with victim investors about the stock of the companies and fraudulently concealed their control of shares of the companies that were held in brokerage accounts in the names of other individuals or entities (similar to Mesa's role as represented by Mesa)**. As the price climbed, members of the ring called and emailed potential investors, many of them elderly, pressuring them to buy the stocks, while concurrently, Isen and others sold off their own stakes, without telling investors (a "**pump and dump**").

41. At no time prior to filing this Complaint did Ligi, Mesa or Isen disclose this material information related to Isen's "colorful" background, beginning with Isen being barred from associating with any broker or dealer for violations of the antifraud provisions of the Federal securities laws in 1995 through the July 12, 2017 criminal and civil actions, or the prior investigations related thereto. On information and belief, Isen knew or should have known about the impending actions, and that such alleged conduct would be material to ProBility in its decision to enter into the Settlement Agreement and Convertible Note.

42. On information and belief, Mesa and Ligi knew of the impending actions against Isen.

43. On information and belief, based partly on the similar circumstances alleged in the criminal indictment and civil enforcement action (over-the-counter securities, below-market prices,[3] accounts held in the names of others), neither Isen nor Mesa intended to

---

[3] In fact, Isen through FSC, entered into a subsequent written agreement with ProBility in furtherance of his marketing strategy, that called for compensation equivalent to 400,000

perform under their oral representations and never intended to market ProBility securities.

### 5. Isen as Agent of Mesa and Ligi

44. ProBility is informed and believes, and based on such information and belief, alleges that at all times mentioned, Isen represented himself as an actual agent of Mesa, a de facto manager of Mesa, managing member of Mesa, a person with authority or control over Mesa and/or a person with the authority or control to direct the principals of Mesa with respect to representations and promises made on Mesa's behalf, which such representations were made through oral statements by Isen and through the conduct (or lack thereof) of both Isen and Mesa. Such statements and conduct are detailed in the foregoing allegations, and include, but are not limited to: (i) Isen's representations that he was agent of and could direct the actions of Mesa; (ii) Isen's representations that, if shares were transferred to Mesa, he had authority to market the shares and sell them through Mesa or to direct principals of Mesa with respect to the sale of shares in accordance with his instructions; (iii) Isen represented himself as the sole representative of Mesa in communications and negotiations with ProBility; (iv) Isen represented he had actual authority to negotiate and enter agreements on behalf of Mesa; (v) Isen represented Mesa would sell shares only at his direction; (vi) Isen represented Mesa would sell shares into the open market in a manner that would ensure a stable market for ProBility's shares; (vii) reviewing ProBility's balance sheet for debt that met the characteristics in his view, on behalf of Mesa, the ability to be restructured as a convertible promissory notes, and on behalf of Mesa, identifying the Typenex Note; (viii) negotiating and communicating on behalf of Mesa the terms of the Note Purchase Agreement with both Typenex and ProBility; (ix) negotiating and communicating on behalf of Mesa the terms of the Assignment Agreement with both Typenex and ProBility; (x) overseeing the 3(a)(10)

---

warrants, convertible into restricted common shares of ProBility, at a below market price of $0.005 per share.

Action on behalf of Mesa, including communicating with Mesa's counsel, and corresponding with ProBility on behalf of Mesa, including directing the execution of declarations in support of the Ex Parte Request for Order Approving the Settlement Agreement and acting as the central point of contact for Mesa's counsel; (xi) negotiating and communicating on behalf of Mesa the terms of the Convertible Note and Settlement Agreement, including but not limited to, the Conversion Price, which was substantially below recent sales of convertible preferred shares recently sold by ProBility; (xii) communicating with counsel for Mesa for the issuance of the legal opinion related to the Transferred Shares and requesting information from ProBility for such legal opinion, on behalf of Mesa; and (xiii) communicating on behalf of Mesa related to Mesa's account with Alpine. The representations and conduct were made by Isen with the intention that ProBility would rely on these representations and ProBility did detrimentally rely on these representations and conduct. On information and belief, ProBility's first direct interaction with Mesa was not until after criminal charges and civil claims were brought against Isen by the DOJ and the SEC in parallel proceedings on July 12, 2017 and ProBility's Cease and Desist Letter issued to Mesa on July 28, 2017.

45. ProBility is informed and believes, and based on such information and belief, alleges that at all times mentioned, Isen was the actual or ostensible agent of Mesa and had the authority to direct the acts of Mesa, and in committing the acts alleged herein, was acting within the scope of such agency and authority. The acts or neglect of Mesa, as well as Alpine, led ProBility to believe that Isen was acting as an agent for Mesa. These acts, neglect and conduct are detailed in the foregoing, and include, but are not limited to: (i) Isen's representations that he was agent of and could direct the actions of Mesa; (ii) Isen's representations that, if shares were transferred to Mesa, he had authority to market the shares and sell them through Mesa or to direct principals of Mesa with respect to the sale of shares in accordance with his instructions; (iii) Isen represented himself as the sole representative of Mesa in communications and negotiations with ProBility; (iv) Isen represented he had actual authority to negotiate and enter agreements on behalf of Mesa;

(v) Isen represented Mesa would sell shares only at his direction; (vi) Isen represented Mesa would sell shares into the open market in a manner that would ensure a stable market for ProBility's shares; (vii) reviewing ProBility's balance sheet for debt that met the characteristics in his view, on behalf of Mesa, the ability to be restructured as a convertible promissory notes, and on behalf of Mesa, identifying the Typenex Note; (viii) negotiating and communicating on behalf of Mesa the terms of the Note Purchase Agreement with both Typenex and ProBility; (ix) negotiating and communicating on behalf of Mesa the terms of the Assignment Agreement with both Typenex and ProBility; (x) overseeing the 3(a)(10) Action on behalf of Mesa, including communicating with Mesa's counsel, and corresponding with ProBility on behalf of Mesa, including directing the execution of declarations in support of the Ex Parte Request for Order Approving the Settlement Agreement and acting as the central point of contact for Mesa's counsel; (xi) negotiating and communicating on behalf of Mesa the terms of the Convertible Note and Settlement Agreement, including but not limited to, the Conversion Price, which was substantially below recent sales of convertible preferred shares recently sold by ProBility; (xii) communicating with counsel for Mesa for the issuance of the legal opinion related to the Transferred Shares and requesting information from ProBility for such legal opinion, on behalf of Mesa; and (xiii) communicating on behalf of Mesa related to Mesa's account with Alpine. On information and belief, despite the various transactions entered between ProBility and Mesa, none of the principals of ProBility have personally interacted with Mr. Allan Ligi, the alleged owner of Mesa. ProBility's reliance on the ostensible authority of Isen was reasonable in that Mesa: (i) never communicated directly with ProBility until after criminal charges and civil claims were brought against Isen by the DOJ and the SEC in parallel proceedings on July 12, 2017 and ProBility's Cease and Desist Letter issued to Mesa on July 28, 2017; (ii) knew it was receiving a significantly below market conversion price in the Convertible Note based on the representations and promises of Isen; and (iii) allowed Isen to negotiate and communicate on its behalf in the series of transactions that resulted in the Settlement Agreement and Convertible Note.

Throughout the various negotiations and transactions entered into, or in which ProBility was a party thereof, Mesa never denied such authority nor contradicted the authority of Isen, but rather continued to allow Isen to hold himself out as agent until July 12, 2017, when Isen was no longer available due to the criminal and civil securities fraud actions were brought against him. On information and belief, ProBility's first direct interaction with Mesa was not until after criminal charges and civil claims were brought against Isen by the DOJ and the SEC in parallel proceedings on July 12, 2017 and ProBility's Cease and Desist Letter issued to Mesa on July 28, 2017.

### 6. Post-Discovery of Intended Scheme – Cease & Desist, Mitigation Attempts and Rescission

46. On or about July 13, 2017, due to the significant allegations in the criminal and civil complaints against Isen and the similarities therein with the prior dealings with Isen and Mesa, ProBility issued a stop order to its transfer agent directing that no action be taken related to the shares converted under the Convertible Note without a written release from Probility prior to transfer ("Stop Order").

47. On July 18, 2017, ProBility rescinded its consulting agreement with Mr. Isen and, by proxy, Mesa. As a result, ProBility rescinded and repudiated its oral and written agreements with Isen and Mesa relating to the marketing of ProBility stock, his marketing strategy and the Settlement Agreement and Convertible Note that was a part thereof.

48. On July 28, 2017, due to proceedings against Isen (restraining his residence and removal proceedings to New York) and the potential lack of communication with Mesa, ProBility contacted Mesa directly, without Isen, for the first time to notify Mesa of its position regarding the Settlement Agreement and Convertible Note, which is similar to the underlying factual allegations supporting this Complaint, that:

    a. "[ProBility] **relied upon the oral representations of Isen** that the shares represented by the settlement agreement would be sold into the open market and that Isen would help build a robust market for the [ProBility's] shares

via social media broadcasts and the use of electronic mailing lists with the goal of encouraging individuals to purchase the [ProBility's] common stock." A true and correct copy of the letter from ProBility to Mesa dated July 28, 2017 ("Cease and Desist Letter") is attached hereto as Exhibit D (emphasis added).

b. ProBility believed based on the civil and criminal actions against Isen, "that **Isen was planning to utilize the illegal methods outlined in the SEC complaint and indictment** in order to create a market for the [ProBility's] common stock. Had the [ProBility] been aware that Isen was planning to utilize illegal methods to encourage individuals to purchase its common stock, [ProBility] would have never agreed to the settlement or filed the declarations with the Court." *Id*. (emphasis added).

c. "[ProBility] retained [Isen and FSC] to assist the Company with investor relations and identifying sources of capital. The settlement agreement with Mesa was entered into largely due to the fact that [Probility] had entered into agreements with [Isen and FSC]. Based upon Isen's representations, [ProBility] agreed to a below market conversion price in order to facilitate the transaction. **Prior to entering into the settlement agreement, [ProBility] was raising funds at $0.15 per share**. [ProBility] agreed to a below market conversion price of $0.04 per share **at Isen's insistence and in reliance upon his oral representations**. [ProBility] would not have agreed to this conversion price otherwise. [ProBility] has since cancelled the contract with Isen." *Id*. (emphasis added).

d. "It is [ProBility's] understanding that Mesa is attempting to lift the restrictions on the stock certificates it has received [i.e., the Transferred Shares]. **[ProBility] believes that the restrictions on the shares should not be lifted since the settlement was based upon representations that**

**[ProBility] now has reason to believe were false, misleading and potentially fraudulent**." *Id*. (emphasis added).

   e.  "[ProBility] is prepared to rescind the settlement agreement and the issuance of the [shares issued under the Convertible Note] if [ProBility] is not able to reach a mutually agreed amendment to the settlement with Mesa." *Id*.

49. ProBility has demanded Isen and Mesa cease and desist in their collective efforts to lift the restrictions on the ProBility stock certificates and to sell ProBility stock, because the transfer of the certificates was based upon fraudulent representations by Isen acting as agent of, and with authority to control, Mesa.

50. On or about September 5, 2017, despite receiving the Cease and Desist Letter and the entry of the Stop Order, Alpine and Mesa contacted ProBility's current transfer agent, VStock Transfer, LLC ("VStock"), and demanded that the restrictive legend on the Transferred Shares be removed. A true and correct copy of the correspondence to VStock Transfer, LLC dated September 5, 2017 ("Alpine Demand") is attached hereto as <u>Exhibit F</u>.

   a.  Mesa and Alpine submitted its "request that the restrictive legend on the certificate(s) representing the above identified securities…be removed pursuant to rule 144 promulgated under the Securities Act of 1933." *Id*. at 4.

   b.  Mesa and Alpine represented that it had "fully paid for, beneficially owned, and held the shares of the Company for a period of...Six Months" despite owning such shares for a little over one month. *Id*. at 4.

   c.  **Despite never transmitting the request to ProBility**, Mesa and Alpine represented that it submitted the request to the ProBility (and the transfer agent) and that both "both may rely on the above statements." *Id*. at 4.

   d.  **Despite never transmitting the request to ProBility**, Alpine represented that it submitted its Broker Representation Letter to both ProBility and the transfer agent "in order to induce [ProBility]…transfer the" Transferred

24

Shares owned by Mesa that it is about to sell "in a manner satisfying the requirements of Section(g), Rule 144 of the Securities Act of 1933." *Id*. at 5.

e. Alpine further represented to ProBility (and its transfer agent) that it "after such reasonable inquiry, is **not aware of any facts indicating that the information** supplied by [Mesa] to [Alpine] in connections with the sale of the above described securities **was not complete and accurate as of the date of the sale of such securities**." *Id*. at 5.

f. Despite that the Settlement Agreement provides that ProBility shall deliver "opinions of a legal counsel for [ProBility]," potentially foretelling the impending doom of Isen and the representations made to induce ProBility to enter into the Settlement Agreement, Convertible Note and the California State Court Action, Isen on behalf of Mesa,[4] engaged an attorney to draft a legal opinion dated June 26, 2017 that opined "that the [Transferred Shares]: (i) may be issued under the exception to the registration requirements of Section 5 of the Act as provided in Section 3(a)(10) of the Act; and (ii) may be issued free of any restrictive legend and any existing restrictive legend(s) may be removed." *Id*. at 8. Nonetheless, the opinion states that counsel relied on Mesa's representations, without an investigation, that:

i. "neither [Mesa] or any of its affiliates have ever been and are not now Officers, Directors, Control Persons, Promoters or owners of Ten Percent (10%) or more of the Company's equity securities or any other securities convertible into more than Ten Percent (10%) or more of any class of the [ProBility's] securities." However, if counsel had properly investigated (through a certificate of ProBility), Mesa would

---

[4] Isen received and forwarded the legal opinion to ProBility on June 26, 2017, the only document received by ProBility (other than the attached pleadings) that ProBility received indirectly prior September 29, 2019 (as discussed herein).

be deemed an affiliate as a "person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with" ProBility, as properly counting the common controlled beneficial interests (through warrants held by FSC and Isen), Mesa, FSC and Isen "are the beneficial owners collectively of 10 percent or more of any class of equity securities or 10 percent or more of the equity interest" pursuant to Rule 144(a)(2). Thus, the shares would be remain "restricted securities" at the time of the issuance of the legal opinion.

ii.   "the Court approved the issuance of the Shares to the Holder."

iii.  "the parties had adequate notice of and the ability to be heard at the Hearing"

iv.  "the Court found that the terms and conditions of the exchange were fair to the Shareholder within the meaning of Section 3(a)(10) of the Act." However, it is the SEC's view that the Court "making the fairness determination 'must have sufficient information before it to determine the value of both the securities, claims or interests to be surrendered and the securities to be issued in the proposed transaction.'"[5] Counsel represented that he reviewed ProBility's financial reports, which demonstrate arm's length transactions for convertible promissory notes to be issues at a $0.15 conversion price.

51. On or before September 28, 2019, after witnessing a significant spike in the trading volume of its common stock on the over-the-counter bulletin board ("OTCBB"), ProBility began an investigation of certain suspect trading activity that artificially

[5] *See* SEC Division of Corporate Finance, Staff Legal Bulletin No. 3A (CF) (June 18, 2008) Release No. SLB -3A; *see also* California Department of Corporations, Release No. 117-C (January 18, 2006).

depressed the price of ProBility's stock price and significantly increased its volatility, which included discussions with its current transfer agent, VStock, related to the spike in its average daily trading volume.

52. Despite the Stop Order and Cease and Desist Letter, ProBility learned that Alpine and Mesa caused the Transferred Shares to be reissued without the restrictive legends, sold a large volumes of stock compared to the average daily trading volume and retained the remaining unsold Transferred Shares with expectation of future sales.

53. On or about September 28, 2017, ProBility initiated communication with Alpine, through one of its compliance officer and its general counsel. ProBility informed Alpine of the involvement of Isen, the filed indictment of Isen for criminal securities fraud, the civil enforcement action brought by the SEC for securities fraud, the similar factual circumstances related to the Settlement Agreement, Convertible Note and the shares issued upon conversion of the Convertible Note, the fraudulent inducement in the issuance of the Settlement Agreement and Convertible Note and the Cease and Desist Letter previously sent to Mesa.

54. Alpine responded that it could "neither confirm nor deny the existence of account(s), position(s) or activity in [ProBility]" and that Alpine would take no action unless and until a restraining was issued by "any Court of competent jurisdiction." The general counsel of Alpine instructed ProBility, that "in the event you deem in necessary to proceed against the party you believed wronged you and are able to obtain a restraining order that would be applicable to, say, broker dealers that the alleged bad actor has an account with, any such broker dealer would honor that Court's directive."

55. On or about September 29, 2017, based on the lack of any meaningful assistance by Alpine, ProBility requested that VStock reverse the transfer based on the: (i) a Stop Order was in place, (ii) the removal of the restrictive legend without the ProBility's knowledge and (iii) VStock's acceptance of a legal opinion effectuating such removal of the restrictive legend without ProBility's approval. Unfortunately, VStock informed

ProBility that it was "unable to reverse the transfer since the shares are under the control of" Alpine.

56. On or about September 29, 2017, based on the lack of any meaningful assistance by Alpine and VStock's inability to reverse the transfer, ProBility engaged VStock as an intermediary to attempt a resolution on the Transferred Shares. However, VStock reached the same result with Alpine, requiring ProBility to continue to expend its prescious resources on obtaining a Temporary Restraining Order, rather than on ProBility's immediate needs as emerging growth company, or to further its actual intent in entering the Transfer Agreement in the first place (to raise capital to pursue acquisitions, acquire training content, create investor and investment professional awareness and seek various forms of long-term financing).

57. Despite actual and constructive knowledge of the Stop Order, the Cease and Desist Letter, civil and criminal proceedings against Isen that presented similar factual allegations to the instant dispute with Mesa, the significant history of disciplinary actions of both Alpine and Scottsdale and recent civil enforcement action brought against it for conduct related to the sale of unregistered securities (like ProBility), the reliance on the opinion letter acquired by Isen on Mesa's behalf that explicitly provided that it was no longer valid ("[t]he opinions set forth herein are based expressly on the facts stated herein, and **may not be relied upon in the event that other facts, not presently known to us, come to light**….**If any facts or documents are determined to be incorrect, misstated, or misrepresented, then the opinion or opinions expressed herein may not continue to be valid**."), knowledge or reason to believe that certain other statements by Mesa to Alpine or to the drafter of the legal opinion may misrepresentations or otherwise inaccurate, the fraudulent inducement in the Settlement Agreement and Convertible Note, the risk that the shares issued on conversion of the Convertible Note were not exempt from registration and/or restricted based on the aggregate beneficial ownership of Mesa and Isen collectively, the continued damage to ProBility through the artificially depressed price of ProBility's stock price and significant increase in volatility on the OTCBB:

a. Alpine refused to terminate, and continues to refuse to terminate, sales of ProBility's securities owned by Mesa and controlled by Isen; and

b. Isen and Mesa have sold and will continue to sell ProBility stock in large volumes (compared to the average trading volume of the stock) through Alpine; and

c. Alpine, through its conduct, has enabled, participated and/or aided and abetted Mesa and Isen's continued tortious conduct.

58. On information and belief, based in part on the actual or constructive knowledge of Alpine of the preceding facts, Alpine did not conduct a reasonable inquiry in connection with the sale of unregistered securities to determine whether the sale of those securities of ProBility in its customer account, Mesa, would violate the requirements of Section 5 of the Securities Act, state securities law or the rules promulgated by FINRA pursuant to its authority provided by the SEC, including by way of example, the responsibilities of Alpine outlined in FINRA Regulatory Notice 09-05. *See also* SEC Office of Compliance Inspections and Examinations, Broker-Dealer Controls Regarding Customer Sales of Microcap Securities (October 9, 2014). Alpine failed to investigate and determine whether the parties with whom Ligi and Mesa contracted with had been involved in other pump and dump schemes, or other securities violations.

59. On information and belief, Alpine did not conduct a reasonable inquiry regarding the opinion letter provided to it by Mesa and Isen in light of the facts disclosed to Alpine and the actual or constructive knowledge of Alpine. For example, NTM 09-05 provides that:

In considering their obligations, firms should be aware that there are limitations on their ability to discharge those obligations by relying on others. FINRA, the SEC and the courts have repeatedly held that firms cannot rely on outside counsel, clearing firms, transfer agents, issuers, or issuer's counsel to discharge their obligations to undertake an inquiry. Moreover, **the fact that securities have been issued by a transfer agent**

**without a restrictive legend, or have been put into trading status by a clearing firm, does not mean that those securities can be resold immediately and without limitation under the Securities Act**…Recent investigations have uncovered fact patterns in which firms inappropriately relied on stock certificates issued without restrictive legends **or certificates accompanied by false attorney opinions**, or assumed that their clearing agent had the responsibility to determine if shares could be sold without restriction. [F]irms are still responsible for the discharge of their obligations, even if they rely on third parties to perform certain activities and functions related to their business operations and regulatory responsibilities.

*Id*. (emphasis added).

60. On information and belief, Alpine did not conduct a reasonable inquiry regarding the control person, persons with authority, ownership of the Mesa and other risks associated with the type of account held by Mesa. For example, the SEC identified "certain types of accounts that appeared to be frequently associated with the unregistered sale of large quantities of the illiquid shares of microcap issuers, including sales of restricted securities on behalf of corporate insiders. They included certain omnibus accounts, which can be used to disguise the trading activity of the accounts' beneficial owners by commingling securities and funds from several beneficial owners. Examples of such omnibus accounts included, but were not limited to: …Accounts held in the name of a corporate entity (or LLC), either for the company's own use or as a third-party custodian on behalf of other beneficial shareholders or customers, which disguise the unregistered sales of securities owned by corporate insiders of the company and allow for those insiders to withdraw proceeds individually[.]" *See* SEC Office of Compliance Inspections and Examinations, Broker-Dealer Controls Regarding Customer Sales of Microcap Securities (October 9, 2014).

61. On or about November 3-4, 2017, based on Mesa and Alpine's refusal to mitigate any damages resulting from Isen and Mesa's fraudulent inducement to enter the

Settlement Agreement and Convertible Note and the continued sales by Mesa that have severely depressed the market for ProBility's stock, in an additional effort to minimize judicial intervention in the dispute between ProBility and the Defendants, ProBility performed the following additional efforts to mitigate the dispute and minimize prolonged judicial intervention in the controversy forming the basis of this Complaint (collectively, "Rescission Notices"):

    a.  Provided notice to Alpine and Mesa of the view that: (i) "Section 3(a)(10) Applies to Initial Issuance of Securities to Mesa," not the resale thereof; (ii) Mesa is an affiliate of ProBility for purposes of Rule 144 as a beneficial owner of more than 10% of ProBility's stock; and (iii) Alpine was relying on false representations in violation of its duties under the Exchange Act and FINRA rules. A true and correct copy of the correspondence to Alpine dated November 3, 2017 is attached hereto as <u>Exhibit G</u> (exhibits thereto redacted).

    b.  Provided notice of prepayment and tendered payment to Mesa at a 140% premium of the principal and accrued interest under the Convertible Note for total consideration of $174,720. A true and correct copy of the correspondence to Mesa dated November 3, 2017 is attached hereto as <u>Exhibit H</u>.

    c.  Provided notice of rescission and payment to Mesa of a 150% premium of the principal and accrued interest pursuant to the default provisions under the Convertible Note Convertible Note for all shares in either Mesa's possession, or the possession of its agent, Alpine, including but not limited to ProBility's initial review of the issues associated with the Settlement Agreement and Convertible Note, the beneficial ownership limitations, defaults due to impossibility/frustration of purpose and illegality, similar to the factual allegations underlying the present Complaint. A true and correct copy of the correspondence to Mesa (one of two related to the shares

underlying two different certificates) dated November 4, 2017 is attached hereto as <u>Exhibit I</u> (exhibits thereto redacted).

62. From ProBility's perspective, the entire purpose of the Settlement Agreement, Convertible Note and services/transactions related thereto was completely frustrated. However, from Mesa's perspective, it was a huge success, albeit at the expense of the securities markets, ProBility and each and every other shareholder of ProBility. Put simply, had ProBility known of the Mesa Defendants' true intentions, it would ***never*** have agreed to the plan, but instead it would have, among other efforts, argued the SEC's position, pursued legitimate business transactions, engaged other lawful investor relations firms, waited the few additional months to allow stockholders to sell under the safe harbor provisions of Rule 144.

63. To date, as a result of these events, the decreased price and the increased volatility in ProBility stock has made it difficult, near impossible or severely weakened ProBility's ability to capitalize its continuing operations and/or to seek various forms of longer term financing, causing ProBility to suffer irreparable injury and other damages as a result of Defendants' conduct.

### <u>Governing Law of Section 3(a)(10) of the Securities Act</u>

64. Section 3(a)(10) of the Securities Act is an exemption from Securities Act registration for offers and sales of securities in specified exchange transactions that exempts "any security which is issued in exchange for one or more bona fide outstanding securities, claims or property interests…where the terms and conditions of such issuance and exchange are approved, after a hearing upon the fairness of such terms and conditions at which all persons to whom it is proposed to issue securities in such exchange shall have the right to appear, by any court," or by any agency or other governmental authority "expressly authorized by law to grant such approval." 15 U.S.C.A. § 77c(a)(10).

**1. Section 3(a)(10) Only Exempts Issuance of Convertible Note, Not Shares on Subsequent Conversion**

65. The Settlement Agreement, as ordered and approved by the June 20th Order, exempts both the issuance of the Convertible Note and the "Settlement Shares" (the shares issued in conversion of the Convertible Note) from the registration requirements under the Securities Act of 1933 (the "Securities Act") in contravention of well-established rules on Section 3(a)(10)[6] transactions thereunder.[7]

66. The Settlement Agreement, as ordered and approved by the June 20th Order, **could not exempt the issuance of the "Settlement Shares."** While the Court approved the issuance of the Convertible Note, the later exercise/conversion of the Convertible Note is not exempt from the Securities Act under Section 3(a)(10). The SEC has made clear that the issuance of the Convertible Note would be exempt, but its later conversion would not, by stating "it is important to note that **when options, warrants, or other convertible securities are issued in the Section 3(a)(10) transaction, <u>Section 3(a)(10) does not exempt the later exercise or conversion</u>**." SEC Division of Corporate Finance, Staff Legal Bulletin No. 3A (CF) (June 18, 2008) Release No. SLB -3A (emphasis added).

67. This long-standing rule follows, and is derived from, similar prior no-action letter responses from the SEC. *See* Allied Leisure Indus., Inc. (S.E.C. No - Action Letter Oct. 4, 1979) 1979 WL 14401, at *2 ("However, the Division is unable to conclude that it would not recommend enforcement action if the above warrants are exercised and the underlying common stock issued without compliance with the registration provisions of the Act. Such exercise would appear to involve the sale of the underlying common stock, which is subject to registration absent an appropriate exemption. We cannot concur with

---

[6] Section 3(a)(10) exempts "any security which is issued in exchange for one or more bona fide outstanding securities, claims or property interests[.]" 15 U.S.C.A. § 77c(a)(10).

[7] *See, e.g.*, Settlement Agreement, ¶¶ 1, 2, 5.

your view that the exemption provided by Section 3(a)(9) is available under these circumstances."); *see also* Canadian Conquest Expl. Inc. (S.E.C. No - Action Letter Apr. 6, 1989) 1989 WL 245804, at *1 ("Division will not recommend any enforcement action to the Commission if CCE, in reliance upon your opinion as counsel that the exemption provided by Section 3(a)(10) of the Securities Act of 1933 (the "Securities Act") is available, issues its common stock and warrants (**but not the common stock underlying such warrants**) as described without registration under the Securities Act[.]") (emphasis added).

### 2. Section 3(a)(10) Exempts Initial Issuance, Not Subsequent Resale or Transfer Transaction

68. Additionally, the Settlement Agreement, as ordered and approved by the June 20th Order, exempts both the issuance of the "Settlement Shares" and the resale or transfer thereof in contravention of Section 4 of the Securities Act (and the rules thereunder). Section 3 covers exempt securities, while section 4 covers exempt transactions – any resale or transfer must be exempt under other available transactional exemptions, which such resale or transfer was not exempt, such as Section 4(a)(1) of the Securities Act.[8]

69. The Settlement Agreement, as ordered and approved by the June 20th Order, **could not exempt the resale or transfer of the "Settlement Shares"** as a transactional exemption. A "determination that a recipient of unregistered securities acquired in this

---

[8] Assuming "all of the conditions of Section 3(a)(10) are met, the issuance, exchange, or transfer of unregistered securities is exempted from the registration requirements of the Act[,]" but such exemption does not answer "whether the recipients are free to resell the unregistered securities without having to find an independent exemption." 7 J. William Hicks, *Exempted Transactions Under the Securities Act of 1933* § 3:80 (2017). Section 3 covers exempt securities, while section 4 covers exempt transactions. "The generally accepted opinion is that Section 3(a)(10) is a transactional exemption that applies to the issuance or exchange of securities, but not to subsequent resales or transfers…Consequently, resales of securities that were acquired under [Section 3(a)(10)] must be analyzed in terms of other available exemptions, especially Section 4(a)(1) and Rule 144." *Id.* (emphasis added).

type of exempted transaction may immediately resell an unlimited amount of these securities through a broker or otherwise cannot be made without considering such factors as (1) the status of the securities under Rule 144(a)(3); (2) the status of the selling security holder; (3) the nature of the proposed sale; and (4) the type of transaction in which the securities were originally issued or exchanged." 7 J. William Hicks, *Exempted Transactions Under the Securities Act of 1933* § 3:80 (2017).

70. As Mesa is an "affiliate of the issuer," the SEC has made clear that even if the issuance of the "Settlement Shares" would be exempt (assuming such were not convertible as provided above), the later resale or transfer transaction of the "Settlement Shares" would not by stating "it is the Division's view that securities received in a Rule 145(a) transaction not involving a shell company that was exempt under Section 3(a)(10) may generally be resold without regard to Rule 144 **if the sellers are not affiliates of the issuer of the Section 3(a)(10) securities** and have not been affiliates within 90 days of the date of the Section 3(a)(10)-exempt transaction, as such securities would not constitute "restricted securities" within the meaning of Rule 144(a)(3) under the Securities Act. **In the event that the securities are held by affiliates of the issuer, those holders <u>may be able to resell</u> the securities in accordance with the provisions of Rule 144.**" SEC Division of Corporate Finance, Staff Legal Bulletin No. 3A (CF) (June 18, 2008) Release No. SLB -3A (emphasis added).

71. This long-standing rule follows, and is derived from, similar prior no-action letter responses from the SEC. In a no action request in a similar 3(a)(10) transaction, the SEC stated "[w]ith respect to the public resale…, the Division will not recommend any enforcement action to the Commission if persons who are not affiliates of Delhi International at the time the Debentures are issued and at the time the Debentures or shares of Common Stock are resold make sales without compliance with the registration requirements of the Act in reliance upon Section 4(1) thereof. **Persons who may be deemed affiliates may resell their shares by complying with the volume and**

**transaction provisions of Rule 144 under the Act**." Delhi Int'l Oil Corp. (S.E.C. No - Action Letter Mar. 25, 1977) 1977 WL 10620, at *3 (emphasis added).

72. Rule 144 broadly defines an "affiliate of an issuer [as] a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer." 17 C.F.R. § 230.144(a)(1). A "beneficial owner of 10 percent or more of the voting securities of a company is presumptively a control person" of the issuer and "SEC guidelines under the Securities Exchange Act of 1934 (Rule 13d-3 and Rule 16a-1) are customarily used by persons in determining the existence and extent of a person's beneficial ownership of an issuer's voting securities for purposes of the 1933 Act." 7A J. William Hicks, *Exempted Transactions Under the Securities Act of 1933* § 10:39 (2017). As discussed in Paragraphs 73 through 83 of this Complaint, Mesa was and is a beneficial owner of more than 10% of the shares of ProBility at the time of Settlement Agreement and the date of Mesa's notice of conversion (still remains subject to the 60-day provision under Rule 144); thus, Mesa was an "affiliate" of ProBility and its resales were in violation of Section 4(a)(1) of the Securities Act, and the safe harbor promulgated thereunder in Rule 144.

### Beneficial Ownership under Federal Securities Law

**1. Beneficial Ownership under Rule 13d-3**

73. Under Rule 13d-3 of the Exchange Act ("Rule 13d-3"), a person is a beneficial owner of an equity security if that person, either directly or indirectly, has or shares: (1) voting power, including the power to vote, or to direct the voting of, the security; or (2) investment power, including the power to dispose, or to direct the disposition of, the security. *See* 17 C.F.R. § 240.13d-3(a). Rule 13d-3's wide net also encompasses persons who have the right to acquire beneficial ownership through conversion of a convertible securities (such as the Convertible Note) – a person is deemed a beneficial owner of a security if that person has the right to acquire beneficial ownership of an equity security within 60 days (including through conversion). *Id.*; *see also* 17 C.F.R. § 240.13d-3(d)(1) ("A person shall be deemed to be the beneficial owner of a security…if that person has

the right to acquire beneficial ownership of such security…within sixty days, including but not limited to any right to acquire: (A) Through the exercise of any option, warrant or right; (B) through the conversion of a security… Any securities not outstanding which are subject to such options, warrants, rights or conversion privileges shall be deemed to be outstanding for the purpose of computing the percentage of outstanding securities of the class owned by such person but shall not be deemed to be outstanding for the purpose of computing the percentage of the class by any other person."). Further, a person who, directly or indirectly, creates or uses a trust, proxy, power of attorney, pooling arrangement, or any other contract, arrangement, or device with the purpose or effect of divesting itself of beneficial ownership of a security or preventing the vesting of beneficial ownership as part of plan or scheme to evade the reporting requirements of Section 13(d) or 13(g) is deemed, for those sections, to be the beneficial owner of that security. 17 C.F.R. § 240.13d-3(b).

74. On June 20, 2017, when the Settlement Agreement became effective and when Mesa converted a portion of shares, Mesa was Mesa had already acquired, held and still holds two additional convertible notes: a 15% Convertible Promissory Notes due May 26, 2018 ("Note 1") and a 15% Convertible Promissory Notes due June 7, 2018 ("Note 2").

75. As of June 20, 2017 (which subsequently increased due to the accrual of interest under the Convertible Note), Mesa was the beneficial owner, under Rule 13d-3, of approximately 10.37% of the common stock of ProBility (having a right to acquire approximately 5,266,667 shares under the Convertible Note, Note 1 and Note 2).[9] *See* Form 10-Q, Quarterly Period Ended April 30, 2017 (filed June 19, 2017)[10] ("As of June

---

[9] Mesa has the right to acquire 100,000 shares under Note 1, 166,667 shares under Note 2 and initially 5,000,000 shares under Note 3 (at the time of issuance, which increased due to the accrual of interest).

[10] Available at https://www.sec.gov/Archives/edgar/data/1530981/000168316817001623/probility_10q-043017.htm.

19, 2017, there were 45,508,841 shares of the issuer's common stock, par value $0.001, outstanding.").

### 2. Beneficial Ownership Limitation in Settlement Agreement is Illusory/Sham Conversion Cap

76. The Settlement Agreement, as ordered and approved by the June 20th Order, provides that the issuance and delivery of the Convertible Note and "the shares of Common Stock to be issued under the Convertible Note (the 'Settlement Shares')" are "subject to the beneficial limitations set forth" therein. *See* Settlement Agreement, ¶ 2.

77. The sole limitation, provision or restriction related to beneficial ownership in the Settlement Agreement provides that "[u]nder no circumstances will PROBILITY issue to MESA…at any one time a number of shares which, when aggregated with all shares of Common Stock then beneficially owned or controlled by MESA or its affiliates, exceed 9.99% of the total number of shares of Common Stock outstanding after such issuance." *See* Settlement Agreement, ¶ 5 (referred hereafter as the "Issuance Cap").

78. However, the Issuance Cap does not satisfy SEC guidance for an effective beneficial ownership limitations as it is not binding and illusory. SEC guidance provides that "[c]onversion provisions that limit the ownership of a class of securities must be binding and valid (*e.g.*, provisions that are non-waivable, enforceable, established in the issuer's governing instruments, applicable to affiliates and assigns, etc.) to effectively eliminate the right of the holder of the convertible securities to acquire the underlying shares and, thereby, relieve the holder of a beneficial ownership report filing obligation." *See* Exchange Act Sections 13(d) and 13(g) and Regulation 13D-G Beneficial Ownership Reporting (July 14, 2016) at Question 105.03[11] (citing Brief of the SEC as Amicus Curiae Supporting Appellees, *Levy v. Southbrook Int'l Investments*, 263 F.3d 10 (2d Cir.2001) (No. 00–7630), 2001 WL 34120374).

---

[11] Available at https://www.sec.gov/divisions/corpfin/guidance/reg13d-interp.htm.

79. However, on examination, the beneficial limitations of the Issuance Cap in the Settlement Agreement were: (i) easily **waivable** by the parties (particularly the holder of the convertible securities); (ii) **lacked an enforcement mechanism**; (iii) were **not adhered to** in practice; and/or (iv) **could be avoided** by transferring the securities to an affiliate of Mesa. For example, Mesa did not follow adhere to the limitation/provision when it issued its conversion notice directly to ProBility's transfer agent (without notifying ProBility) on or about June 20, 2017. Further, as Mesa could purchase additional securities by affiliates, or transfer securities to affiliate, without notice to ProBility or without ProBility's knowledge, there was no effective enforcement mechanism, or any binding obligation on the part of Mesa. In addition, the beneficial limitations in the Settlement Agreement were <u>not</u>, or did <u>not</u>: (1) provide in the certificate of designation or the ProBility's governing instruments; (2) reflect limitations established by another regulatory scheme applicable to ProBility; (3) product of bona fide negotiations between the parties; or (4) limit the number of conversions that may take place over a period of time.

80. Thus, the beneficial ownership limitations (or conversion cap) was, according to SEC guidance, illusory or a sham (not binding or invalid), and should be disregarded, analyzed as through no such limitations existed and ineffective at preventing the vesting of a 10% beneficial ownership interest with Mesa.

### Beneficial Ownership Reporting Requirements

81. Section 13(d) of the Exchange Act (15 U.S.C. § 78m(d)), and Rule 13d-1 (17 C.F.R. § 240.13d-1) promulgated thereunder, require any person who acquires 5 percent or more of a class of securities of a publicly traded company (registered under Section 12 of the Exchange Act), like ProBility, to file a Schedule 13D disclosure with the Securities and Exchange Commission ("SEC") **within 10 days** of the acquisition of the stock and to disclose in that filing, including, among other things: the number of shares beneficially owned; the source and amount of the funds to be used in the acquisition; information as to any contracts, agreements, or understandings with any entity relating to the securities

of the issuer; and the beneficial owner's plans for the issuer's business and governance. Where a group of persons owning more than 5 percent of an issuer's stock has agreed to act together for the purpose of acquiring, holding, voting or disposing of such stock, the information required by Section 13(d) must be disclosed with respect to each member of the group and with respect to the group as a whole.

82. Rule 13d-2 (17 C.F.R. § 240.13d-2) requires such person to timely amend the Schedule 13D if any material changes occur.

83. Section 13(d) mandates disclosures that allow stockholders to know critical information about the identities and intentions of large stockholders. Thus, the purpose of Section 13(d) is to alert the marketplace to large accumulations of securities which might represent a potential shift in corporate control or otherwise affect the market price. Section 13(d) is not a mere "technical" reporting provision; it is rather, the "pivot" of a regulatory scheme that may represent the only way that corporations, their shareholders and others can adequately evaluate the possible effects of a change in substantial shareholdings. Pursuant to § 16(a)(4) of the Exchange Act (15 U.S.C. § 78p(a)(4)), such reports are made available to the investing public on the SEC's website.

## V.    CLAIMS AGAINST DEFENDANTS
## FIRST CLAIM FOR RELIEF
### Violation of Section 13(d) of the Securities Exchange Act of 1934
### (Against Defendants Mesa, Ligi and Does 1-10)

84. ProBility incorporates and realleges the allegations set forth in Paragraphs 1 through 83 of this Complaint as though fully set forth herein.

85. Despite the fact that the Defendants Ligi and his alter ego, Mesa, and perhaps others, have beneficially owned at least 5 percent of ProBility stock and agreed to act together for the purpose of voting such stock since a date not later than June 20, 2017, it did not file a Schedule 13D (as specifically alleged in paragraphs 73-83).

86. Defendants violated Section 13(d) of the Exchange Act by failing to disclose their beneficial ownership of ProBility.

87. Defendants repeated failure to make proper disclosure of its beneficial ownership of ProBility's securities was material to ProBility shareholders and to the investing public, and concerns precisely the kind of information Section 13(d) requires to be made public.

88. ProBility and its shareholders have been injured by Defendants' conduct.

89. In accordance with Section 13(d) of the Exchange Act, ProBility is entitled to injunctive relief to prevent future violations.

90. ProBility's shareholders and the investing public will be irreparably harmed in the absence of the relief as prayed for herein.

## SECOND CLAIM FOR RELIEF

**Disgorgement of Short-Swing Profits in Violation of Securities Exchange Act of 1934 § 16(b) (15 U.S.C. 78p(b))**

**(Against Defendants Mesa, Ligi and Does 1-10)**

91. ProBility incorporates and realleges the allegations set forth in Paragraphs 1 through 90 of this Complaint as though fully set forth herein.

92. Section 16(a) of the Exchange Act, 15 U. S. C. 78p(a), establishes a mechanism for reporting information to notify issuers and security holders of short-swing transactions, thereby facilitating actions for recovery of profits under Section 16(b) of the Exchange Act.

93. Under Section 16(a), insiders must comply with the disclosure requirements by filing an initial beneficial ownership report, a "Form 3" report, and subsequent change in beneficial ownership reports, or "Form 4" reports, with the Securities and Exchange Commission (17 C.F.R. 240.16a-3(a)).

94. Disclosure information specified in the Form 3 and Form 4 reports is mandatory, and information disclosed is a matter of public record available for inspection by members of the public.

95. Insiders must disclose any change in their ownership of securities by filing a Form 4 before the end of the second business day following such change. Those reports are

made available to the public and set forth the insider's name, the date of the transaction, the number of shares bought or sold and the price per share.

96. These requirements exist so that a corporation may quickly determine whether a statutory insider has profited from a short-swing transaction by examining the Form 4s filed with the SEC. The issuer may then use the Form 4s to establish 16(b) liability.

97. ProBility is informed and believes and thereon alleges that, at all times relevant herein, Defendants Mesa and Ligi and Does 1 through 10 acted as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of the securities of ProBility, such that they became a single owner of ProBility's common stock (as specified by Section 13(d)(3) of the Securities Exchange Act of 1934) for purposes of sections 16(a) and 16(b).

98. Defendants therefore directly or indirectly became the beneficial owners of more than ten percent of the common stock of ProBility, which is a class of equity security which is registered under Exchange Act Section 12 (15 U.S.C. § 78l). Defendants were therefore obligated to file timely reports on SEC Forms 3 and 4 disclosing their initial beneficial ownership and any changes in beneficial ownership.

99. ProBility is informed and believes and thereon alleges that Defendants, and each of them, failed to make timely disclosures concerning their beneficial ownership of ProBility's common stock as required by Exchange Act Section 16(a) (15 U.S.C. § 78p(a)) and Rule 16a-3 (17 C.F.R. §240.16a-3) because at all relevant times Defendants failed and refused to file the relevant SEC Forms 3 and 4.

100.     ProBility is informed and believes and thereon alleges that these failures to disclose beneficial ownership of ProBility's common stock concealed that the Defendants, within a period of six months, directly engaged in short-swing trading through their own accounts and/or had indirectly engaged in short-swing trading through the accounts of certain strawmen which they controlled, including but not limited to DOES 1-10. Defendants' sale of ProBility's common stock during the manipulation scheme resulted in their receipt of short-swing trading profits therefrom.

101.    By law, short-swing trading profits under 16(b) inure to the issuer and are gains of the issuer. Both an issuing company and shareholders of an issuing company have a statutory right to sue on behalf of the company to recover short-swing profits.

102.    These failures to disclose the Group's beneficial ownership and stock sales deprived both ProBility and ProBility's public shareholders of the means to discover short-swing trades and had the effect of denying ProBility and its shareholders the right to recover short-swing profits for the benefit of ProBility.

103.    Before each short-swing transaction, Defendants and Does 1-10 were beneficial owners of 10% of the outstanding common stock of ProBility.

104.    By reason of the foregoing, Defendants and Does 1-10 violated Exchange Act Section 16(a) (15 U.S.C. § 78p(a)) and Rule 16a-3 (17 C.F.R. §240.16a-3) thereunder.

105.    By reason of the foregoing, Defendants and Does 1-10, directly or indirectly, violated Section 16(b) of the Securities Exchange Act of 1934.

## THIRD CLAIM FOR RELIEF

### Breach of Contract

### (Against Isen, Mesa and FSC)

106.    ProBility incorporates and realleges the allegations set forth in Paragraphs 1 through 105 of this Complaint as though fully set forth herein.

107.    On or about April 2017, ProBility entered into an oral agreement with Isen, on behalf of himself, FSC and Mesa (the "Mesa Defendants"), based on the oral promises of Isen, on behalf of the Mesa Defendants, providing that ProBility would enter into a series of transactions that resulted in a transfer of shares below at a below market price to Mesa, in which Isen, through his control and authority over Mesa, could avoid market volatility and decreased stock price of ProBility, while concurrently stabilizing the market through orderly sales and a robust marketing campaign.

108.    Based on the Mesa Defendants' oral agreement, ProBility agreed to a below market conversion price of $0.04 per share. ProBility would not have agreed to this conversion price otherwise.

109.    The Mesa Defendants have repudiated this contract by implication, by: (i) selling and continuing to sell ProBility shares in large volumes that has decreased the price of the stock and increased the volatility of the market for ProBility making it difficult or impossible for ProBility to capitalize its continuing operations and/or to seek various forms of longer term financing, causing ProBility to suffer injury and other damages as a result of the Mesa Defendants' conduct; (ii) through Isen being named in both criminal and civil securities fraud complaints on January 12, 2017, marking Mesa Defendants' performance futile or impossible.

110.    At the time of the Mesa Defendants' acts of repudiation, ProBility had performed the terms of the contract in the manner specified by the contract.

111.    ProBility has performed all conditions, covenants, and promises required to be performed in accordance with the terms and conditions of the agreement, except where such performance was excused by the conduct and/or breaches of the Mesa Defendants.

112.    Such failure and refusal by the Mesa Defendants to honor the oral agreement constitutes a breach. Mesa Defendants' conduct is a breach of the terms of the agreement between ProBility and the Mesa Defendants, which was premised on the understanding that the Mesa Defendants would not engage in conduct designed to depress artificially the price of ProBility's stock.

113.    ProBility has been damaged as a direct and proximate result of the Mesa Defendants' breach. Among other losses, the Mesa Defendants' breach has adversely affected ProBility's share value, ProBility has lost significant capital on the below market prices of the converted shares sold into the market and lost significant market valuation that has affected its ability to execute pending acquisitions and financing transactions or will cause materially detrimental amendments to the proposed terms.

114.     Further, pursuant to the Settlement Agreement, "upon delivery of the Convertible Note in accordance with paragraph 2" of the Settlement Agreement, the Mesa Defendants were required to file with the Superior Court "a dismissal with prejudice of" ProBility. ProBility delivered the Convertible Note on June 20, 2017, but the Mesa Defendants have refused, and continue to refuse, to dismiss ProBility in the California State Court Action. *See* Settlement Agreement, ¶ 12.  Rather, despite that the California State Court Action should have been dismissed on June 20, 2017, the Mesa Defendants have exacerbated the breach of the Settlement Agreement by causing additional expense and damages to ProBility by serving ProBility, in the California State Court Action, with multiple forms of discovery (form interrogatories, requests for admissions and requests for production) on December 18, 2017. Thus, ProBility has been further damaged as a direct and proximate result of the Mesa Defendants' breach of the written contract, among other losses, by the incurred legal expenses associated with the continued litigation in the California State Court Action.

115.     As specific performance is unavailable, ProBility is entitled to rescission of the oral agreements and all transactions related thereto as well as the Settlement Agreement,  and a return of the value of ProBility's stock.

116.     In the alternative, in the event that the Court does not order specific performance or rescission, ProBility is entitled to money damages in an amount to be proven at trial, but in no event less than the value of the market price of the stock, plus statutory interests and costs as the Court deems just and reasonable.

117.     ProBility is further entitled to lost income that it would have earned had the oral contract been honored and attorney's fees for the Mesa Defendants' refusal to dismiss the California State Court Action.

## **FOURTH CLAIM FOR RELIEF**

### **Negligent Misrepresentation**

### **(Against All Defendants)**

118.     ProBility incorporates and realleges the allegations set forth in Paragraphs 1 through 117 of this Complaint as though fully set forth herein.

119.     At the time of entering into the oral agreement, Settlement Agreement and Convertible Note, Isen, Mesa and FSC owed a duty to ProBility to disclose facts which, if not disclosed, would likely mislead ProBility regarding the oral agreement, Settlement Agreement and Convertible Note.

120.     At the time of entering into the oral agreement, Settlement Agreement and Convertible Note, Isen, Mesa and FSC, failed to disclose the material fact that Isen was the subject of a SEC and DOJ investigation for criminal and civil securities fraud that would make performance of their promises impossible and would cause irreparable reputational harm to ProBility.

121.     At the time of entering into the oral agreement, Settlement Agreement and Convertible Note, Isen, Mesa and FSC, failed to disclose the material fact that Isen, Mesa and FSC did not intend to honor their promises or obligations as this was another "pump and dump" by Isen and FSC, through their straw man, Mesa.

122.     At the time of the Alpine Demand to remove the restrictive legends on the Transferred Shares, Alpine knew or should have known of the agreements, the breaches thereof, and the charges against Isen, an integral party in which Alpine had previously communicated with on behalf of Mesa.  Alpine did not make any reasonable inquiry as required under Section 5 of the Securities Act or FINRA rules, but nonetheless, represented to both ProBility and the transfer agent, "in order to induce [ProBility]…transfer the" shares owned by Mesa that it is about to sell "in a manner satisfying the requirements of Section(g), Rule 144 of the Securities Act of 1933" that "after such reasonable inquiry, is not aware of any facts indicating that the information

1  supplied by [Mesa] to [Alpine] in connections with the sale of the above described

2  securities was not complete and accurate as of the date of the sale of such securities."

3      123.     At the time of the Alpine Demand and subsequent correspondence with

4  Alpine, Alpine failed to disclose that it did not perform a reasonable inquiry of the shares

5  it intended to sell and that Alpine misrepresented certain statements or omitted certain

6  statements to both ProBility and its transfer agent in order to remove the restrictive

7  legends on the shares converted by the Mesa Defendants.

8      124.     Defendants had no reasonable grounds for believing the representations were

9  true when they made the representations.

10      125.     ProBility reasonably relied on the Defendants' representations.

11      126.     ProBility was harmed.

12      127.     ProBility's reliance on Defendants' representations was a substantial factor

13  in causing ProBility's harm.

14  **FIFTH CLAIM FOR RELIEF**

15  **Common Law Fraud**

16  **(Against Ligi, Mesa, Isen and FSC)**

17      128.     ProBility incorporates and realleges the allegations set forth in Paragraphs 1

18  through 127 of this Complaint as though fully set forth herein.

19      129.     In order to induce ProBility to enter into the oral agreement, Settlement

20  Agreement and Convertible Note, Isen, Mesa and FSC made materially false statements

21  or material omissions and the reasons each statement was knowingly false when made are

22  described above in paragraphs 22-38, 40-45.

23      130.     As explained above and in paragraphs 22-38, ProBility reasonably relied

24  upon Isen, Mesa and FSC's false statements.

25      131.     Isen, Mesa and FSC had a duty to disclose to ProBility based on their

26  material misrepresentations, absent disclosure would be misleading.

27      132.     At the time of the material misrepresentations and omissions identified

28  above by each of the Defendants, ProBility was ignorant of their falsity and believed

them to be true. Had ProBility known of the truth at the time, they would not have entered into the Convertible Note at a below market conversion price (or at all), entered into the Settlement Agreement (or at all), sought a 3(a)(10) exemption, withdrew its argument that ProBility was not a shell company with the SEC, issued or transferred the shares or engaged in any business relationship with Defendants. Indeed, the material misrepresentations and omissions on each of these occasions caused ProBility harm.

133.     ProBility's reliance on each of the Defendants' material misrepresentations and omissions (identified above) was justified.

134.     As a proximate result of Defendants' respective intentional material misrepresentations, as herein alleged, ProBility has suffered damages which will be established according to proof at trial, in an amount in excess of this Court's minimum jurisdiction.

## **SIXTH CLAIM FOR RELIEF**

### **Rescission under Cal. Civ. Code § 1689**

### **(Against Mesa, Ligi, Isen and FSC)**

135.     ProBility incorporates and realleges the allegations set forth in Paragraphs 1 through 134 of this Complaint as though fully set forth herein.

136.     As provided in Paragraphs 65-67, neither the June 20th Order nor the Settlement Agreement may: (1) exempt the issuance of the Convertible Note **and** (2) the issuance of the "Settlement Shares" under Section 3(a)(10) of the Securities Act. As the terms of the Settlement Agreement, which only became binding based on the upon the entry of the June 20th Order (see Settlement Agreement, ¶4), exempted both the issuance of the Convertible Note and the "Settlement Shares," it is **unlawful and must be rescinded** pursuant to Cal. Civ. Code § 1689(b)(5).[12] *See* 15 U.S.C.A. § 77n ("Any

---

[12] Alternatively, the Settlement Agreement, as ordered and approved by the June 20th Order, is premised on a mistake of law and should be rescinded pursuant to Civ. Code, § 1689(b)(1).

condition, stipulation, or provision binding any person acquiring any security to waive compliance with any provision of this subchapter or of the rules and regulations of the Commission shall be void."); *see also* 15 U.S.C.A. § 78cc(b) ("Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, and every contract (including any contract for listing a security on an exchange) heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, shall be void[.]"); *see also* Convertible Note, ¶ 9 ("If any term in this Note is found by a court of competent jurisdiction to be unenforceable, then the entire Note shall be rescinded, the consideration proffered by the Holder for the remaining Debt acquired by the Holder not converted by the Holder in accordance with this Note shall be returned in its entirety and any Conversion Shares in the possession or control of the Investor shall be returned to the Issuer.").

137.     As provided in Paragraphs 68-72, the Settlement Agreement (or the June 20th Order approving such agreement) **may not** extend the exemption to securities of the issuance of the Convertible Note (or the "Settlement Shares") under Section 3 of the Exchange Act to the exemption to transactions under Section 4 of the Securities Act. As Mesa is an "affiliate of the issuer," it may only be able to resell the shares (assuming such were not convertible as discussed previously) in compliance with the volume and transaction provisions of Rule 144. As the terms of the Settlement Agreement, which only became binding based on the upon the entry of the June 20th Order (see Settlement Agreement, ¶4), exempt both the issuance of the of the Convertible Note (or the "Settlement Shares") and the subsequent resale or transfer transaction, it is **unlawful and**

**must be rescinded** pursuant to Cal. Civ. Code § 1689(b)(5).[13] *See* 15 U.S.C.A. § 77n; *see also* 15 U.S.C.A. § 78cc(b); *see also* Convertible Note, ¶ 9.

138.　　When ProBility and Mesa executed the Settlement Agreement, either ProBility and Mesa's consent was based on misapprehension of the law, or ProBility's consent was based on misapprehension of the law, of which Mesa was aware at the time of contracting, but did not rectify, that Mesa a beneficial owner of more than 9.99% of ProBility's common stock and should be rescinded pursuant to Cal. Civ. Code § 1689(b)(1). Such misapprehension of the law includes, among others, the following:

> a. As provided in Paragraphs 73-75, on June 20, 2017, when the Settlement Agreement became effective and when Mesa converted a portion of shares, Mesa was Mesa had already acquired, held and still holds two additional convertible notes: a 15% Convertible Promissory Notes due May 26, 2018 ("Note 1") and a 15% Convertible Promissory Notes due June 7, 2018 ("Note 2"). As of June 20, 2017 (which subsequently increased due to the accrual of interest under the Convertible Note), Mesa was the beneficial owner, under Rule 13d-3, of approximately 10.37% of the common stock of ProBility (having a right to acquire approximately 5,266,667 shares under the Convertible Note, Note 1 and Note 2).[14] *See* Form 10-Q, Quarterly Period Ended April 30, 2017 (filed June 19, 2017)[15] ("As of June 19, 2017,

---

[13] Alternatively, the Settlement Agreement, as ordered and approved by the June 20th Order, is premised on a mistake of law and should be rescinded pursuant to Civ. Code, § 1689(b)(1).

[14] Mesa has the right to acquire 100,000 shares under Note 1, 166,667 shares under Note 2 and initially 5,000,000 shares under Note 3 (at the time of issuance, which increased due to the accrual of interest).

[15] Available at https://www.sec.gov/Archives/edgar/data/1530981/000168316817001623/probility_10q-043017.htm.

there were 45,508,841 shares of the issuer's common stock, par value $0.001, outstanding.").

b.  As provided in Paragraphs 76-80, the beneficial limitations of the Issuance Cap in the Settlement Agreement were: (i) easily **waivable** by the parties (particularly the holder of the convertible securities); (ii) **lacked an enforcement mechanism**; (iii) were **not adhered to** in practice; and/or (iv) **could be avoided** by transferring the securities to an affiliate of Mesa. For example, Mesa did not follow adhere to the limitation/provision when it issued its conversion notice directly to ProBility's transfer agent (without notifying ProBility) on or about June 20, 2017. Further, as Mesa could purchase additional securities by affiliates, or transfer securities to affiliate, without notice to ProBility or without ProBility's knowledge, there was no effective enforcement mechanism, or any binding obligation on the part of Mesa. In addition, the beneficial limitations in the Settlement Agreement were <u>not</u>, or did <u>not</u>: (1) provide in the certificate of designation or the ProBility's governing instruments; (2) reflect limitations established by another regulatory scheme applicable to ProBility; (3) product of bona fide negotiations between the parties; or (4) limit the number of conversions that may take place over a period of time. Therefore, the beneficial ownership limitations (or conversion cap) were, according to SEC guidance, illusory or a sham (not binding or invalid), and should be disregarded and analyzed as through no such limitations existed and ineffective at preventing the vesting of a 10% beneficial ownership interest with Mesa, or other affiliates.

139.   As explained above and in paragraphs 106-117, the consideration fails or is void and therefore, the Settlement Agreement and Convertible Note should be rescinded pursuant to Cal. Civ. Code §§ 1689(b)(2)-(3).

140.     As explained above and in paragraphs 128-134, the consent of ProBility to the Settlement Agreement and Convertible Note was obtained through fraud and should be rescinded pursuant to Cal. Civ. Code §§ 1689(b)(1).

141.     On or about July 28, 2017, ProBility promptly gave notice to Mesa of rescission and offered to either negotiate market terms through the Cease and Desist Letter. Alternatively, service of this Complaint constitutes notice or offer or both.

142.     On or about November 3-4, 2017, promptly gave notice to Mesa of rescission and offered to provide a default sum under the Convertible Note (e.g., 150% of the outstanding principal and interest on the converted shares) through the Rescission Notices. Alternatively, service of this Complaint constitutes notice or offer or both.

143.     ProBility desires a judicial determination that the Settlement Agreement and Convertible Note are rescinded, costs and expenses incurred in bringing this action and such other additional relief as the Court deems just and proper.

## SEVENTH CLAIM FOR RELIEF

### Conversion

### (Against Against Mesa, Ligi, Isen and FSC)

144.     ProBility incorporates and realleges the allegations set forth in paragraphs 1 through 143 of this Complaint as though fully set forth herein.

145.     By virtue of the conduct alleged above, Defendants wrongfully, fraudulently, and maliciously retained and converted ProBility's shares for their own use, with full knowledge that ProBility was the lawful and beneficial owners of said shares and were entitled to the exclusive rights thereto.

146.     Defendants disposed of the ProBility's shares through the sale on the OTCBB in a manner inconsistent with ProBility's rights.

147.     As a proximate result of Defendants' conversion, as herein alleged, ProBility has suffered damages which will be established according to proof at trial, in an amount in excess of this Court's minimum jurisdiction.

### EIGHTH CLAIM FOR RELIEF

**Aiding and Abetting**

**(Against Alpine)**

148.     ProBility incorporates and realleges the allegations set forth in paragraphs 1 through 147 of this Complaint as though fully set forth herein.

149.     Alpine substantially assisted Mesa, Isen and FSC in perpetrating their fraud and other malfeasance against ProBility, as described herein, including conversion.

150.     At the time of the Alpine Demand to remove the restrictive legends on the shares, Alpine had actual knowledge of Mesa, Isen and FSC's fraud and other malfeasance against ProBility, as described herein.  Alpine did not make any reasonable inquiry as required under Section 5 of the Securities Act or FINRA rules, but nonetheless, represented to both ProBility and its transfer agent, "in order to induce [ProBility]…transfer the" shares owned by Mesa that it is about to sell "in a manner satisfying the requirements of Section(g), Rule 144 of the Securities Act of 1933" that "after such reasonable inquiry, is not aware of any facts indicating that the information supplied by [Mesa] to [Alpine] in connections with the sale of the above described securities was not complete and accurate as of the date of the sale of such securities.

151.     As such, Alpine aided and abetted Mesa, Isen and FSC and is liable to ProBility to the same degree.

### NINTH CLAIM FOR RELIEF

**Conspiracy**

**(Against All Defendants)**

152.     ProBility incorporates and realleges the allegations set forth in paragraphs 1 through 151 of this Complaint as though fully set forth herein.

153.     ProBility is informed and believes, and thereon alleges, that the Defendants knowingly and willfully entered into an agreement and conspiracy to defraud ProBility by misappropriating the shares, concealing such conversion and using the misappropriated funds for their own purposes.

154.     ProBility is informed and believes, and thereon alleges, that pursuant to the aforementioned agreement and conspiracy, the Defendants committed the illegal acts alleged above and distributed the misappropriated funds, or portions thereof, to themselves.

155.     As a proximate result of the Defendants' conspiracy to defraud Plaintiffs as herein alleged, ProBility has suffered damages which will be established according to proof at trial, in an amount in excess of this Court's minimum jurisdiction.

## TENTH CLAIM FOR RELIEF

### Unjust Enrichment

### (Against All Defendants)

156.     ProBility incorporates and realleges the allegations set forth in paragraphs 1 through 155 of this Complaint as though fully set forth herein.

157.     Mesa, Isen and FSC were the recipient of substantially all of the ill-gotten gains from the sale of ProBility's stock. Based on the allegations contained herein, Mesa, Isen and FSC received and accepted ProBility's stock with knowledge that such were acquired through their fraudulent inducement to enter into the Settlement Agreement and Convertible Note, knowing that ProBility was the true and proper owner of the shares. Despite this knowledge, Mesa, Isen and FSC maintained possession of the shares and any funds received on the sale of the Transferred Shares.

158.     Alpine received commissions on the sale of shares and paid itself those commissions despite knowing that such commissions were levied on the sale of ProBility's shares that were acquired by Mesa, Isen and FSC through fraud, and to the detriment of ProBility's shareholders.

159.     ProBility, as a matter of law and in equity and good conscience, are therefore entitled to restitution from Defendants constituting the value of the misappropriated Shares, any funds received on the sale and any commissions or fees earned, which will be established according to proof at trial, in an amount in excess of this Court's minimum jurisdiction.

### ELEVENTH CLAIM FOR RELIEF

**Order to Surrender of Certificates under Nev. Rev. Stat. Ann. § 78.250**

**(Against Mesa, Ligi and Alpine)**

160.     ProBility incorporates and realleges the allegations set forth in paragraphs 1 through 159 of this Complaint as though fully set forth herein.

161.     Certificates 1236 and 1237, in the name of Mesa, no longer conform to the articles or to the rights of Mesa, as the holder thereof as the restrictive covenant has been removed in contravention of the federal securities law and the Board of ProBility has otherwise determined that is desirable to cancel any outstanding certificate for shares and issue a new certificate therefore conforming to the rights of the holder.

162.     ProBility has attempted to order, through non-judicial means, that Mesa and/or Alpine surrender and exchange the certificates for new certificates, which confirms to the existing rights of Mesa, based on the factual allegations contained herein, but Mesa and Alpine have refused ProBility's demand as provided in paragraphs 48 and 61.

163.     Defendants refused, and continues to refuse, to surrender the share certificates for new certificates.

164.     ProBility desires a judicial determination against Defendants that the Court order Defendants to surrender the certificate(s), suspend Defendants' right to sell the shares until exchanged, costs and expenses incurred in bringing this action and such other additional relief as the Court deems just and proper pursuant to the provisions of Nev. Rev. Stat. Ann. § 78.250.

### VI.   PRAYER FOR RELIEF

**WHEREFORE**, ProBility requests that the Court enter relief and judgment in its favor and against Defendants as follows:

1. Enter judgment in favor of ProBility and against Defendants on all Claims.

2. For an order declaring that Defendants failed to file complete and accurate disclosures in violation of Sections 13(d) of the Exchange Act and requiring file with the SEC accurate disclosures required by Section 13(d) of the Exchange Act.

3. For an order requiring the Defendants to rescind any conversion of the Convertible Note to ProBility stock prior to filing complete and accurate Schedule 13D disclosures as such conversation was acquired unlawfully.

4. Disgorgement of all short-swing profits in an amount to be determined at time of trial.

5. For such preliminary and/or permanent injunctive relief as may be necessary: (1) to prevent the Mesa Defendants from enjoying any rights or benefits from ProBility securities that were acquired in violation of law, and (2) to prevent irreparable injury to ProBility and/or its stockholders arising out of Defendants' unlawful conduct.

6. For an order rescinding the Settlement Agreement and Convertible Note.

7. For an order that Defendants must surrender their certificates of ProBility's stock in exchange new certificates and enjoining the sale of stock until Defendants surrender their certificates.

8. The return of all consideration given to or taken by Defendants.

9. Award of compensatory damages, including rescissionary damages where applicable, in favor of the ProBility against Defendants for all damages sustained as a result of the Defendants' wrongdoing in an amount to be proven at trial, including interest thereon;

10. Award of ProBility's reasonable costs and expenses incurred in this action, including counsel fees, expert fees, and prejudgment and post-judgment interest, to the extent allowable by law.

11. Punitive damages, to the extent allowable by law, based on Defendants' fraudulent conduct.

12. Such other and further legal and equitable relief as this Court deems necessary, just and proper.

## VII.   DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(a), ProBility hereby demands a trial by jury on all issues so triable.


Dated: October 25, 2017                    Respectfully submitted,

                                           **EVANS & KOB, PC**


By: _____

Brett G. Evans (Bar No. 244213)
1172 Orange Avenue, 2nd Floor
Coronado, CA 92118
Telephone:   (657) 210-2114
Facsimile:    (888) 956-7890
*Counsel to Plaintiff Probility Media Corporation*