# EXHIBIT 4

ELECTRONICALLY FILED
Superior Court of California,
County of San Diego
**10/25/2017** at 08:00:00 AM
Clerk of the Superior Court
By Erika Engel,Deputy Clerk

Brett G. Evans (Bar No. 244213)
brett@eklawpc.com
Jeffrey S. Kob. (Bar No. 147971)
jeff@eklawpc.com
Evans & Kob, PC
1172 Orange Avenue, Second Floor
Coronado, California 92118
Telephone:  (657) 210-2114
Facsimile:   (888) 956-7890

Attorneys for Plaintiff ProBility Media Corporation

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF SAN DIEGO, CENTRAL DIVISION

| | |
|---|---|
| PROBILITY MEDIA CORPORATION, a Nevada Corporation,<br><br>Plaintiff,<br><br>vs.<br><br>LAWRENCE D. ISEN, an individual, MESA STRATEGIES, INC., a Nevada corporation, ALPINE SECURITIES CORPORATION, a Utah Corporation, FSC, LLC, a limited liability company, and DOES 5-100, inclusive.<br><br>Defendants. | Case No. 37-2017-00040541-CU-FR-CTL<br><br>**COMPLAINT FOR:**<br>**(1) BREACH OF CONTRACT**<br>**(2) NEGLIGENT MISREPRESENTATION**<br>**(3) COMMON LAW FRAUD**<br>**(4) RESCISSION BASED ON FRAUD**<br>**(5) RESCISSION BASED ON MISTAKE**<br>**(6) CONVERSION**<br>**(7) CONSPIRACY**<br>**(8) UNJUST ENRICHMENT**<br>**(9) DECLARATORY RELIEF (SURRENDER OF SHARES)** |

EVANS & KOB, PC

Plaintiff, ProBility Media Corporation ("ProBility"), alleges on information and belief as follows:

# I.     INTRODUCTION

1.   ProBility Media Corporation ("ProBility") is a public company that was fraudulently induced to enter into a series of transactions with a group of Defendants that later turned out to have a colorful history of securities violations, including recent civil and criminal charges against one of the principal participants. While ProBility sought to create a robust market for its future growth, instead entered into agreements with serial microcap/penny stock promoters, brokers repeatedly accused of violating regulatory rules and securities laws relating unregistered securities and an alleged mastermind behind a $147 million "pump and dump" scheme that appears eerily familiar to the path that ProBility was fraudulently induced to follow. While Defendants' histories were unknown to ProBility at the time, the company is nonetheless learning the hard lesson: **If you lie down with dogs, you get up with fleas**."

# II.    BACKGROUND FACTS

### A.   JURISDICTION AND VENUE

2.   This Court has jurisdiction over this action pursuant to Code of Civil Procedure section 410.10 and Code of Civil Procedure section 664.6.

3.   Venue is appropriate under this is appropriate in this county in accordance with Code Civ. Proc., § 395(a) and Code Civ. Proc., § 395.5 because Defendants and ProBility contracted to perform their obligations in this county, because the contract was entered into in this county, because the liability, obligation and breach occurred within this county, and because the principal place of business of Defendants, or some of them, is situated in this county. Venue is further proper because the acts alleged herein primarily took place in San Diego County, California.

4.   The Court has personal jurisdiction over the Defendants because they are residents of and/or doing business in the State of California. This Court has jurisdiction over Defendants because a substantial portion of the wrongdoing alleged herein took place in California, and because Defendants reside or resided in California or purposely participated in acts occurring in California at relevant times, are or were authorized to conduct business in California, do or did conduct business

EVANS & KOB, PC

in California, have intentionally availed themselves of California economic opportunities and California law, and/or otherwise possess sufficient minimum contacts with California so as to render the exercise of jurisdiction by California courts permissible under traditional notions of fair play and substantial justice.

### B. PARTIES

#### 1. Plaintiff

5.   ProBility Media Corporation ("ProBility") (formerly known as Panther Biotechnology, Inc., formerly known as NEF Enterprises, Inc. and formerly known as New Era Filing Services, Inc.) is a Corporation organized under the laws of the State of Nevada with its principal place of business at 1517 San Jacinto Street, Houston, Texas 77002.

6.   ProBility is an online global provider of compliance, career advancement and training content for tradesmen and technical experts.

7.   Probility is a public company whose stock is traded over-the-counter under the trading symbol "PBYA."

#### 2. Defendants

8.   Lawrence D. Isen ("Isen") is an individual, residing in San Diego, California. From approximately 1987 to 1995, Isen was associated with three different broker-dealers as a registered representative. During that time, Isen held Series 7, 24 and 63 licenses. On May 18, 1995, the Securities and Exchange Commission ("SEC") barred Isen from associating with any broker or dealer for violations of the antifraud provisions of the Federal securities laws, and on November 16, 2000, Isen was convicted by a jury in the United States District Court for the Southern District of New York of conspiracy to commit securities fraud and wire fraud. On December 19, 2001, Isen was sanctioned by the SEC for violations of Section 17(a) of the Securities Act of 1933 ("Securities Act") and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder based on the conduct underlying his criminal conviction. On December 20, 2007, Isen was sanctioned by the SEC and permanently enjoined from violating Sections 5(a), 5(c), 17(a)(2), and 17(a)(3) of the Securities Act in *SEC v. Isen*, No. 07-CV-11386 (S.D.N.Y. Dec. 19, 2007).

9.   Mesa Strategies, Inc. ("Mesa") is a corporation organized under the laws of the State of

E+K EVANS & KOB, PC

1   Nevada with is principal place of business located at 18145 Old Coach Drive, Poway, California,

2   92064.

3        10. Alpine Securities Corporation ("Alpine") is a corporation organized under the laws of the

4   State of Utah with is principal place of business located at 39 Exchange Place, Salt Lake City, Utah

5   84111. Both Alpine, and Scottsdale Capital Advisors Corp. under common control with Alpine,[1] are

6   and at all times mentioned herein was, a registered broker-dealer under the Securities Exchange Act

7   of 1934 ("Exchange Act"), licensed and authorized to transact business in California pursuant to

8   section 25210 of the Corporations Code, and member firms of the Financial Industry Regulatory

9   Authority ("FINRA"), the self-regulatory agency for broker-dealers authorized under the Exchange

10   Act. Alpine is a self-clearing broker-dealer and has been registered with the SEC since 1984. The

11   majority of its business involves clearing microcap over-the-counter ("OTC") stock transactions for

12   other firms (securities similar to ProBility). Both Alpine and Scottsdale have a history of disciplinary

13   actions brought against them by FINRA for various violations, including failure to maintain

14   adequate written supervisory procedures and for participating in unregistered offerings and sales of

15   securities in violation of Section 5 of the Securities Act of 1933 ("Securities Act"), with Alpine

16   subject to 40 regulatory disclosure events. For example, on December 22, 2009, Alpine executed an

17   Acceptance, Waiver and Consent based on FINRA's review of 2,157,000 unsolicited sale orders in

18   one OTC stock over a period of approximately one year finding that the Alpine violated former

19   NASD Rule 2010, by selling unregistered securities in violation of Section 4 of the Securities Act of

20   1933 and former NASD Rules 3010 and 2110 by failing to establish, maintain and enforce a system,

21   to supervise the activities of its associated persons that were reasonably designed to detect and

22   prevent the sale of unregistered securities. On March 31, 2017, FINRA's Department of

---

24   [1] Scottsdale Capital Advisors Corp. ("Scottsdale") is a retail and institutional broker-dealer located

25   in Scottsdale, Arizona. It has been registered as a broker-dealer with the SEC since 2002 and is

26   currently registered as an investment adviser with the states of Arizona and California. Scottsdale

27   introduced customers to Alpine and similar to Alpine, Scottsdale's business focuses on microcap

28   stock transactions.

EVANS & KOB, PC

Enforcement found that Scottsdale violated FINRA Rule 2010 by selling securities without registration and without an exemption, in contravention of Section 5 of the Securities Act of 1933, and permanently barred John J. Hurry (pending review), [2] who indirectly through a trust and holding company, owns both Alpine and Scottsdale, based on findings that Hurry engaged in activities designed to enable the unlawful transactions and evade regulatory scrutiny when Scottsdale engaged and participated in sales of securities that were not registered with the SEC, in transactions that were not exempt from registration. The findings stated that Hurry, the firm's indirect owner, acted in contravention of Section 5 of the Securities Act of 1933 by being a necessary participant and substantial factor in the sales of unregistered securities, though his indirect ownership and control of Scottsdale, Alpine (Scottsdale's clearing firm), and the Cayman Island broker-dealer, allowed suspect microcap stock liquidations to be facilitated without the scrutiny that the transactions demanded. On June 5, 2017, the Securities and Exchange Commission ("SEC") initiated a civil enforcement action against Alpine charging them with securities law violations related to its alleged practice of clearing transactions for microcap stocks (or over-the-counter securities similar to ProBility) that were used in manipulative schemes to harm investors alleging that "[s]ince 2011, Alpine has cleared thousands of deposits of microcap securities, most of them involving [Scottsdale] as the introducing broker, and **many of which were used as part of various stock manipulation and other schemes**." (*Securities and Exchange Commission v. Alpine Securities Corporation*, Civil Action No. 7:17-CV-4179) (S.D.N.Y., filed June 5, 2017) (emphasis added). The SEC's complaint charges Alpine with thousands of violations of Section 17(a) of the Securities Exchange Act of 1934 and Rule 17a-8 based on allegations that Alpine routinely and systematically failed to file Suspicious Activity Reports (SARs) for stock transactions that it flagged as suspicious, and when it did file, Alpine frequently omitted the necessary information that formed the bases for Alpine knowing,

---

[2] On April 26, 2017, this matter was appealed to the National Adjudicatory Council (NAC) and the sanctions are not in effect pending review. On June 20, 2017, an Amended Extended Hearing Panel Decision was issued to correct a factual error. The amendment does not change the substance of the decision and remains on appeal with the NAC.

1  suspecting, or having reason to suspect that a transaction was suspicious. Further, the SEC alleged

2  that "[m]any Scottsdale and Alpine customers have been charged with violations of the federal

3  securities laws, including violations relating to transactions that cleared through Alpine[,]"

4  "seldom…refused to clear trades generated by such accounts...Alpine instead allowed Scottsdale's

5  customers to engage in suspicious transactions [in exchange for] fees that were significantly higher

6  than those charged by other clearing firms."

7  11. FSC, LLC ("FSC") is a limited liability company organized under the laws of the State of

8  California located at 10673 Hunters Glen, San Diego, California, 92130. On information and belief,

9  Isen is a managing member or person in control or both of FSC, or otherwise, FSC is the alter ego of

10  Isen.

11  12. The true names and capacities, whether individual, corporate, associate, or otherwise, of

12  defendants named herein as Does 5 through 100, inclusive, are unknown to ProBility, who therefore

13  sue said defendants by such fictitious names. ProBility will amend this Complaint to show such true

14  names and capacities when they have been ascertained. References to, and allegations concerning,

15  the named defendants shall be deemed to include like references to, and allegations concerning, the

16  Doe defendants.

17  13. ProBility is informed and believes, and on the basis of that information and belief alleges,

18  that at all times herein mentioned in this Complaint, Defendants, and each of them, were the agents,

19  representatives, employees, successors and/or assigns, each of the other, and at all times pertinent

20  hereto were acting within the course and scope of their authority as such agents, representatives,

21  employees, successors and/or assigns and acting on behalf of, under the authority of, and subject to

22  the control of each other.

23  **C.  SUBSTANTIVE FACTUAL ALLEGATIONS, PRIOR HISTORY AND BACKGROUND**

24  14. On or about August 20, 2015, ProBility entered into a Secured Convertible Promissory Note

25  ("Note")  issued to Typenex Co- Investment, LLC ("Typenex"), which the parties (ProBility and

26  Typenex) restructured and settled on or about October 5, 2016 pursuant to a Note Settlement

27  Agreement (the "Note Settlement Agreement"). A true and correct copy of the Note Settlement

28  Agreement is attached hereto as <u>Exhibit A</u> and incorporated herein by this reference.

E+K  EVANS & KOB, PC

15. On or about November 8, 2016, ProBility consummated a business combination with Brown Technical Media Corporation ("Brown") and sought to raise capital in an effort expand the operations of Brown, pursue acquisitions of complementary companies that can add content to its eLearning operations, add online training content to its offerings and licensing and acquiring training content.

16. In early 2017, in an effort to expedite its capital raising efforts, ProBility began exploring financial public relations, marketing and investor awareness providers, including initial discussions with Isen.

17. In or about early 2017, ProBility initially engaged Isen through an oral agreement, to among other things, market ProBility. Isen represented he would effectively market the shares through, among other things, social media broadcasts, newsletters, and the use of electronic mailing lists, which he represented could eventually lead to additional sources of capital for ProBility.

18. On January 27, 2017, ProBility responded to SEC correspondence on dated December 12, 2016 addressing the SEC's position that ProBility was a "shell company." ProBility responded that it was not "a shell company within the meaning of Rule 405 prior to the" Brown transaction as it began biotechnology operations in May 2014 with the "goal of identifying, licensing, and acquiring undervalued molecules that were designed to heal without causing harm and are either optimized derivatives of existing products, repurposed approved products, products that did not meet clinical endpoints and also new classes of drugs." If ProBility accepted the SEC's determination, it would be severely restricted in its capital raising and business goals, as its shares could not be resold under the safe harbor of Rule 144 until the earlier of November 8, 2017 (one year after the Brown transaction).

19. However, Isen presented a workaround through an exemption under Section 3(a)(10) of the Securities Act, while continuing to market ProBility. A Section 3(a)(10) exemption of the Securities Act is meant to exempt securities transactions where a fairness hearing by a judge or government agency's ruling replaces usual registration requirements. Isen represented that many over-the-counter traded securities (over-the-counter bulletin board or OTCBB and pinksheets), like ProBility, have been utilizing the exemption found in Section 3(a)(10) to convert all forms of debt into freely tradable common stock. Isen represented that the conversion of debt into common stock could assist

COMPLAINT

ProBility by eliminating certain debt from its balance sheet and increase its liquidity and solvency, convince lenders to make investments into a company without the investor relying solely on the company cash flows for repayment, and critical for ProBility, allow for a certain amount of freely tradeable common stock upon the eventual conversion of a promissory note into its common stock to generate investor and investment professionals awareness and interest in ProBility as well as a public float to support further financing and acquisition transactions.

20. In connection with the oral agreement with Isen, Isen represented that, he could structure a convertible promissory note with takedowns of the debt by the creditor (Mesa) priced at a discount to market and subject to an ownership limitation to avoid affiliation, which upon conversion to common stock of ProBility, he would have the authority and/or ability to direct another company, Mesa, to market and sell shares of the common stock of ProBility in conjunction with his marketing strategy.

21. In negotiation with Isen for his services, Isen represented that the only way that it would be possible for him to provide investor relations services to ProBility and successfully implement his marketing strategy was for ProBility to execute his plan for a Section 3(a)(10) exemption by transferring the shares to a third-party that he would effectively have the authority to control.

22. Isen represented that by control and direction of Mesa, including the timing of conversion and subsequent sale of shares, whereby through his control of Mesa, ProBility could substantially eliminate the common risk/tendency in such convertible promissory note structures under Section 3(a)(10), which for many over-the-counter traded securities drives down the company's stock price and results in substantial dilution to existing stockholders, while Isen, through Mesa, could stabilize the price of ProBility's stock through generating interest with investors and investment professionals through his marketing strategy and limiting the amount of public float through strategic, gradual sales of Mesa's stock in ProBility.

23. At all relevant times, Isen represented that he was the agent of and could direct the actions of Mesa.

24. Isen represented that, if shares were transferred to Mesa, he had authority to market the shares and sell them through Mesa or to direct principals of Mesa with respect to the sale of shares in

EVANS & KOB, PC

1   accordance with his instructions.

2        25. The sole representative of Mesa communicating to and negotiating with ProBility was Isen.

3        26. Isen represented he had actual authority to negotiate and enter agreements on behalf of Mesa.

4        27. Isen represented Mesa would sell shares only at his direction.

5        28. Isen represented Mesa would sell shares into the open market in a manner that would ensure

6   a stable market for Probility's shares.

7        29. In furtherance of Isen's plan and in detrimental reliance on Isen's promises and

8   representations, ProBility withdrew its position with the SEC that ProBility was a "start-up

9   company" and accepted, without alteration, that ProBility was a "shell company" up to the date of

10  the Brown transaction on November 8, 2016. Thus, absent Isen's promises related to the Section

11  3(a)(10) exemption and the execution thereof through Mesa (as a "straw man"), ProBility would be

12  severely restricted in its capital raising and business goals, as its shares could not be resold under the

13  safe harbor of Rule 144 no earlier than November 8, 2017 (one year after the Brown transaction).

14       30. In furtherance of Isen's plan and in detrimental reliance on Isen's representations, Mesa,

15  through Isen, and ProBility, entered into a series of pre-arranged transactions whereby ProBility

16  would transfer securities in connection with the marketing agreement for ProBility with Isen and

17  Mesa, including:

18            a.   On or about May 12, 2017, Mesa entered into a Note Purchase Agreement with

19                 Typenex ("Note Purchase Agreement"), in which Isen communication on behalf of

20                 communicated the demands of Mesa, pursuant to which Mesa purchased the Note

21                 from Typenex, as restructured pursuant to the Note Settlement Agreement. Pursuant

22                 to the Note Purchase Agreement, the outstanding balance of the Note was reduced to

23                 $188,250. A true and correct copy of the Note Purchase Agreement is attached hereto

24                 as Exhibit B and incorporated herein by this reference. The Note was transferred from

25                 Typenex to Mesa pursuant to an Assignment Agreement dated May 12, 2017

26                 ("Assignment Agreement"). A true and correct copy of the Assignment Agreement is

27                 attached hereto as Exhibit C and incorporated herein by this reference.

28            b.   On May 31, 2017, Mesa, at Isen's direction, filed a complaint with this Court against

E-K   EVANS & KOB, PC

1    ProBility for breach of contract on the Note (*Mesa Strategies, Inc. vs. Probility Media*
2    *Group, Inc.*, Case No. 37-2017-00019738-CU-BC-CTL) ("3(a)(10) Action").

3       c.    On or about June 9, 2017, Mesa and ProBility executed a Settlement Agreement
4    ("Settlement Agreement"), contingent on the Court's approval of the Settlement
5    Agreement in the 3(a)(10) Action. A true and correct copy of the Settlement
6    Agreement is attached hereto as <u>Exhibit D</u> and incorporated herein by this reference.
7    Pursuant to the Settlement Agreement, ProBility agreed to "issue to MESA] the 10%
8    Convertible Note dated June 9, 2017" ("Convertible Note") that "allows MESA to
9    convert all or any part of the Convertible Note into shares of" ProBility at a price of
10    $0.04 per share in full satisfaction of the debt in the 3(a)(10) Action. A true and
11    correct copy of the Convertible Note is attached hereto as <u>Exhibit 1</u> to <u>Exhibit D</u> and
12    incorporated herein by this reference.

13       d.    On June 12, 2017, ProBility and Mesa filed a Joint Ex Parte Application for Order
14    Approving the Settlement Agreement in the 3(a)(10) Action.

15       e.    On June 20, 2017, the Court ordered: (1) the Settlement Agreement was "approved in
16    its entirety;" (2) Mesa "owns bona fide outstanding claims against [ProBility], and the
17    terms and conditions of the issuance and exchange of such claims for free-trading
18    shares of common stock of [ProBility], as set forth in the Settlement Agreement and
19    Release, are approved after a hearing upon the fairness of such terms and conditions
20    at which [Mesa], the only person to whom it is proposed to issue securities in such
21    exchange, appeared by counsel[;]" and (3) the Court would "retain jurisdiction to
22    enforce the terms of this Order by motion under California Code of Civil Procedure
23    Section 664.6." ("June 20th Order"). A true and correct copy of the June 20th Order is
24    attached hereto as <u>Exhibit E</u> (redacting the Settlement Agreement submitted
25    previously) and incorporated herein by this reference.

26      31. On June 20, 2017, the Settlement Agreement and Convertible Note (collectively, the
27    "Transfer Agreement") became effective as a result of the June 20th Order.

28      32. The Transfer Agreement, and subsequent written contract with Isen, were entered into by

EVANS & KOB, PC

ProBility on the basis of Isen's representations regarding his control of Mesa and his ability to effectively and legally market ProBility stock.

33. On or around June 21, 2017, in furtherance of Isen's plan and in detrimental reliance on Isen's representations, based on Isen's agency relationship and authority over Mesa, ProBility agreed to transfer two million shares of restricted stock related to certificate numbers 1236 and 1237 to Mesa, with an effective date of June 20, 2017 ("Transferred Shares"). A true and correct copy of the certificates for the Transferred Shares is attached hereto as Exhibit F. The certificates for the Transferred Shares provided the following legend:

> RULE 144 – RESTRICTED SHARES
>
> The shares represented by this certificate have not been registered under the Securities Act of 1933 (the "Act"), and are Restricted Securities as that term is defined in Rule 144 under the Act, and **requires written release from either the issuing company or their attorney prior to legend removal**.
>
> (emphasis added).

34. On or about July 12, 2017, ProBility became aware that Isen was the subject of criminal charges by the Department of Justice ("DOJ") (U.S. v. Chartier, *et al.*, case number 1:17-cr-00372) and a civil enforcement action brought by the Securities and Exchange Commission ("SEC") (Securities and Exchange Commission v. PowerTradersPress.com Inc., *et al.*, case number 1:17-cv-04133), both in the U.S. District Court for the Eastern District of New York. The DOJ and SEC allege that, between January 2014 and July 2017, Isen together with thirteen other defendants and others, engaged in a $147 million scheme to defraud investors and potential investors in, among other companies, one or more of the following microcap, publicly traded companies: NWMH, CESX, GRLD, HECC, and ICEIF (**all of which, like ProBility were over-the-counter securities**), with criminal charges by the DOJ including conspiracy to commit securities fraud, conspiracy to commit wire fraud, conspiracy to commit money laundering, and substantive securities fraud in connection with the stock manipulation. **To execute this scheme, the Isen and others obtained shares from corporate insiders at below-market prices, engaged in manipulative trading patterns to drive up the price of the shares by controlling the price and volume of the traded**

EVANS & KOB, PC

1   **shares, made material misrepresentations and omissions in their communications with victim**

2   **investors about the stock of the companies and fraudulently concealed their control of shares**

3   **of the companies that were held in brokerage accounts in the names of other individuals or**

4   **entities (similar to Mesa's role as represented by Mesa)**.  As the price climbed, members of the

5   ring called and emailed potential investors, many of them elderly, pressuring them to buy the stocks,

6   while concurrently, Isen and others sold off their own stakes, without telling investors (a "**pump and**

7   **dump**").

8      35. At no time prior to filing this Complaint did Mesa or Isen disclose this material information

9   related to Isen's "colorful" background, beginning with being barred Isen from associating with any

10   broker or dealer for violations of the antifraud provisions of the Federal securities laws in 1995

11   through the July 12, 2017 criminal and civil actions, or the prior investigations related thereto. On

12   information and belief, Isen knew or should have known about the impending actions, and that such

13   alleged conduct would be material to ProBility in its decision to enter into the Transfer Agreement

14   and transfer of the Transferred Shares.

15      36. On information and belief, Mesa knew of the impending actions against Isen.

16      37. On information and belief, based partly on the similar circumstances alleged in the criminal

17   indictment and civil enforcement action (over-the-counter securities, below-market prices,[3] accounts

18   held in the names of others), neither Isen nor Mesa intended to perform under their oral

19   representations and never intended to market ProBility securities.

20      38. ProBility is informed and believes, and based on such information and belief, alleges that at

21   all times mentioned, Isen represented himself as an actual agent of Mesa, a de facto manager of

22   Mesa, managing member of Mesa, a person with authority or control over Mesa and/or a person with

23   the authority or control to direct the principals of Mesa with respect to representations and promises

24   made on Mesa's behalf, which such representations were made through oral statements by Isen and

25

26   _____

    [3] In fact, Isen through FSC, entered into a subsequent written agreement with ProBility in

27   furtherance of his marketing strategy, that called for compensation equivalent to 400,000 warrants,

28   convertible into restricted common shares of ProBility, at a below market price of $0.005 per share.

EVANS & KOB, PC

through the conduct (or lack thereof) of both Isen and Mesa. Such statements and conduct are detailed in the foregoing allegations, and include, but are not limited to: (i) Isen's representations that he was agent of and could direct the actions of Mesa; (ii) Isen's representations that, if shares were transferred to Mesa, he had authority to market the shares and sell them through Mesa or to direct principals of Mesa with respect to the sale of shares in accordance with his instructions; (iii) Isen represented himself as the sole representative of Mesa in communications and negotiations with ProBility; (iv) Isen represented he had actual authority to negotiate and enter agreements on behalf of Mesa; (v) Isen represented Mesa would sell shares only at his direction; (vi) Isen represented Mesa would sell shares into the open market in a manner that would ensure a stable market for ProBility's shares; (vii) reviewing ProBility's balance sheet for debt that met the characteristics in his view, on behalf of Mesa, the ability to be restructured as a convertible promissory notes, and on behalf of Mesa, identifying the Typenex Note; (viii) negotiating and communicating on behalf of Mesa the terms of the Note Purchase Agreement with both Typenex and ProBility; (ix) negotiating and communicating on behalf of Mesa the terms of the Assignment Agreement with both Typenex and ProBility; (x) overseeing the 3(a)(10) Action on behalf of Mesa, including communicating with Mesa's counsel, and corresponding with ProBility on behalf of Mesa, including directing the execution of declarations in support of the Ex Parte Request for Order Approving the Settlement Agreement and acting as the central point of contact for Mesa's counsel; (xi) negotiating and communicating on behalf of Mesa the terms of the Convertible Note and Settlement Agreement, including but not limited to, the Conversion Price, which was substantially below recent sales of convertible preferred shares recently sold by ProBility; (xii) communicating with counsel for Mesa for the issuance of the legal opinion related to the Transferred Shares and requesting information from ProBility for such legal opinion, on behalf of Mesa; and (xiii) communicating on behalf of Mesa related to Mesa's account with Alpine. The representations and conduct were made by Isen with the intention that ProBility would rely on these representations and ProBility did detrimentally rely on these representations and conduct. On information and belief, ProBility's first direct interaction with Mesa was not until after criminal charges and civil claims were brought against Isen by the DOJ and the SEC in parallel proceedings on July 12, 2017 and ProBility's Cease and Desist

EVANS & KOB, PC

1    Letter issued to Mesa on July 28, 2017.

2        39. ProBility is informed and believes, and based on such information and belief, alleges that at

3    all times mentioned, Isen was the actual or ostensible agent of Mesa and had the authority to direct

4    the acts of Mesa, and in committing the acts alleged herein, was acting within the scope of such

5    agency and authority. The acts or neglect of Mesa, as well as Alpine, led ProBility to believe that

6    Isen was acting as an agent for Mesa. These acts, neglect and conduct are detailed in the foregoing,

7    and include, but are not limited to: (i) Isen's representations that he was agent of and could direct the

8    actions of Mesa; (ii) Isen's representations that, if shares were transferred to Mesa, he had authority

9    to market the shares and sell them through Mesa or to direct principals of Mesa with respect to the

10   sale of shares in accordance with his instructions; (iii) Isen represented himself as the sole

11   representative of Mesa in communications and negotiations with ProBility; (iv) Isen represented he

12   had actual authority to negotiate and enter agreements on behalf of Mesa; (v) Isen represented Mesa

13   would sell shares only at his direction; (vi) Isen represented Mesa would sell shares into the open

14   market in a manner that would ensure a stable market for ProBility's shares; (vii) reviewing

15   ProBility's balance sheet for debt that met the characteristics in his view, on behalf of Mesa, the

16   ability to be restructured as a convertible promissory notes, and on behalf of Mesa, identifying the

17   Typenex Note; (viii) negotiating and communicating on behalf of Mesa the terms of the Note

18   Purchase Agreement with both Typenex and ProBility; (ix) negotiating and communicating on

19   behalf of Mesa the terms of the Assignment Agreement with both Typenex and ProBility; (x)

20   overseeing the 3(a)(10) Action on behalf of Mesa, including communicating with Mesa's counsel,

21   and corresponding with ProBility on behalf of Mesa, including directing the execution of

22   declarations in support of the Ex Parte Request for Order Approving the Settlement Agreement and

23   acting as the central point of contact for Mesa's counsel; (xi) negotiating and communicating on

24   behalf of Mesa the terms of the Convertible Note and Settlement Agreement, including but not

25   limited to, the Conversion Price, which was substantially below recent sales of convertible preferred

26   shares recently sold by ProBility; (xii) communicating with counsel for Mesa for the issuance of the

27   legal opinion related to the Transferred Shares and requesting information from ProBility for such

28   legal opinion, on behalf of Mesa; and (xiii) communicating on behalf of Mesa related to Mesa's

EVANS & KOB, PC

account with Alpine. On information and belief, despite the various transactions entered between ProBility and Mesa, none of the principals of ProBility have personally interacted with Mr. Allan Ligi, the alleged owner of Mesa. ProBility's reliance on the ostensible authority of Isen was reasonable in that Mesa: (i) never communicated directly with ProBility until after criminal charges and civil claims were brought against Isen by the DOJ and the SEC in parallel proceedings on July 12, 2017 and ProBility's Cease and Desist Letter issued to Mesa on July 28, 2017; (ii) knew it was receiving a significantly below market conversion price in the Convertible Note based on the representations and promises of Isen; and (iii) allowed Isen to negotiate and communicate on its behalf in the series of transactions that resulted in the Settlement Agreement and Convertible Note. Throughout the various negotiations and transactions entered into, or in which ProBility was a party thereof, Mesa never denied such authority nor contradicted the authority of Isen, but rather continued to allow Isen to hold himself out as agent until July 12, 2017, when Isen was no longer available due to the criminal and civil securities fraud actions were brought against him. On information and belief, ProBility's first direct interaction with Mesa was not until after criminal charges and civil claims were brought against Isen by the DOJ and the SEC in parallel proceedings on July 12, 2017 and ProBility's Cease and Desist Letter issued to Mesa on July 28, 2017.

40. On or about July 13, 2017, ProBility issued a stop order to its transfer agent directing that no action be taken related to the Transferred Shares without a written release from Probility prior to transfer. A true and correct copy of the stop order ("Stop Order") is attached hereto as Exhibit G.

41. On July 18, 2017, ProBility rescinded its consulting agreement with Mr. Isen and, by proxy, Mesa. As a result, ProBility rescinded and repudiated its oral and written agreements with Isen and Mesa relating to the marketing of ProBility stock, his marketing strategy and the Transfer Agreement that was a part thereof.

42. On July 28, 2017, due to proceedings against Isen (restraining his residence and removal proceedings to New York) and the potential lack of communication with Mesa, ProBility contacted Mesa directly, without Isen, for the first time to notify Mesa of its position regarding the Transfer Agreement and Transferred Shares, which is the same underlying factual allegations supporting this Complaint, that:

EVANS & KOB, PC

a. "[ProBility] client **relied upon the oral representations of Isen** that the shares represented by the settlement agreement would be sold into the open market and that Isen would help build a robust market for the [ProBility's] shares via social media broadcasts and the use of electronic mailing lists with the goal of encouraging individuals to purchase the [ProBility's] common stock." A true and correct copy of the letter from ProBility to Mesa dated July 28, 2017 ("Cease and Desist Letter") is attached hereto as Exhibit H (emphasis added).

b. "[ProBility believed based on the civil and criminal actions against Isen], that **Isen was planning to utilize the illegal methods outlined in the SEC complaint and indictment** in order to create a market for the [ProBility's] common stock. Had the [ProBility] been aware that Isen was planning to utilize illegal methods to encourage individuals to purchase its common stock, [ProBility] would have never agreed to the settlement or filed the declarations with the Court." *Id.* (emphasis added).

c. "[ProBility] retained [Isen and FSC] to assist the Company with investor relations and identifying sources of capital. The settlement agreement with Mesa was entered into largely due to the fact that [Probility] had entered into agreements with [Isen and FSC]. Based upon Isen's representations, [ProBility] agreed to a below market conversion price in order to facilitate the transaction. **Prior to entering into the settlement agreement, [ProBility] was raising funds at $0.15 per share**. [ProBility] agreed to a below market conversion price of $0.04 per share **at Isen's insistence and in reliance upon his oral representations**. [ProBility] would not have agreed to this conversion price otherwise. [ProBility] has since cancelled the contract with Isen." *Id.* (emphasis added).

d. "It is [ProBility's] understanding that Mesa is attempting to lift the restrictions on the stock certificates it has received [i.e., the Transferred Shares]. **[ProBility] believes that the restrictions on the shares should not be lifted since the settlement was based upon representations that [ProBility] now has reason to believe were false, misleading and potentially fraudulent**." *Id.* (emphasis added).

EK EVANS & KOB, PC

e.  "[ProBility] is prepared to rescind the settlement agreement and the issuance of the [Transferred Shares] if [ProBility] is not able to reach a mutually agreed amendment to the settlement with Mesa." *Id.*

43. ProBility has demanded Isen and Mesa cease and desist in their collective efforts to lift the restrictions on the ProBility stock certificates and to sell ProBility stock, because the transfer of the certificates was based upon fraudulent representations by Isen acting as agent of, and with authority to control, Mesa.

44. On or about September 5, 2017, despite receiving the Cease and Desist Letter and the entry of the Stop Order, Alpine and Mesa contacted ProBility's transfer agent and demanded that the restrictive legend on the Transferred Shares be removed. A true and correct copy of the correspondence to VStock Transfer, LLC dated September 5, 2017 ("Alpine Demand") is attached hereto as <u>Exhibit I</u>.

a.  Mesa and Alpine submitted its "request that the restrictive legend on the certificate(s) representing the above identified securities…be removed pursuant to rule 144 promulgated under the Securities Act of 1933." *Id*. at 4.

b.  Mesa and Alpine represented that it had "fully paid for, beneficially owned, and held the shares of the Company for a period of...Six Months" despite owning such shares for a little over one month. *Id*. at 4.

c.  **Despite never transmitting the request to ProBility**, Mesa and Alpine represented that it submitted the request to the ProBility (and the transfer agent) and that both "both may rely on the above statements." *Id*. at 4.

d.  **Despite never transmitting the request to ProBility**, Alpine represented that it submitted its Broker Representation Letter to both ProBility and the transfer agent "in order to induce [ProBility]…transfer the" Transferred Shares owned by Mesa that it is about to sell "in a manner satisfying the requirements of Section(g), Rule 144 of the Securities Act of 1933." *Id*. at 5.

e.  Alpine further represented to ProBility (and its transfer agent) that it "after such reasonable inquiry, is **not aware of any facts indicating that the information**

EVANS & KOB, PC

supplied by [Mesa] to [Alpine] in connections with the sale of the above described securities **was not complete and accurate as of the date of the sale of such securities**." *Id*. at 5.

    f.    Despite that the Settlement Agreement provides that ProBility shall deliver "opinions of a legal counsel for [ProBility]," potentially foretelling the impending doom of Isen and the representations made in the Transfer Agreements, Isen on behalf of Mesa,[4] engaged an attorney to draft a legal opinion dated June 26, 2017 that opined "that the [Transferred Shares]: (i) may be issued under the exception to the registration requirements of Section 5 of the Act as provided in Section 3(a)(10) of the Act; and (ii) may be issued free of any restrictive legend and any existing restrictive legend(s) may be removed." *Id*. at 8. Nonetheless, the opinion states that counsel relied on Mesa's representations, without an investigation, that:

        i.    "neither [Mesa] or any of its affiliates have ever been and are not now Officers, Directors, Control Persons, Promoters or owners of Ten Percent (10%) or more of the Company's equity securities or any other securities convertible into more than Ten Percent (10%) or more of any class of the [ProBility's] securities." However, if counsel had properly investigated (through a certificate of ProBility), Mesa would be deemed an affiliate as a "person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with" ProBility, as properly counting the common controlled beneficial interests (through warrants held by FSC and Isen), Mesa, FSC and Isen "are the beneficial owners collectively of 10 percent or more of any class of equity securities or 10 percent or more of the equity interest" pursuant to Rule 144(a)(2). Thus,

---

[4] Isen received and forwarded the legal opinion to ProBility on June 26, 2017, the only document received by ProBility (other than the attached pleadings) that ProBility received indirectly prior September 29, 2019 (as discussed herein).

EVANS & KOB, PC

the shares would be remain "restricted securities" at the time of the issuance of the legal opinion.

  ii. "the Court approved the issuance of the Shares to the Holder."

  iii. "the parties had adequate notice of and the ability to be heard at the Hearing"

  iv. "the Court found that the terms and conditions of the exchange were fair to the Shareholder within the meaning of Section 3(a)(10) of the Act." However, it is the SEC's view that the Court "making the fairness determination 'must have sufficient information before it to determine the value of both the securities, claims or interests to be surrendered and the securities to be issued in the proposed transaction.'"[5] Counsel represented that he reviewed ProBility's financial reports, which demonstrate arm's length transactions for convertible promissory notes to be issues at a $0.15 conversion price.

45. On or before September 28, 2019, after witnessing a significant spike in the trading volume of its common stock on the over-the-counter bulletin board ("OTCBB"), ProBility began an investigation of certain suspect trading activity that artificially depressed the price of ProBility's stock price and significantly increased its volatility, which included discussions with its current transfer agent, VStock Transfer, LLC ("VStock"), related to the spike in its average daily trading volume.

46. Despite the Stop Order and Cease and Desist Letter, ProBility learned that Alpine and Mesa caused the Transferred Shares to be reissued without the restrictive legends, sold a large volumes of stock compared to the average daily trading volume and retained the remaining unsold Transferred Shares with expectation of future sales.

47. On or about September 28, 2017, ProBility initiated communication with Alpine, through one of its compliance officer and its general counsel. ProBility informed Alpine of the involvement

---

[5] *See* SEC Division of Corporate Finance, Staff Legal Bulletin No. 3A (CF) (June 18, 2008) Release No. SLB -3A; *see also* California Department of Corporations, Release No. 117-C (January 18, 2006).

EVANS & KOB, PC

of Isen, the filed indictment of Isen for criminal securities fraud, the civil enforcement action brought by the SEC for securities fraud, the similar factual circumstances related to the issuance of the Transferred Shares, the fraudulent inducement in the issuance of the Transferred Shares and attached the Cease and Desist Letter previously sent to Mesa.

48. Alpine responded that it could "neither confirm nor deny the existence of account(s), position(s) or activity in [ProBility]" and that Alpine would take no action unless and until a restraining was issued by "any Court of competent jurisdiction." The general counsel of Alpine instructed ProBility, that "in the event you deem in necessary to proceed against the party you believed wronged you and are able to obtain a restraining order that would be applicable to, say, broker dealers that the alleged bad actor has an account with, any such broker dealer would honor that Court's directive."

49. On or about September 29, 2017, based on the lack of any meaningful assistance by Alpine, ProBility requested that VStock reverse the transfer based on the: (i) a Stop Order was in place, (ii) the removal of the restrictive legend without the ProBility's knowledge and (iii) VStock's acceptance of a legal opinion effectuating such removal of the restrictive legend without ProBility's approval. Unfortunately, VStock informed ProBility that it was "unable to reverse the transfer since the shares are under the control of" Alpine.

50. On or about September 29, 2017, based on the lack of any meaningful assistance by Alpine and VStock's inability to reverse the transfer, ProBility engaged VStock as an intermediary to attempt a resolution on the Transferred Shares. However, VStock reached the same result with Alpine, requiring ProBility to continue to expend its prescious resources on obtaining a Temporary Restraining Order, rather than on ProBility's immediate needs as emerging growth company, or to further its actual intent in entering the Transfer Agreement in the first place (to raise capital to pursue acquisitions, acquire training content, create investor and investment professional awareness and seek various forms of long-term financing).

51. Despite actual and constructive knowledge of the Stop Order, the Cease and Desist Letter, civil and criminal proceedings against Isen that presented similar factual allegations to the instant dispute with Mesa, the significant history of disciplinary actions of both Alpine and Scottsdale and

EVANS & KOB, PC

recent civil enforcement action brought against it for conduct related to the sale of unregistered securities (like ProBility), the reliance on the opinion letter acquired by Isen on Mesa's behalf that explicitly provide that it was no longer valid ("[t]he opinions set forth herein are based expressly on the facts stated herein, and **may not be relied upon in the event that other facts, not presently known to us, come to light**….**If any facts or documents are determined to be incorrect, misstated, or misrepresented, then the opinion or opinions expressed herein may not continue to be valid**."), knowledge or reason to believe that certain other statements by Mesa to Alpine or to the drafter of the legal opinion may misrepresentations or otherwise inaccurate, the fraudulent inducement in initial issuance of the Transferred Shares, the risk that the Transferred Shares were not exempt from registration and/or restricted based on the aggregate beneficial ownership of Mesa and Isen collectively, the continued damage to ProBility through the artificially depressed price of ProBility's stock price and significant increase in volatility on the OTCBB:

> g.   Alpine refused to terminate, and continues to refuse to terminate, sales of ProBility's securities owned by Mesa and controlled by Isen; and

> h.   Isen and Mesa have sold and will continue to sell ProBility stock in large volumes (compared to the average trading volume of the stock) through Alpine; and

> i.   Alpine, through its conduct, has enabled, participated and/or aided and abetted Mesa and Isen's continued tortious conduct.

52. On information and belief, based in part on the actual or constructive knowledge of Alpine of the preceding facts, Alpine did not conduct a reasonable inquiry in connection with the sale of unregistered securities to determine whether the sale of those securities of ProBility in its customer account, Mesa, would violate the requirements of Section 5 of the Securities Act, state securities law or the rules promulgated by FINRA pursuant to its authority provided by the SEC. For example, FINRA Regulatory Notice 09-05 provides that:

> All firms must have procedures reasonably designed to avoid becoming participants in the potential unregistered distribution of securities.
> …
> The Securities Act prohibits the sale of securities unless the sale is made pursuant to an effective registration statement, or falls within an available exemption from registration. **Before selling securities in reliance on an exemption, a firm must take reasonable steps to ensure that the transaction qualifies for the exemption, regardless of whether the sale is for its own accounts or on behalf of customers**. This includes taking whatever **steps necessary to ensure that the sale does not**

**involve an issuer, a person in a control relationship with an issuer, or an underwriter** with a view to offer or sell the securities in connection with an unregistered distribution.

…Section 4(2) of the Securities Act exempts sales made by an issuer not involving a public offering. Whether a sale is one that involves a public offering, however, is a question of fact which requires an inquiry regarding the surrounding circumstances, including such factors as the relationship between the seller and the issuer, and the nature, scope, size, type and manner of the offering. **Section 4(4) of the Securities Act provides an exemption for unsolicited brokers' transactions. However, this exemption is available only if a broker is not aware, after a reasonable inquiry, of circumstances indicating that the selling customer is participating in a distribution of securities**.

…

A common theme in [unregistered distribution enforcement] cases was that firms resold large amounts of low-priced equity securities in over-the-counter transactions. Among the allegations in these cases are that the inquiries necessary to uncover the facts of the unregistered distribution were not done or were inadequate, and the firms lacked proper supervisory controls to ensure that their written procedures were being followed. More specifically, …firms failed to take steps to determine when or how their customers had received the share certificates at issue, **whether their customers were control persons of the issuers, or what percentage of the outstanding shares of these companies their customers owned**.

…

…[P]roblems can arise when firms fail to recognize or take appropriate steps when confronted with "red flags" that signal the possibility of an illegal, unregistered distribution.

[E]xamples of red flags [relevant to the sale of ProBility]

…

A customer has a pattern of depositing physical share certificates, immediately selling the shares and then wiring out the proceeds of the resale;

A customer deposits share certificates that are recently issued or represent a large percentage of the float for the security;

…

The lack of a restrictive legend on deposited shares seems inconsistent with the date the customer acquired the securities or the nature of the transaction in which the securities were acquired;

…

The company was a shell company when it issued the shares;

A customer with limited or no other assets under management at the firm receives an electronic transfer or journal transactions of large amounts of low-priced, unlisted securities;

The issuer has been through several recent name changes, business combinations or recapitalizations, or the company's officers are also officers of numerous similar companies[.]

…

Before reselling restricted securities, **firms must take reasonable steps to ensure that the transaction complies with Rule 144 or another available exemption**.

A true and correct copy of FINRA Regulatory Notice 09-05 ("NTM 09-05") is attached hereto as

1   Exhibit J (emphasis added).[6]

2       53. On information and belief, Alpine did not conduct a reasonable inquiry regarding the opinion

3   letter provided to it by Mesa and Isen in light of the facts disclosed to Alpine and the actual or

4   constructive knowledge of Alpine. For example, NTM 09-05 provides that

5           In considering their obligations, firms should be aware that there are limitations on
            their ability to discharge those obligations by relying on others. FINRA, the SEC and

6           the courts have repeatedly held that firms cannot rely on outside counsel, clearing
            firms, transfer agents, issuers, or issuer's counsel to discharge their obligations to

7           undertake an inquiry. Moreover, **the fact that securities have been issued by a
            transfer agent without a restrictive legend, or have been put into trading status**

8           **by a clearing firm, does not mean that those securities can be resold immediately
            and without limitation under the Securities Act**…Recent investigations have

9           uncovered fact patterns in which firms inappropriately relied on stock certificates
            issued without restrictive legends **or certificates accompanied by false attorney**

10          **opinions**, or assumed that their clearing agent had the responsibility to determine if
            shares could be sold without restriction. [F]irms are still responsible for the discharge

11          of their obligations, even if they rely on third parties to perform certain activities and
            functions related to their business operations and regulatory responsibilities.

12          *Id*. (emphasis added).

13      54. On information and belief, Alpine did not conduct a reasonable inquiry regarding the control

14  person, persons with authority, ownership of the Mesa and other risks associated with the type of

15  account held by Mesa. For example, the SEC identified "certain types of accounts that appeared to

16  be frequently associated with the unregistered sale of large quantities of the illiquid shares of

17  microcap issuers, including sales of restricted securities on behalf of corporate insiders. They

18  included certain omnibus accounts, which can be used to disguise the trading activity of the

19  accounts' beneficial owners by commingling securities and funds from several beneficial owners.

20  Examples of such omnibus accounts included, but were not limited to: …Accounts held in the name

21  of a corporate entity (or LLC), either for the company's own use or as a third-party custodian on

22  behalf of other beneficial shareholders or customers, which disguise the unregistered sales of

23  securities owned by corporate insiders of the company and allow for those insiders to withdraw

24

25

26

27  [6] *See also* SEC Office of Compliance Inspections and Examinations, Broker-Dealer Controls

28  Regarding Customer Sales of Microcap Securities (October 9, 2014).

EK EVANS & KOB, PC

1    proceeds individually[.]"[7]

2    55. The decreased price and the increased volatility in ProBility stock have made it difficult or

3    impossible for ProBility to capitalize its continuing operations and/or to seek various forms of longer

4    term financing, causing ProBility to suffer injury and other damages as a result of Defendants'

5    conduct.

6    56. ProBility seeks the termination and/or rescission of the Transfer Agreement fraudulently

7    induced by Isen and Mesa.

8    57. ProBility seeks to rescind and/or unwind the Transfer Agreement as any association by

9    ProBility, or its shares, with Isen or any common enterprise with Isen, including Mesa and Alpine,

10   causes irreparable injury and damage to ProBility's reputation, probability of executing its business

11   plan, including the difficulty or impossibility of ProBility to capitalize its continuing operations,

12   execute acquisitions with potential targets, or seek various forms of additional favorable long-term

13   financing. As a result, the investment and existing value of existing shareholders (or beneficial

14   owners of shares) will be put at significant risk as a result of Defendants' conduct.

15                                 **FIRST CAUSE OF ACTION**

16                                 **(BREACH OF CONTRACT)**

17                                 **(Civ. Code, §§ 3300, 1440)**

18                                 **(Against Isen, Mesa and FSC)**

19   58. ProBility incorporates and realleges the allegations set forth in paragraphs 1 through 57 of

20   this Complaint as though fully set forth herein.

21   59. On or about April 2017, ProBility, Isen and Mesa entered into an oral agreement, based on

22   the oral promises of Isen, on behalf of himself, FSC and Mesa, ProBility would enter into a series of

23   transactions that resulted in a transfer of shares below at a below market price to Mesa, in which

24   Isen, through his control and authority over Mesa, could avoid market volatility and decreased stock

25   price of ProBility, while concurrently stabilizing the market through orderly sales and a robust

26

27   _____

     [7] *See* SEC Office of Compliance Inspections and Examinations, Broker-Dealer Controls Regarding

28   Customer Sales of Microcap Securities (October 9, 2014).

EVANS & KOB, PC

1  marketing campaign.

2      60. Based on Defendants' oral agreement, ProBility agreed to a below market conversion price

3  of $0.04 per share. ProBility would not have agreed to this conversion price otherwise.

4      61. Defendants have repudiated this contract by implication, by: (i) selling and continuing to sell

5  ProBility shares in large volumes that has decreased the price of the stock and increased the

6  volatility of the market for ProBility making it difficult or impossible for ProBility to capitalize its

7  continuing operations and/or to seek various forms of longer term financing, causing ProBility to

8  suffer injury and other damages as a result of Defendants' conduct; (ii) through Isen being named in

9  both criminal and civil securities fraud complaints on January 12, 2017, marking Defendants'

10  performance futile or impossible.

11      62. At the time Defendants' acts of repudiation, ProBility had performed the terms of the

12  contract in the manner specified by the contract.

13      63. ProBility has performed all conditions, covenants, and promises required to be performed in

14  accordance with the terms and conditions of the agreement, except where such performance was

15  excused by the conduct and/or breaches of Defendants.

16      64. Such failure and refusal by Defendants to honor the oral agreement constitutes a breach.

17      65. ProBility has been damaged as a direct and proximate result of Defendants' breach. Among

18  other losses, ProBility has lost capital on the below market prices of the Transferred Shares sold into

19  the market and lost significant valuation that has affected its ability to execute pending acquisitions

20  and financing transactions or will cause materially detrimental amendments to the proposed terms.

21      66. As specific performance is unavailable, ProBility is entitled to rescission of the oral

22  agreements and all transactions related thereto, including the Transfer Agreement, and a return of the

23  value of ProBility's stock.

24      67. In the alternative, in the event that the Court does not order specific performance or

25  rescission, ProBility are entitled to money damages in an amount to be proven at trial, but in no

26  event less than the value of the market price of the stock, plus statutory interests and costs as the

27  Court deems just and reasonable.

28      68. ProBility is further entitled to lost income that it would have earned had the oral contract

EVANS & KOB, PC

1  been honored.

2  **SECOND CAUSE OF ACTION**

3  **(NEGLIGENT MISREPRESENTATION)**

4  **(Against All Defendants)**

5  69. ProBility incorporates and realleges the allegations set forth in paragraphs 1 through 68 of

6  this Complaint as though fully set forth herein.

7  70. At the time of entering into the oral agreement and the Transfer Agreement, Isen, Mesa and

8  FSC owed a duty to ProBility to disclose facts which, if not disclosed, would likely mislead

9  ProBility regarding Convertible Note, Settlement Agreement and Transferred Shares.

10  71. At the time of entering into the oral agreement and the Transfer Agreement, Isen, Mesa and

11  FSC, failed to disclose the material fact that Isen was the subject of a SEC and DOJ investigation for

12  criminal and civil securities fraud that would make performance of their promises impossible and

13  would cause irreparable reputational harm to ProBility.

14  72. At the time of entering into the oral agreement and the Transfer Agreement, Isen, Mesa and

15  FSC, failed to disclose the material fact that Isen, Mesa and FSC did not intend to honor their

16  promises or obligations as this was another "pump and dump" by Isen and FSC, through their straw

17  man, Mesa.

18  73. At the time of the Alpine Demand to remove the restrictive legends on the Transferred

19  Shares, Alpine knew or should have known of the agreements, the breaches thereof, and the charges

20  against Isen, an integral party in which Alpine had previously communicated with on behalf of

21  Mesa.  Alpine did not make any reasonable inquiry as required under Section 5 of the Securities Act

22  or FINRA rules, but nonetheless, represented to both ProBility and the transfer agent, "in order to

23  induce [ProBility]…transfer the" Transferred Shares owned by Mesa that it is about to sell "in a

24  manner satisfying the requirements of Section(g), Rule 144 of the Securities Act of 1933" that "after

25  such reasonable inquiry, is not aware of any facts indicating that the information supplied by [Mesa]

26  to [Alpine] in connections with the sale of the above described securities was not complete and

27  accurate as of the date of the sale of such securities."

28  74. Defendants had no reasonable grounds for believing the representations were true when they

26

COMPLAINT

1  made the representations.

2      75. ProBility reasonable relied on the Defendants' representations.

3      76. ProBility was harmed.

4      77. ProBility's reliance on Defendants' representations were a substantial factor in causing

5  ProBility's harm.

6                        **THIRD CAUSE OF ACTION**

7                         **(COMMON LAW FRAUD)**

8                          **(Against All Defendants)**

9      78. ProBility incorporates and realleges the allegations set forth in paragraphs 1 through 77 of

10 this Complaint as though fully set forth herein.

11     79. In order to induce ProBility to enter into the preceding oral agreement and Transfer

12 Agreement, Isen, Mesa and FSC made materially false statements or material omissions and the

13 reasons each statement was knowingly false when made are described above (in paragraphs 16, 18-

14 27, 33-38).

15     80. As explained above and in paragraphs 28-32, ProBility reasonably relied upon Isen, Mesa

16 and FSC's false statements.

17     81. The material misrepresentations by Alpine and reason each statement made by Alpine is

18 knowingly false when made are set forth in paragraphs 43, 45-53.

19     82. As explained above and in paragraph 43, ProBility reasonably relied upon Alpine's false

20 statements.

21     83. Isen, Mesa and FSC had a duty to disclose to ProBility based on their material

22 misrepresentations, absent disclosure would be misleading.

23     84. Alpine had a duty to disclosed based on their representations to induce ProBility and the

24 transfer agent into accepting the Transferred Shares for resale.

25     85. At the time of the material misrepresentations and omissions identified above by each of the

26 Defendants, ProBility was ignorant of their falsity and believed them to be true. Had ProBility

27 known of the truth at the time, they would not have entered into the Convertible Note at a below

28 market conversion price (or at all), entered into the Settlement Agreement (or at all), sought a

EVANS & KOB, PC

3(a)(10) exemption, withdrew its argument that ProBility was not a shell company with the SEC, issued or transferred the Transfer Shares or engaged in any business relationship or communication with Alpine. Indeed, the material misrepresentations and omissions on each of these occasions caused ProBility harm.

86. ProBility's reliance on each of the Defendants' material misrepresentations and omissions (identified above) was justified.

87. As a proximate result of Defendants' respective intentional material misrepresentations, as herein alleged, ProBility has suffered damages which will be established according to proof at trial, in an amount in excess of this Court's minimum jurisdiction.

## FOURTH CAUSE OF ACTION

## RESCISSION BASED ON FRAUD

### (Against Mesa, Isen and FSC)

88. ProBility incorporates and realleges the allegations set forth in paragraphs 1 through 87 of this Complaint as though fully set forth herein.

89. In reliance on Defendants' representations, and ignorant of its falsity, ProBility was induced to enter into the Convertible Note or the Settlement Agreement or transferred the Transfer Shares.

90. Had ProBility known that the representations were not truthful ProBility would not have entered in Convertible Note or the Settlement Agreement or transferred the Transfer Shares.

91. ProBility did not discover that any injury was caused by Defendant until on or about July 12, 2017, when Isen was charged with criminal and civil securities fraud allegations. On this date ProBility discovered the falsity of Defendants' representation and became entitled to rescind the contract on the ground of fraudulent misrepresentation.

92. On or about July 28, 2017, Plaintiff promptly gave notice to Defendants of rescission and offered to either negotiate market terms. Alternatively, service of this Complaint constitutes notice or offer or both.

93. As a proximate result of Defendants' respective intentional material misrepresentations, as herein alleged, ProBility has suffered damages which will be established according to proof at trial, in an amount in excess of this Court's minimum jurisdiction.

EVANS & KOB, PC

94. ProBility desires a judicial determination that the Convertible Note and Settlement Agreement are rescinded, costs and expenses incurred in bringing this action and such other additional relief as the Court deems just and proper.

**FIFTH CAUSE OF ACTION**

**RESCISSION BASED ON MUTUAL MISTAKE**

**(Against Mesa, Isen and FSC)**

95. ProBility incorporates and realleges the allegations set forth in paragraphs 1 through 94 of this Complaint as though fully set forth herein.

96. Alternatively, when Mesa, Isen and FSC made the representations referenced in Third Cause of Action, Defendants were mistaken.

97. Entry of the Settlement Agreement is otherwise premised on a mistake of law. The SEC makes clear that the Settlement Agreement and the June 20th Order could not approve the freely tradeable shares of ProBility as "when options, warrants, or other convertible securities are issued in the Section 3(a)(10) transaction, Section 3(a)(10) does not exempt the later exercise or conversion." *See* SEC Division of Corporate Finance, Staff Legal Bulletin No. 3A (CF) (June 18, 2008) Release No. SLB -3A; *see also* Allied Leisure Indus., Inc. (S.E.C. No - Action Letter Oct. 4, 1979) 1979 WL 14401, at *2 ("is unable to conclude that it would not recommend enforcement action if the above warrants are exercised and the underlying common stock issued without compliance with the registration provisions of the Act. Such exercise would appear to involve the sale of the underlying common stock, which is subject to registration absent an appropriate exemption."). The Court approved the issuance of the Convertible Note, the later exercise/conversion of the Convertible Note is not exempt under Section 3(a)(10).

98. ProBility desires a judicial determination that the Convertible Note and Settlement Agreement are rescinded, costs and expenses incurred in bringing this action and such other additional relief as the Court deems just and proper.

COMPLAINT

EVANS & KOB, PC

**SIXTH CAUSE OF ACTION**

**CONVERSION**

**(Against Mesa, Isen and FSC)**

99. ProBility incorporates and realleges the allegations set forth in paragraphs 1 through 98 of this Complaint as though fully set forth herein.

100.     By virtue of the conduct alleged above, Defendants wrongfully, fraudulently, and maliciously retained and converted ProBility's shares for their own use, with full knowledge that ProBility was the lawful and beneficial owners of said shares and were entitled to the exclusive rights thereto.

101.     Defendants disposed of the ProBility's shares through the sale on the OTCBB in a manner inconsistent with ProBility's rights.

102.     As a proximate result of Defendants' conversion, as herein alleged, ProBility has suffered damages which will be established according to proof at trial, in an amount in excess of this Court's minimum jurisdiction.

**SEVENTH CAUSE OF ACTION**

**AIDING AND ABETTING**

**(Against Alpine)**

103.     ProBility incorporates and realleges the allegations set forth in paragraphs 1 through 102 of this Complaint as though fully set forth herein.

104.     Alpine substantially assisted Mesa, Isen and FSC in perpetrating their fraud and other malfeasance against ProBility, as described herein, including conversion.

105.     At the time of the Alpine Demand to remove the restrictive legends on the Transferred Shares, had actual knowledge of Mesa, Isen and FSC's fraud and other malfeasance against ProBility, as described herein.  Alpine did not make any reasonable inquiry as required under Section 5 of the Securities Act or FINRA rules, but nonetheless, represented to both ProBility and the transfer agent, "in order to induce [ProBility]…transfer the" Transferred Shares owned by Mesa that it is about to sell "in a manner satisfying the requirements of Section(g), Rule 144 of the Securities Act of 1933" that "after such reasonable inquiry, is not aware of any facts indicating that

EK EVANS & KOB, PC

1   the information supplied by [Mesa] to [Alpine] in connections with the sale of the above described

2   securities was not complete and accurate as of the date of the sale of such securities."

3   106.     As such, Alpine aided and abetted Mesa, Isen and FSC and are liable to ProBility to

4   the same degree.

5                              **SEVENTH CAUSE OF ACTION**

6                                       **CONSPIRACY**

7                              **(Against All Defendants)**

8   107.     ProBility incorporates and realleges the allegations set forth in paragraphs 1 through

9   106 of this Complaint as though fully set forth herein.

10   108.     ProBility is informed and believes, and thereon alleges, that the Defendants

11   knowingly and willfully entered into an agreement and conspiracy to defraud ProBility by

12   appropriating the Transferred Shares, concealing such conversion and using the misappropriated

13   funds for their own purposes.

14   109.     ProBility is informed and believes, and thereon alleges, that pursuant to the

15   aforementioned agreement and conspiracy, the Defendants committed the illegal acts alleged above

16   and distributed the misappropriated funds, or portions thereof, to themselves.

17   110.     As a proximate result of the Defendants' conspiracy to defraud Plaintiffs as herein

18   alleged, ProBility has suffered damages which will be established according to proof at trial, in an

19   amount in excess of this Court's minimum jurisdiction.

20                              **EIGHTH CAUSE OF ACTION**

21                                   **UNJUST ENRICHMENT**

22                              **(Against All Defendants)**

23   111.     ProBility incorporates and realleges the allegations set forth in paragraphs 1 through

24   110 of this Complaint as though fully set forth herein.

25   112.     Mesa, Isen and FSC were the recipient of substantially all of the ill-gotten gains from

26   the sale of the Transferred Shares. Based on the allegations contained herein, Mesa, Isen and FSC

27   received and accepted the Transferred Shares with knowledge that such were acquired through their

28   fraudulent inducement to enter into the Transfer Agreement, knowing that ProBility was the true and

EK   EVANS & KOB, PC

1   proper owner of the Transferred Shares. Despite this knowledge, Mesa, Isen and FSC maintained

2   possession of the Transferred Shares and any funds received on the sale of the Transferred Shares.

3        113.     Alpine received commissions on the sale of the Transferred Shares and paid itself

4   those commissions despite knowing that such commissions were levied on the sale of ProBility's

5   shares that were acquired by Mesa, Isen and FSC through fraud, and to the detriment of ProBility's

6   shareholders.

7        114.     ProBility, as a matter of law and in equity and good conscience, are therefore entitled

8   to restitution from Defendants constituting the value of the misappropriated Transferred Shares, any

9   funds received on the sale and any commissions or fees earned, which will be established according

10  to proof at trial, in an amount in excess of this Court's minimum jurisdiction.

11  **NINTH CAUSE OF ACTION**

12  **DECLARATORY RELIEF FOR ORDER DIRECTING SURRENDER AND EXCHANGE**

13  **OF CERTIFICATES**

14  **(Corp. Code, § 422)**

15  **(Against Mesa and Alpine)**

16       115.     ProBility incorporates and realleges the allegations set forth in paragraphs 1 through

17  114 of this Complaint as though fully set forth herein.

18       116.     Certificate 1237, in the name of Mesa, no longer conform to the articles or to the

19  rights of Mesa, as the holder thereof.

20       117.     ProBility has attempted to order, through non-judicial means, that Mesa cease and

21  desist further attempts to remove the restrictive legends on the shares, cancel the outstanding

22  certificate for shares and issue a new certificate therefore, which confirms to the existing rights of

23  Mesa, based on the factual allegations contained herein, but Mesa and Alpine have refused

24  ProBility's demand as provided in paragraphs 41-42.

25       118.     Defendants refused, and continues to refuse, to surrender the share certificates for

26  new certificates.

27       119.     ProBility desires a judicial determination against Defendants that the Court order

28  Defendants to surrender the certificate (or certificates if Defendants have removed the restriction on

EVANS & KOB, PC

Certificate 1236 through other means), costs and expenses incurred in bringing this action and such other additional relief as the Court deems just and proper.

## III.    PRAYER FOR RELIEF

WHEREFORE, ProBility prays for trial by jury and request that the Court:

1.  Enter judgment in favor of ProBility and against Defendants on all Counts;

2.  Award ProBility compensatory damages in an amount to be determined at trial;

3.  Award ProBility punitive damages in an amount to be determined at trial appropriate to the severity of Defendants' conduct;

4.  Award ProBility its costs and interest;

5.  A judicial determination that the Convertible Note and Settlement Agreement are rescinded;

6.  A judicial determination against Defendants that for Defendants to surrender the certificates for reissuance;

7.  Such other and further relief as this Court may deem just and proper.

Dated: October 25, 2017             Respectfully submitted,

                                    **EVANS & KOB, PC**


                                    By: _Brett S. Evans_____
                                        Brett G. Evans
                                    Attorneys for Plaintiff ProBility Media Corporation

COMPLAINT

E-K EVANS & KOB, PC

Exhibit A

## NOTE SETTLEMENT AGREEMENT

This Note Settlement Agreement (this **"Agreement"**) is entered into as of October 5, 2016 (the **"Effective Date"**) by and between Typenex Co-Investment, LLC, a Utah limited liability company (**"Lender"**), and Panther Biotechnology, Inc., a Nevada corporation (**"Borrower"**). Capitalized terms used in this Agreement without definition shall have the meanings given to them in the Note (defined below). Each of Borrower and Lender is sometimes referred to herein individually as a **"Party"** and collectively as the **"Parties."**

A.      Borrower previously sold and issued to Lender that certain Secured Convertible Promissory Note dated August 20, 2015 in the original principal amount of $1,215,000.00 (the **"Note"**) pursuant to that certain Securities Purchase Agreement dated August 20, 2015 by and between Lender and Borrower (the **"Purchase Agreement,"** and together with the Note and all other documents entered into in conjunction therewith, the **"Transaction Documents"**).

B.      On March 30, 2016, Lender delivered to Borrower a certain notice outlining the occurrence of various Events of Default under the Transaction Documents (the **"Defaults"**).

C.      As a result of the Defaults, on or around April 25, 2016, Lender filed a lawsuit against Borrower in the Third Judicial District Court of Salt Lake County, State of Utah (the **"Lawsuit"**) and initiated arbitration against Borrower by delivering an Arbitration Notice pursuant to Section 10.2 and Exhibit H of the Purchase Agreement (the **"Arbitration"**).

D.      Lender and Borrower now desire to restructure and settle the Note on the terms and conditions set forth herein and to stay the Lawsuit and the Arbitration.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.      **Recitals and Definitions**. Each of the parties hereto acknowledges and agrees that the recitals set forth above in this Agreement are true and accurate, are contractual in nature, and are hereby incorporated into and made a part of this Agreement.

2.      **Settlement Amount**. Notwithstanding the terms and conditions of the Note, Borrower covenants and agrees to pay to Lender $265,000.00 plus accrued interest thereon (the **"Settlement Amount"**) in accordance with the terms and conditions of this Agreement. The Settlement Amount will be due and payable to Lender in fourteen (14) payments (each such payment, an **"Amortization Payment"**). The first thirteen (13) Amortization Payments will be in the amount of $20,000.00 each and the fourteenth (14th) Amortization Payment will be in the amount of the unpaid balance of the Settlement Amount. The first Amortization Payment is due and payable to Lender on or before October 21, 2016, and each successive Amortization Payment is due and payable to Lender on or before the fifth (5th) day of each month thereafter until November 5, 2017 (each such date, a **"Payment Date"**). The first thirteen (13) Amortization Payments shall be made as follows: (i) $10,000.00 in cash, and (ii) if elected by Lender in its sole discretion, up to $10,000.00 in shares of Borrower's Common Stock (**"Payment Shares"**); provided that any portion of any Amortization Payment that is paid via Payment Shares (the **"Conversion Amount"**) shall be subject to the following conditions: (a) the



number of Payment Shares deliverable with respect to any portion of any Amortization Payment made in Common Stock shall be equal to the Conversion Amount divided by the Market Price (as defined below); (b) all Payment Shares must be delivered in the manner set forth in Section 9 of the Note; and (c) the applicable Payment Shares must have been received by Lender or its broker, as applicable, and become Free Trading within three (3) Trading Days of the delivery of the Conversion Notice (as defined below) for such Amortization Payment to be deemed to have been timely made. The fourteenth (14th) and final Amortization Payment shall be made in cash. If Lender elects to receive a particular Conversion Amount via Payment Shares, then in such event Lender will deliver a conversion notice (a "**Conversion Notice**") to Borrower setting forth the number of Payment Shares deliverable with respect to such Conversion Amount. Any Payment Shares delivered pursuant to this Section 2 shall be subject to a true-up in accordance with the terms and provisions of Section 11 of the Note. In addition, if any Conversion Amount in any month is less than $10,000.00, then in the following month or months Lender shall be allowed to convert an amount equal to the difference between the amounts Lender was allowed to convert and the amounts Lender actually converted. For illustration purposes only, if Lender's aggregate Conversion Amounts during the first two (2) months following the Effective Date were $15,000.00, then Lender would be entitled to convert a Conversion Amount of up to $15,000.00 in the next month (the $10,000 available for conversion during such third month, plus the $5,000.00 carryover from the first two (2) months). If Lender's aggregate Conversion Amounts during the third month following the Effective Date were $12,000.00 for purposes of this example, then Lender would be entitled to convert a Conversion Amount of up to $13,000.00 during the following month. For purposes hereof the term "**Market Price**" shall mean 60% multiplied by the average of the three (3) lowest Closing Bid Prices in the ten (10) Trading Days immediately preceding the applicable Payment Date.

3.     **Prepayment.** Borrower shall have the right, exercisable at any time in Borrower's sole discretion, to prepay the Settlement Amount, in full, prior to the final Payment Date without any prepayment penalty.

4.     **Interest.** Beginning on the Effective Date, Interest shall accrue on the Settlement Amount at the rate of 10% per annum. All interest calculations hereunder shall be computed on the basis of a 360-day year comprised of twelve (12) thirty (30) day months and shall compound daily. Interest shall be calculated, due and payable with the 14th payment.

5.     **Share Reserve.** Within three (3) Trading Days of the Effective Date, Borrower agrees to cause its transfer agent to increase the Share Reserve (as defined in the Purchase Agreement) to 3,750,000 shares of Common Stock and to cause its transfer agent to provide confirmation to Lender that such increase in the Share Reserve has been completed.

6.     **Forbearance.** Subject to the terms, conditions and understandings contained in this Agreement, Lender hereby agrees to refrain and forbear from exercising and enforcing its remedies under the Note, any of the Transaction Documents or under applicable law, for so long as Borrower is not in default of any of its obligations under this Agreement, including without limitation making all Amortization Payments as and when due (the "**Forbearance**"). For the avoidance of doubt, the Forbearance shall automatically terminate immediately upon the occurrence of any material breach of this Agreement (including without limitation any failure of Borrower to make any Amortization Payment when due) and in such event Lender may seek all

2

recourse available to it under the terms of the Note, this Agreement, or any other Transaction Document.

7.      **Payment in Full**. Upon satisfaction of all of Borrower's obligations under this Agreement, including, without limitation, timely payment of all Amortization Payments to Lender or otherwise paying the entire Settlement Amount, Borrower shall be deemed to have paid the entire Outstanding Balance of the Note in full and shall have no further obligations under the Note. In addition, upon satisfaction of all of Borrower's obligations under this Agreement, including without limitation payment of all Amortization Payments or otherwise paying the Settlement Amount to Lender in full, the Transaction Documents will terminate and shall be deemed to be of no further force or effect, and the Parties shall be released from all obligations, definitions, representations and commitments therein.

8.      **Failure to Comply**. Should Borrower fail to comply with any of the conditions set forth herein, including without limitation failing to make any Amortization Payment when due hereunder (including timely delivery of any Payment Shares), if Borrower has not previously repaid the Settlement Amount in full, all accommodations given herein shall immediately and automatically be deemed withdrawn and Lender shall be entitled to all remedies available to it at law, in equity or as otherwise set forth in the Note, the other Transaction Documents, and this Agreement, including without limitation accelerating Borrower's obligation to repay the entire Outstanding Balance of the Note in full (as such Outstanding Balance is calculated pursuant to the terms of the Note and notwithstanding any reductions thereof or other accommodations granted herein) and Default Interest shall begin accruing on such Outstanding Balance. In the event Borrower has made any Amortization Payments hereunder, but fails to make all Amortization Payments when due hereunder, Lender shall apply the Amortization Payments previously made against the Outstanding Balance of the Note.

9.      **Stay of Lawsuit and Arbitration**. Upon execution of this Agreement, the Parties agree to cause the Lawsuit and the Arbitration to be stayed. The Parties further agree to cooperate with each other to the extent reasonably necessary in the filing of any documents necessary to stay the Lawsuit and the Arbitration. In addition, the Parties also agree to dismiss the Lawsuit and the Arbitration with prejudice once Borrower's obligations hereunder have been satisfied in full (including, without limitation, timely payment of all Amortization Payments to Lender or otherwise paying the entire Settlement Amount).

10.     **Ownership Limitation**. Notwithstanding anything to the contrary contained in this Agreement, if at any time Lender shall or would be issued shares of Common Stock hereunder, but such issuance would cause Lender (together with its affiliates) to beneficially own a number of shares exceeding 9.99% of the number of shares of Common Stock outstanding on such date (including for such purpose the shares of Common Stock issuable upon such issuance) (the "**Maximum Percentage**"), then Borrower must not issue to Lender shares of Common Stock which would exceed the Maximum Percentage. For purposes of this section, beneficial ownership of Common Stock will be determined pursuant to Section 13(d) of the 1934 Act. The shares of Common Stock issuable to Lender that would cause the Maximum Percentage to be exceeded are referred to herein as the "**Ownership Limitation Shares**". Borrower will reserve the Ownership Limitation Shares for the exclusive benefit of Lender. From time to time, Lender may notify Borrower in writing of the number of the Ownership Limitation Shares that may be

3



issued to Lender without causing Lender to exceed the Maximum Percentage. Upon receipt of such notice, Borrower shall be unconditionally obligated to immediately issue such designated shares to Lender, with a corresponding reduction in the number of the Ownership Limitation Shares. By written notice to Borrower, Lender may increase, decrease or waive the Maximum Percentage as to itself but any such waiver will not be effective until the 61st day after delivery thereof. The foregoing 61-day notice requirement is enforceable, unconditional and non-waivable and shall apply to all affiliates and assigns of Lender.

11.    **Representations, Warranties and Agreements**. In order to induce Lender to enter into this Agreement, Borrower, for itself, and for its affiliates, successors and assigns, hereby acknowledges, represents, warrants and agrees as follows:

11.1.    Authority. Borrower has full power and authority to enter into this Agreement and to incur and perform all obligations and covenants contained herein, all of which have been duly authorized by all proper and necessary action. No consent, approval, filing or registration with or notice to any governmental authority is required as a condition to the validity of this Agreement or the performance of any of the obligations of Borrower hereunder.

11.2.    No Waiver. Any Event of Default which may have occurred under any Note has not been, is not hereby, and shall not be deemed to be waived by Lender, expressly, impliedly, through course of conduct or otherwise except upon full satisfaction of Borrower's obligations under this Agreement. The agreement of Lender to refrain and forbear from exercising any rights and remedies by reason of any existing default or any future default shall not constitute a waiver of, consent to, or condoning of, any other existing or future default.

11.3.    Accurate Representations. All understandings, representations, warranties and recitals contained or expressed in this Agreement are true, accurate, complete, and correct in all respects; and no such understanding, representation, warranty, or recital fails or omits to state or otherwise disclose any material fact or information necessary to prevent such understanding, representation, warranty, or recital from being misleading. Borrower acknowledges and agrees that Lender has been induced in part to enter into this Agreement based upon Lender's justifiable reliance on the truth, accuracy, and completeness of all understandings, representations, warranties, and recitals contained in this Agreement. There is no fact known to Borrower or which should be known to Borrower which Borrower has not disclosed to Lender on or prior to the date hereof which would or could materially and adversely affect the understandings of Lender expressed in this Agreement or any representation, warranty, or recital contained in this Agreement.

11.4.    No Defenses. Borrower has no defenses, affirmative or otherwise, rights of setoff, rights of recoupment, claims, counterclaims, actions or causes of action of any kind or nature whatsoever against Lender, directly or indirectly, arising out of, based upon, or in any manner connected with, the transactions contemplated hereby, whether known or unknown, which occurred, existed, was taken, permitted, or begun prior to the execution of this Agreement and occurred, existed, was taken, permitted or begun in accordance with, pursuant to, or by virtue of any of the terms or conditions of the Transaction Documents. To the extent any such defenses, affirmative or otherwise, rights of setoff, rights of recoupment, claims, counterclaims, actions or causes of action exist or existed, such defenses, rights, claims, counterclaims, actions

4



and causes of action are hereby waived, discharged and released. Borrower hereby acknowledges and agrees that the execution of this Agreement by Lender shall not constitute an acknowledgment of or admission by Lender of the existence of any claims or of liability for any matter or precedent upon which any claim or liability may be asserted.

11.5.   Voluntary Agreement. Borrower hereby acknowledges that it has freely and voluntarily entered into this Agreement after an adequate opportunity and sufficient period of time to review, analyze, and discuss (i) all terms and conditions of this Agreement, (ii) any and all other documents executed and delivered in connection with the transactions contemplated by this Agreement, and (iii) all factual and legal matters relevant to this Agreement and/or any and all such other documents, with counsel freely and independently selected by Borrower (or had the opportunity to be represented by counsel). Borrower further acknowledges and agrees that it has actively and with full understanding participated in the negotiation of this Agreement and all other documents executed and delivered in connection with this Agreement after consultation and review with its counsel (or had the opportunity to be represented by counsel), that all of the terms and conditions of this Agreement and the other documents executed and delivered in connection with this Agreement have been negotiated at arm's-length, and that this Agreement and all such other documents have been negotiated, prepared, and executed without fraud, duress, undue influence, or coercion of any kind or nature whatsoever having been exerted by or imposed upon any party by any other party. No provision of this Agreement or such other documents shall be construed against or interpreted to the disadvantage of any party by any court or other governmental or judicial authority by reason of such party having or being deemed to have structured, dictated, or drafted such provision.

11.6.   No Proceedings. There are no proceedings or investigations pending or threatened before any court or arbitrator or before or by, any governmental, administrative, or judicial authority or agency, or arbitrator, against Borrower.

11.7.   No Statutes. There is no statute, regulation, rule, order or judgment and no provision of any mortgage, indenture, contract or other agreement binding on Borrower, which would prohibit or cause a default under or in any way prevent the execution, delivery, performance, compliance or observance of any of the terms and conditions of this Agreement and/or any of the other documents executed and delivered in connection with this Agreement.

11.8.   Solvent. Borrower is solvent as of the date of this Agreement, and none of the terms or provisions of this Agreement shall have the effect of rendering Borrower insolvent. The terms and provisions of this Agreement and all other instruments and agreements entered into in connection herewith are being given for full and fair consideration and exchange of value.

12.   **Certain Acknowledgments.** Each of the parties acknowledges and agrees that no property or cash consideration of any kind whatsoever has been or shall be given by Lender to Borrower in connection with this Agreement.



13.    **Miscellaneous.**

13.1.    <u>Further Assurances</u>.  At any time or from time to time after the Effective Date, at the request of a Party, and without further consideration, each of the Parties shall execute and deliver, or shall cause its respective affiliate(s) to execute and deliver, such other agreements, instruments, certifications or other documents as may be necessary or desirable to effectuate the transactions and fulfill its obligations under this Agreement.

13.2.    <u>Arbitration</u>. By its execution of this Agreement, each Party agrees to be bound by the Arbitration Provisions (as defined in the Purchase Agreement) set forth as an exhibit to the Purchase Agreement and the parties agree to submit all Claims (as defined in the Purchase Agreement) arising under this Agreement or any Transaction Document or other agreement between the parties and their affiliates to binding arbitration pursuant to the Arbitration Provisions.

13.3.    <u>Governing Law; Venue</u>.   This Agreement shall be governed by and interpreted in accordance with the laws of the State of Utah without regard to the principles of conflict of laws. Each Party consents to and expressly agrees that the exclusive venue for arbitration of any dispute arising out of or relating to this Agreement or any Transaction Document or the relationship of the Parties or their affiliates shall be in Salt Lake County, Utah. Without modifying the Parties obligations to resolve disputes hereunder or under any Transaction Document pursuant to the Arbitration Provisions, each Party hereto submits to the exclusive jurisdiction of any state or federal court sitting in Salt Lake County, Utah in any proceeding arising out of or relating to this Agreement and agrees that all Claims in respect of the proceeding may only be heard and determined in any such court and hereby expressly submits to the exclusive personal jurisdiction and venue of such court for the purposes hereof and expressly waives any claim of improper venue and any claim that such courts are an inconvenient forum. Each Party hereto hereby irrevocably consents to the service of process of any of the aforementioned courts in any such proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to its address as set forth in the Purchase Agreement, such service to become effective ten (10) days after such mailing.  **BORROWER HEREBY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE TO, AND AGREES NOT TO REQUEST, A JURY TRIAL FOR THE ADJUDICATION OF ANY DISPUTE HEREUNDER OR IN CONNECTION WITH OR ARISING OUT OF THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY.**

13.4.    <u>Severability</u>.  If any part of this Agreement is construed to be in violation of any law, such part shall be modified to achieve the objective of the Parties to the fullest extent permitted and the balance of this Agreement shall remain in full force and effect.

13.5.    <u>Successors</u>. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns. This Agreement or any of the severable rights and obligations inuring to the benefit of or to be performed by Lender hereunder may be assigned by Lender to a third party, including its financing sources, in whole or in part. Borrower may not assign this Agreement or any of its obligations herein without the prior written consent of Lender.

6



13.6.    Entire Agreement. This Agreement, together with all other documents referred to herein, supersedes all other prior oral or written agreements between Borrower, Lender, its affiliates and persons acting on its behalf with respect to the matters discussed herein, and this Agreement and the instruments referenced herein contain the entire understanding of the Parties with respect to the matters covered herein and therein and, except as specifically set forth herein or therein, neither Lender nor Borrower makes any representation, warranty, covenant or undertaking with respect to such matters.

13.7.    Amendments; Waiver. This Agreement may be amended, modified, or supplemented only by written agreement of the Parties. No provision of this Agreement may be waived except in writing signed by the Party against whom such waiver is sought to be enforced.

13.8.    Attorneys' Fees. In the event of any action at law or in equity to enforce or interpret the terms of this Agreement, the Parties agree that the Party who is awarded the most money (without regard to any fines, penalties, or charges imposed by any governmental or regulatory authority) shall be deemed the prevailing Party for all purposes and shall therefore be entitled to an additional award of the full amount of the attorneys' fees and expenses paid by such prevailing Party in connection with the dispute without reduction or apportionment based upon the individual claims or defenses giving rise to the fees and expenses. Nothing herein shall restrict or impair an arbitrator's or a court's power to award fees and expenses for frivolous or bad faith pleading.

13.9.    Counterparts. This Agreement may be executed in any number of counterparts with the same effect as if all signing parties had signed the same document. All counterparts shall be construed together and constitute the same instrument. The exchange of copies of this Agreement and of signature pages by facsimile transmission or other electronic transmission (including email) shall constitute effective execution and delivery of this Agreement as to the Parties and may be used in lieu of the original Agreement for all purposes. Signatures of the Parties transmitted by facsimile transmission or other electronic transmission (including email) shall be deemed to be their original signatures for all purposes.

13.10.   Acknowledgement. By executing this Agreement, each of the Parties evidences that it carefully read and fully understands all of the provisions of this Agreement.

13.11.   No Reliance. Borrower acknowledges and agrees that neither Lender nor any of its officers, directors, members, managers, representatives or agents has made any representations or warranties to Borrower or any of its agents, representatives, officers, directors, stockholders, or employees except as expressly set forth in this Agreement and, in making its decision to enter into the transactions contemplated by this Agreement, Borrower is not relying on any representation, warranty, covenant or promise of Lender or its officers, directors, members, managers, agents or representatives other than as set forth in this Agreement.

13.12.   Continuing Enforceability; Conflict Between Documents. Except as otherwise modified by this Agreement, the Note and each of the other Transaction Documents shall remain in full force and effect, enforceable in accordance with all of their original terms and provisions. This Agreement shall not be effective or binding unless and until it is fully



executed and delivered by Lender and Borrower. If there is any conflict between the terms of this Agreement, on the one hand, and the Note or any other Transaction Document, on the other hand, the terms of this Agreement shall prevail.

      13.13.  <u>Time is of the Essence</u>. Time is expressly made of the essence with respect to each and every provision of this Agreement.

      13.14.  <u>Notices</u>. Unless otherwise specifically provided for herein, all notices, demands or requests required or permitted under this Agreement to be given to Borrower or Lender shall be given as set forth in the "Notices" section of the Purchase Agreement.

<em>[Remainder of page intentionally left blank]</em>

8



IN WITNESS WHEREOF, the undersigned have executed this Agreement to be effective as of the Effective Date.

LENDER:

**TYPENEX CO-INVESTMENT, LLC**

By: Red Cliffs Investments, Inc., its Manager

By: _____
    John M. Fife, President

BORROWER:

**PANTHER BIOTECHNOLOGY, INC.**

By: _____
Name: Steven M Plumb
Title: Chief Financial Officer

*[Signature Page to Note Settlement Agreement]*

Exhibit B

# NOTE PURCHASE AGREEMENT

This Note Purchase Agreement (this "Agreement") is made and entered into as of the 12th day of May, 2017, by and between Mesa Strategies, Inc., a Nevada corporation ("Purchaser"), and Typenex Co-Investment, LLC, a Utah limited liability company ("Seller"), collectively referred to hereinafter as the "Parties" or individually as a "Party."

## W I T N E S S E T H :

WHEREAS, Seller is the holder of a certain Secured Convertible Promissory Note issued by Probility Media Corp., a Nevada corporation (f/k/a Panther Biotechnology, Inc.) ("PBYA"), dated August 20, 2015, in the original principal amount of $1,215,000.00 (the "Note"); and

WHEREAS, PBYA made certain payments to Seller after the issuance of the Note which reduced the outstanding balance of the Note; and

WHEREAS, PBYA defaulted on certain of its obligations under the Note and Seller filed a lawsuit against PBYA in the Third Judicial District Court of Salt Lake County, State of Utah and initiated arbitration against PBYA (the "Legal Proceedings"); and

WHEREAS, PBYA and Seller entered into that certain Note Settlement Agreement dated October 5, 2016 (the "Settlement Agreement"), whereby the parties restructured and settled the Note according to the terms of the Note and the Settlement Agreement; and

WHEREAS the Settlement Agreement provided, among other things, that (i) PBYA could settle all obligations under the Note if it paid the Settlement Amount (as defined in the Settlement Agreement) in timely Amortization Payments (as defined and set forth in the Settlement Agreement), and (ii) in the event PBYA failed to make all such Amortization Payments and pay the full Settlement Amount in a timely manner that all accommodations made by Seller under the Settlement Agreement would be withdrawn and Seller could pursue remedies with respect to the entire outstanding balance of the Note notwithstanding the Settlement Amount; and

WHEREAS, PBYA failed to make each Amortization Payment in a timely manner, such that PBYA is, as of the date hereof, in breach of the Settlement Agreement and Seller is entitled to pursue the outstanding balance of the Note and disregard the Settlement Amount; and

WHEREAS, the outstanding balance of the Note as of the date hereof (prior to the transfer to Purchaser) is $533,744.89 (the "Note Balance");

WHEREAS, notwithstanding the Note Balance, PBYA and Purchaser desire that, after the transfer of the Note from the Seller to the Buyer pursuant to this Agreement, the outstanding balance of the Note will be reduced to an amount equal to the Purchase Price (as defined below); and

WHEREAS, Purchaser desires to acquire the Note from Seller, and Seller desires to sell the Note to Purchaser in exchange for cash and upon the terms and subject to the conditions hereinafter set forth.

NOW THEREFORE, in consideration of the mutual covenants, agreements, conditions, representations, and warranties contained in this Agreement, the Parties hereby agree as follows:

The recitals set forth above are a material part of this Agreement, are contractual in nature and are not mere recitals.

1.   PURCHASE, SALE, AND ASSIGNMENT OF THE NOTE

Subject to the terms and conditions of this Agreement, upon execution of this Agreement, and upon receipt of consideration, Seller hereby transfers, sells, and assigns to Purchaser the Note. Seller hereby accepts, as full payment for the Note purchased hereby, One Hundred Eighty Eight Thousand Two Hundred Fifty Dollars ($188,250) (the "Purchase Price"), payable via wire transfer to an account designated in writing by Seller.  In the event Purchaser fails to deliver the Purchase Price to Seller within two (2) business days following execution of this Agreement, Seller shall have the right at any time thereafter to terminate this agreement by written notice to Purchaser and retain all rights in and to the Note.

2.   PURCHASER'S REPRESENTATIONS AND WARRANTIES

2.1   Restricted Securities.  Purchaser understands that the Note will not be registered under the Securities Act of 1933, as amended (the "Securities Act") at the time of purchase and, therefore, cannot be resold unless it is registered under the Securities Act and applicable state securities laws or unless an exemption from such registration requirements is available.  Purchaser is aware that PBYA is under no obligation to effect any such registration with respect to the Note or to file for or comply with any exemption from registration.  Purchaser has not been formed solely for the purpose of making this investment and is purchasing the Note for its own account for investment, not as a nominee or agent, and not with a view to, or for resale in connection with, the distribution thereof.

2.2   Accredited Investor.  Purchaser is an "Accredited Investor" within the meaning of Rule 501 of Regulation D under the Securities Act, as presently in effect.

2.3   Broker's, Finder's or Similar Fees.  There are no brokerage commissions, finder's fees or similar fees or commissions payable by any party in connection with the transactions contemplated hereby based on any agreement, arrangement or understanding with Purchaser or any action taken by Purchaser.

2.4   Disclosure of Information.  Purchaser has been furnished with, and has had access to, such information as it considers necessary or appropriate for deciding whether to enter into this Agreement, and Purchaser has had an opportunity to ask questions and receive answers from PBYA and its officers concerning PBYA's financial situation, business, prospects, and any other matter that Purchaser has deemed relevant or important in determining whether to enter into this Agreement. Among other things, Purchaser is aware that PBYA's business prospects are speculative.  Purchaser has had the opportunity to consult with counsel of its choosing with respect to this Agreement and the transactions contemplated herein.  Purchaser has received a copy of the Settlement Agreement. Purchaser acknowledges that the outstanding balance of the Note, after giving effect to the adjustment discussed in the recitals and in the acknowledgement by PBYA below, to be effected immediately subsequent to the transfer to Purchaser, will be $188,250. No representations or warranties have been made to Purchaser by Seller, or any of its respective officers, directors, employees, agents, sub-agents, affiliates or subsidiaries, other than the representations of Seller contained herein, and in purchasing the Note hereunder, Purchaser is not relying upon any representations of Seller other than those contained herein.

2.5     Investment Risk.  Purchaser is aware that its purchase of the Note pursuant to this Agreement is a speculative investment that is subject to the risk of complete loss.  Purchaser has such knowledge and experience in financial and business matters that Purchaser is capable of evaluating the merits and risks of such investment, is able to incur a complete loss of such investment and is able to bear the economic risk of such investment for an indefinite period of time.

2.6     Default.  Purchaser is aware that the Note is currently in default.

2.7     Opinions.  Purchaser acknowledges and agrees that it shall be solely responsible to obtain any legal opinion necessary to clear shares of common stock issuable to Purchaser upon any conversion of the Note.

3.     MISCELLANEOUS PROVISIONS

3.1     Modifications and Waivers.  This Agreement may not be amended or modified, nor may the rights of any party hereunder be waived, except by a written document that is executed by the Parties.

3.2     Notices.  Any notice, request, consent, or other communication hereunder shall be in writing, and shall be sent by one of the following means: (i) by registered or certified first class mail, postage prepaid; (ii) by facsimile transmission; (iii) by reputable overnight courier service; or (iv) by personal delivery, and shall be properly addressed as follows:

If to Seller, to:                        If to Purchaser, to:

Attn: John Fife                      Attn:  Allan Ligi
Typenex Co-Investment, LLC           Mesa Strategies, Inc.
303 East Wacker Dr., Ste. 1040       18145 Old Creek Road
Chicago, IL 60601                    Po Way, CA 82064

or to such other address or addresses as Seller or Purchaser shall hereafter designate to the other party in writing.  Notices sent by mail or by courier shall be effective seven (7) days after they are sent, and notices delivered personally by facsimile shall be effective at the time of delivery thereof.

3.3     Assignment.  This Agreement is and shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

3.4     Entire Agreement.  This Agreement constitutes the entire agreement between the parties hereto in relation to the subject matter hereof.  Any prior written or oral negotiations, correspondence, or understandings relating to the subject matter hereof shall be superseded by this Agreement and shall have no force or effect.

3.5     Severability.  If any provision which is not essential to the effectuation of the basic purpose of this Agreement is determined by a court of competent jurisdiction to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of the remaining provisions of this Agreement.

3.6     Exhibits.  The exhibits attached hereto and referred to herein are a part of this Agreement for all purposes.

3.7     Counterparts.  This Agreement may be executed in any number of counterparts, each of which when executed and delivered shall be an original, but all of which together shall constitute one and the same instrument.

3.8     <u>Governing Law</u>.  This Agreement shall be construed in accordance with and governed by the laws of the State of California.

3.9     <u>Delays or Omissions</u>.  No delay or omission to exercise any right, power, or remedy accruing to either party, upon any breach or default of the other party under this Agreement, shall impair any such right, power, or remedy, nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring.  Any waiver, permit, consent, or approval of any kind or character on the part of either party of any breach or default by the other party under this Agreement, or any waiver of any provisions or conditions of this Agreement must be made in writing and shall be effective only to the extent specifically set forth in such writing.  All remedies, either under this Agreement or by law or otherwise afforded to either party, shall be cumulative and not alternative.

3.10    <u>Attorneys' Fees</u>.  If either party elects to pursue legal action to enforce its rights under this Agreement, and if a court of competent jurisdiction adjudicates the matter, then the prevailing party in such action shall be entitled to receive from the losing party all costs and expenses, including but not limited to the reasonable fees of attorneys, accountants, and other experts, incurred by the prevailing party in investigating and prosecuting (or defending) such action at the initial trial and appellate levels.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Signature Page to Note Purchase Agreement of
Typenex Co-Investment, LLC and Mesa Strategies, Inc.
dated May 12, 2017

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their duly authorized representatives to be effective as of the date first set forth above.

Typenex Co-Investment, LLC

By: Red Cliffs Investments, Inc., its Manager

By

By: _____
John Fife, President

Mesa Strategies, Inc.

By: _____
Allan Ligi, President

## PBYA CONSENT

By signing below, PBYA acknowledges and consents to this Agreement. Without limiting the foregoing, PBYA specifically (1) consents to the sale and purchase of the Note pursuant to the terms of this Agreement, (2) acknowledges and agrees that the outstanding balance of the Purchased Note subsequent to the transfer to the Purchaser will be $188,250; (3) represents that that certain Note Settlement Agreement dated October 5, 2016 between PBYA and Seller has been terminated and is of no further force or effect; (4) represents and warrants that the obligations evidenced by the Purchased Note are valid and enforceable obligations of PBYA subject to no defenses, setoffs, counterclaims, cross-actions or equities in favor of PBYA, and to the extent PBYA has any defenses, setoffs, counterclaims, cross-actions or equities against Seller or Purchaser and/or against the enforceability of any such obligations, PBYA acknowledges and agrees that same are hereby fully and unconditionally waived by PBYA; and (5) acknowledges and agrees that PBYA's execution hereof is a material inducement to Purchaser and Seller entering into this Agreement and consummating the transactions contemplated hereby.

Probility Media Corp.

By: _____
Printed Name: _____   Steven M. Plumb
Title: _____   Chief Financial Officer

5

Exhibit C

# ASSIGNMENT AGREEMENT

## KNOW ALL MEN BY THESE PRESENTS:

That Typenex Co-Investment, LLC (the "Assignor"), for good and valuable consideration and cash, the receipt and sufficiency of which are hereby acknowledged, does hereby assign and transfer to Mesa Strategies, Inc. (the "Assignee"), $188,250.00 (the "Assigned Amount") of its rights, title and interest in and to that certain Secured Convertible Promissory Note, dated August 20, 2015 in the original principal amount of $1,215,000.00 and an outstanding balance after giving effect to this assignment of $188,250 of Probility Media Group, Inc., a Nevada corporation (f/k/a Panther Biotechnology, Inc.) (the "Company).

The Assignor covenants and agrees to, on behalf of and for the benefit of the Assignee, warrant and defend title to the Assigned Amount hereby sold and assigned to the Assignee, against all and every person and persons whomsoever. The Assignor warrants that it is the lawful holder in every respect of the Assigned Amount and that the Assigned Amount is held free and clear of any and all liens, security agreements, encumbrances, claims, demands and charges of every kind and character whatsoever.

IN WITNESS WHEREOF, the Assignor has executed this Assignment as of the 12th day of May, 2017.

"Assignor"

Typenex Co-Investment, LLC

By: Red Cliffs Investments, Inc., its Manager

By: _____
John Fife, President

1

Exhibit D

## SETTLEMENT AGREEMENT AND RELEASE

THIS SETTLEMENT AGREEMENT AND RELEASE (this "Agreement") is dated as of June 9, 2017 and is made by and between Mesa Strategies, Inc., a Nevada corporation (hereafter "MESA"), and Probility Media Corporation, a Nevada corporation (hereafter "PROBILITY").

WHEREAS, on or about May 12, 2017, MESA purchased the Secured Convertible Promissory Note dated August 20, 2015 of Panther Biotechnology, Inc. (now known as PROBILITY) issued to Typenex Co-Investment, LLC, which had a balance of $188,250; and

WHEREAS on or about May 31, 2017, MESA filed an action against PROBILITY entitled Mesa Strategies, Inc. vs. Probility Media Group, Inc., Case No. 37-2017-00019738-CU-BC-CTL in the Superior Court of San Diego County, California, (the "Court"), whereby MESA asserted claims against PROBILITY alleging that it owes MESA $188,250; and

WHEREAS, MESA has advanced PROBILITY an additional $11,750; and

WHEREAS, PROBILITY is indebted to MESA in the total amount of $200,000 (the "Debt"); and

WHEREAS, PROBILITY acknowledges that it is liable for the Debt, but acknowledges that it does not have sufficient cash to satisfy the Debt; and

WHEREAS, PROBILITY's common stock trades on the domestic U.S. over-the-counter stock market; and

WHEREAS, PROBILITY files reports with the U.S. Securities and Exchange Commission, and its reports are available at www.SEC.gov; and

WHEREAS, PROBILITY currently only has the means to satisfy payment of MESA's bona fide claim through the issuance of authorized shares to MESA and agrees to issue to MESA the 10% Convertible Note dated June 9, 2017 ("Convertible Note") attached as Exhibit 1 that allows MESA to convert all or any part of the Convertible Note into shares of PROBILITY stock at a price of $0.04 per share in full satisfaction of the Debt; and

WHEREAS, adequate information about the value of the securities offered by PROBILITY is publicly available to MESA in the form of PROBILITY's quarterly report for the period ended January 31, 2017, and reports for earlier periods, which reflect that PROBILITY's continuation as a going concern is dependent upon its ability to generate revenues and its ability to continue receiving capital from shareholders and other related parties and obtain financing from third parties; and

1

WHEREAS, PROBILITY and MESA desire to resolve, settle, and compromise MESA's bona fide claims that it has asserted against PROBILITY, which arise out of or relate to the Debt in the amount of $200,000, which is due and owing; and

With this background incorporated herein, the parties hereby agree to the following settlement:

### TERMS OF SETTLEMENT

1.      **RESOLUTION OF CLAIMS.** MESA agrees to resolve its bona fide claim with PROBILITY in exchange for the Convertible Note and the PROBILITY shares of common stock to be issued pursuant to the Convertible Note (the "Common Stock").

2.      **CONVERTIBLE NOTE AND SETTLEMENT SHARES.** In full and final settlement of the Claims, PROBILITY will issue and deliver to MESA the Convertible Note and the shares of Common Stock to be issued under the Convertible Note (the "Settlement Shares"), subject to the beneficial ownership limitations set forth in this Agreement. No later than the trading day after entry of the Order Approving Settlement of Claims (the "Order") and delivery of a Convertible Note conversion notice by Mesa, time being of the essence, PROBILITY will take and cause to be taken all action necessary to complete the transactions contemplated hereby, including, but not limited to: (a) deliver to PROBILITY's transfer agent (i) a copy of the Order, (ii) opinions of a legal counsel for PROBILITY, in form and substance acceptable to MESA's brokers and the transfer agent, that all shares of Common Stock to be issued pursuant to the Order (A) are legally issued, fully paid and non-assessable, (B) when issued in accordance with the Order will be unrestricted, freely tradable and exempted from the registration requirements under the Securities Act of 1933, and (C) may be issued without restrictive legend and immediately resold by MESA without any registration, restriction or limitation; (b) issue the Settlement Shares, as a certificate bearing no restrictive legend, and immediately facilitate conversion into Direct Registration System (DRS) shares to MESA's balance account with The Depository Trust Company (DTC) or the Deposit/Withdrawal Agent Commission (DWAC) system, without any restriction on transfer or resale, provided that PROBILITY participates in the DRS or DWAC systems; and (c) execute and deliver all further instruments and documents as may be reasonably requested by the transfer agent, MESA, or any of its brokers. The issuance of a certificate alone will not constitute completion of the Settlement Shares if PROBILITY participates in DRS or DWAC systems.

**SIGNATURE STOCK TRANSFER, INC. IS DIRECTED TO DELIVER A PROBILITY MEDIA GROUP, INC. COMMON STOCK CERTIFICATE TO MESA AT THE EXPENSE OF PROBILITY MEDIA GROUP, INC. UPON RECEIPT OF THE ORDER, A COPY OF THIS AGREEMENT AND A CONVERSION NOTICE ISSUED UNDER THE CONVERTIBLE NOTE.**

Settlement Shares Shall Be Issued to:

MESA Strategies, Inc.

MESA may present this Agreement, the Order and a conversion notice under the Convertible Note to Signature Stock Transfer, Inc. and Signature Stock Transfer, Inc. shall be directed to honor the Settlement Shares stock issuance requests of MESA arising from this Agreement. This paragraph shall be binding on any and all stock transfer agents retained by PROBILITY.

3.     **PAYMENT IN FULL; SETTLEMEN FAIR AND REASONABLE.** PROBILITY and MESA agree that delivery of the Convertible Note and Settlement Shares shall satisfy PROBILITY's obligation in full regarding the Claim. Further, PROBILITY, the issuer of the securities, and MESA, the proposed party to whom the securities are to be issued, agree that the value of the Convertible Note and Settlement Shares utilized to satisfy the Claims is fair and reasonable.

4.     **FAIRNESS HEARING.** Upon the execution hereof, PROBILITY and MESA agree, pursuant to Section 3(a)(10) of the Securities Act of 1933, as amended ("Securities Act"), to immediately submit a copy of this Agreement to the Court along with a Joint Application for Order Approving Settlement of Claims in the form attached hereto as Exhibit A, and a proposed Order Approving Settlement of Claims in the form attached hereto as Exhibit B, for a determination of the fairness of such terms and conditions of the Agreement and the Plaintiff's claims resolved thereby with the issuance, pursuant to an exemption from federal and state registration, of the Settlement Shares. This Agreement shall become binding upon the parties only upon entry of the Order by the Court.

5.     **PROBILITY'S REPRESENTATIONS, WARRANTIES, AND COVENANTS.** PROBILITY represents, warrants and covenants as follows: (a) it has sufficient authorized common shares to issue to MESA to comply with the terms of this settlement; (b) the shares of Common Stock to be issued pursuant to the Order are (i) duly authorized, and will be validly and legally issued, fully paid and non-assessable, free and clear of all liens, encumbrances and preemptive and similar rights, (ii) unrestricted, freely tradable and exempted from registration under the Securities Act and FSIPA, (iii) issuable without any restrictive legend, and (iv) may be immediately resold by MESA without any registration, restriction or limitation, including without limitation under the Securities Act or the Securities Exchange Act of 1934, as amended; (c) if at any time it appears reasonably possible that there may be insufficient authorized shares to fully comply with the Order, PROBILITY will take all action required to increase its authorized shares so as to ensure its ability to timely comply with the Order; (d) PROBILITY has all necessary power and authority to execute, deliver and perform all of its obligations under this Agreement and the Order, the execution, delivery and performance of which have been duly authorized by all requisite action on the part of PROBILITY, including without limitation approval by its board of directors; (e) this Agreement has been duly executed and delivered by PROBILITY, and is fully enforceable against PROBILITY in accordance with its terms, and the Agreement and Order will not (i) conflict

3

with, violate, or cause a breach or default under any agreement to which PROBILITY is a party, or (ii) require any waiver, consent, or other action of PROBILITY or any other person; (f) PROBILITY waives, without limitation, any agreement related to the Claims requiring payments to be applied in a certain order, manner, or fashion, or providing for jurisdiction or venue in any court other than this Court; (g) neither MESA, nor any of his affiliates, (i) is or was a licensed broker-dealer or an affiliate thereof, (ii) an officer, director, 10% or greater shareholder, control person, or affiliate of PROBILITY within the last 90 days, (iii) will become a control person or affiliate of PROBILITY while in possession of the Settlement Shares or Final Issuance, including without limitation by effectuation of the Order, or (iv) has or will, directly or indirectly, receive or provide any refund, kickback or other consideration in exchange for selling or satisfying the Claims, other than pursuant to this Agreement; (h) PROBILITY understands that the issuance of shares as required by the Order may have a dilutive effect, which may be substantial; (i) neither PROBILITY nor any of PROBILITY's affiliates or agents has or will provide MESA with any material non-public information regarding PROBILITY or its securities; (j) MESA has no obligation of confidentiality, and may sell any Common Stock into the public markets at any time; and (k) with respect to this Agreement and the transactions contemplated hereby (i) MESA is acting solely in an arm's length capacity, (ii) MESA does not make or has not made any representations, warranties or covenants other than those specifically set forth herein, (iii) PROBILITY's obligations under the Order are unconditional and absolute and not subject to any right of set off, counterclaim, delay or reduction, regardless of any claim PROBILITY may have against MESA, (iv) any statement made by MESA or any of MESA's representatives, agents or attorneys is not advice or a recommendation to PROBILITY, and (v) MESA and his affiliates, attorneys, advisors and representatives have not acted and are not acting as legal, financial, accounting, tax, investment or other advisors, agents or fiduciaries of PROBILITY, or in any similar capacity, and have not provided any legal financial, accounting, tax, investment or other advice of any kind to PROBILITY.

Under no circumstances will PROBILITY issue to MESA (a) share certificates bearing any form of restrictive legend, or (b) at any one time a number of shares which, when aggregated with all shares of Common Stock then beneficially owned or controlled by MESA or its affiliates, exceed 9.99% of the total number of shares of Common Stock outstanding after such issuance.

6.    **NECESSARY ACTION.** At all times after the execution of this Agreement and entry of the Order by the Court, each party hereto agrees to take or cause to be taken all such necessary action including, without limitation, the execution and delivery of such further instruments and documents, as may be reasonably requested by any party for such purposes or otherwise necessary to complete or perfect the transaction contemplated hereby.

7.    **WAIVER OF RIGHTS.** Each party hereto waives all rights to appeal, and all defenses to the Order and its enforcement, including without limitation any based on jurisdiction, standing, or splitting causes of action.

8. **THIRD-PARTY BENEFICIARIES.** There will be no third party beneficiaries with respect to this Agreement or the Order.

9. **CONFIDENTIALITY AGREEMENT.** At all times prior to execution of this Agreement, the parties hereto agree to not disclose any of the terms of said Agreement to any other person or entity other than the parties respective legal counsels.

10. **RELEASES.** Upon delivery of the Settlement Shares to MESA and in consideration of the terms and conditions of this Agreement, and except for the obligations and representations arising or made hereunder or a breach hereof, the parties hereby release, acquit and forever discharge the other and each, every and all of their current and past officers, directors, shareholders, affiliated corporations, subsidiaries, agents, employees, representatives, attorneys, predecessors, successors and assigns, of and from any and all claims, damages, causes of action, suits and costs, of whatever nature, character or description, whether known or unknown, anticipated or unanticipated, which the parties may now have or may hereafter have or claim to have against each other with respect to the Claims. Nothing herein shall be deemed to negate or affect MESA's right and title to any securities heretofore issued to it by PROBILITY.

11. **WAIVER OF CALIFORNIA CIVIL CODE SECTION 1542.** The parties to this Agreement, and each of them, acknowledge that the consideration exchanged for this Agreement is intended and does release and discharge any claim and/or cause of action by them with regard to any unknown or future damage, loss or injury, and they do hereby waive any rights under Civil Code Section 1542 (or similar law of any other state or jurisdiction), which reads as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS
> WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT
> TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING
> THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE
> MATERIALLY AFFECTED HIS SETTLEMENTAGREEMENT
> WITH THE DEBTOR.

The parties to this Agreement acknowledge, warrant and represent that they are familiar with section 1542 of the California Civil Code ("Section 1542") and that the effect and import of that provision has been fully explained to them by their respective attorneys. There is a risk that subsequent to the execution of this Agreement, one or more of the parties to this Agreement will incur or suffer loss, damages or injuries related to the subject matter of this Agreement, but which are unknown and unanticipated at the time this Agreement is signed. The parties to this Agreement, and each of them, hereby assume the above mentioned risks and understand that this Agreement shall apply to all unknown or unanticipated claims, losses, damages or injuries relating to the subject matter of this Agreement, as well as those known and anticipated, and upon advice of legal counsel, the parties to this Agreement, and each of them, do hereby waive any and all rights under the aforesaid Section 1542.

The parties to this Agreement, and each of them, acknowledge that they fully understand that they may hereafter discover facts in addition to or different from those which they now know or believe to be true with respect to the subject matter of this Agreement, but that it is their intention hereby to fully, finally and forever release all claims, obligations and matters released herein, known or unknown, suspected or unsuspected, which do exist, may exist in the future or heretofore have existed between the parties to this Agreement, and that in furtherance of such intention, the releases given herein shall be remain in effect as full and complete releases of the matters released herein, notwithstanding the discovery or existence of any such additional or different facts.

12. **DISMISSAL OF PROBILITY.** MESA shall file with the Court a dismissal with prejudice of PROBILITY upon delivery of the Convertible Note in accordance with paragraph 2 herein.

13. **CONTINUING OBLIGATION.** Both parties agree to use their best efforts to cooperate with the Court to cause the Order to be timely entered and agree that delays caused due to the Court calendars shall not constitute a valid reason to void this Agreement.

14. **INFORMATION.** PROBILITY and MESA each represent that prior to the execution of this Agreement, they have had the opportunity to seek the advice of counsel, that they fully informed themselves of its terms, contents, conditions and effects, and that no promise or representation of any kind has been made to them except as expressly stated in this Agreement.

15. **OWNERSHIP AND AUTHORITY.** PROBILITY and MESA represent and warrant that they have not sold, assigned transferred, conveyed or otherwise disposed of any or all of any claim, demand, right or cause of action, relating to any matter which is covered by this Agreement, and each is the sole owner of such claim, demand, right or cause of action, and each has the power and authority and has been duly authorized to enter into and perform this Agreement and that this Agreement is a binding obligation of each, enforceable in accordance with its terms.

16. **BINDING NATURE.** This Agreement shall be binding on all parties executing this Agreement and their respective successors, assigns and heirs.

17. **AUTHORITY TO BIND.** Each party to this Agreement represents and warrants that the execution, delivery and performance of this Agreement and the consummation of the transaction provided in this Agreement have been duly authorized by all necessary action of the respective party and that the person executing this Agreement on its behalf has the full capacity to bind that entity.

18. **SIGNATURES.** This Agreement may be signed in counterparts and the Agreement, together with its counterpart signature pages, shall be deemed valid and binding on each party when duly executed by all parties. Facsimile and electronically scanned signatures shall be deemed valid and binding for all purposes.

19.   **CHOICE OF LAW, ETC.**  Notwithstanding the place where this Agreement may be executed by either of the parties, or any other factor, all terms and provisions hereof shall be governed by and construed in accordance with the laws of the State of California, applicable to agreements made and to be fully performed in that state and without regard to principles of conflicts of law thereof. Any action brought to enforce, or otherwise arising out of this Agreement shall be brought only in the Superior Court of San Diego County, California.

20.   **LEGAL FEES.**  Each party shall pay the fees and expenses of its advisers, counsel, the accountants and other experts, if any, and all other expenses incurred by such party incident to the negotiation, preparation, execution, delivery and performance of this Agreement. Any attorneys' fees and expenses incurred by either PROBILITY, or MESA in connection with the preparation, negotiation, execution and delivery of any amendments to this Agreement or relating to the enforcement of the rights of any party, after the occurrence of any breach of the terms of this Agreement by another party or any default by another party in respect of the transactions contemplated hereunder, shall be paid on demand by the party which breached the Agreement and/or defaulted, as the case may be.

21.   **ENTIRE AGREEMENT; AND INCONSISTENCY.**  This Agreement is the final agreement between PROBILITY and MESA with respect to the terms and conditions set forth herein, and, the terms of this Agreement may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of the parties. No provision of this Agreement may be amended other than by an instrument in writing signed by PROBILITY and MESA, and no provision hereof may be waived other than by an instrument in writing signed by the party against whom enforcement is sought. In the event of any inconsistency between the terms of this Agreement and any other document executed in connection herewith, the terms of this Agreement shall control to the extent necessary to resolve such inconsistency.

[signature page follows]

7

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the date first indicated above.

**MESA STRATEGIES, INC.**

By: _____
Allan Ligi
President

**PROBILITY MEDIA CORPORATION**

By: _____
Steven M. Plumb
Chief Financial Officer

8

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the date first indicated above.

**MESA STRATEGIES, INC.**

By: _____
Allan Ligi
President

**PROBILITY MEDIA CORPORATION**

By: _____
Steven M. Plumb
Chief Financial Officer

8

# EXHIBIT 1 - Convertible Note

# EXHIBIT 1 - Convertible Note

Probility Media Corporation
Original Principal Amount: $200,000

## 10% CONVERTIBLE NOTE
### DATED JUNE 9, 2017

This 10% Convertible Note, in the amount of $200,000 replaces $188,250.00 of the accrued principal and interest of that certain promissory note issued by the maker hereof to Typenex Co-Investments, LLC on August 20, 2015 in the principal amount of $1,215,000, and includes an additional $11,750 advanced by the note holder.

THIS NOTE (the "Note") is a duly authorized Convertible Note of Probility Media Corporation., a Nevada corporation (the Company").

THIS NOTE arises from the conversion of certain debts owed to Mesa Strategies, Inc. (the "Holder") and accrued on the Company's books and records.

FOR VALUE RECEIVED, the Company therefore promises to pay the Holder the principal sum of $200,000.00 (the "Principal Amount") or such lesser principal amount following the conversion or conversions of this Note in accordance with Paragraph 2 (the "Outstanding Principal Amount") on demand (the "Maturity Date"), and to pay interest on the Outstanding Principal Amount ("Interest") in a lump sum on the Maturity Date, at the rate of ten percent (10%) per annum (the 'Rate" from the date of issuance.

Accrual of Interest shall commence on the date of this Note and continue until the Company repays or provides for repayment in full the Outstanding Principal Amount and all accrued but unpaid Interest. Accrued and unpaid Interest shall bear Interest at the Rate until paid, compounded monthly. The Outstanding Principal Amount of this Note is payable on the Maturity Date in such coin or currency of the United States as at the time of payment is legal tender for payment of public and private debts, at the address last appearing on the Note Register of the Company as designated in writing by the Holder from time to time. The Company may prepay principal and interest on this Note at any time before the Maturity Date.

The Company will pay the Outstanding Principal Amount of this Note on the Maturity Date, free of any withholding or deduction of any kind (subject to the provision of paragraph 2 below), to the Holder as of the Maturity Date and addressed to the Holder at the address appearing on the Note Register.

This Note is subject to the following additional provisions:

1.      All payments on account of the Outstanding Principal Amount of this Note and all other amounts payable under this Note (whether made by the Company or any other person) to or for the account of the Holder hereunder shall be made free and clear of and without reduction by reason of any present and future income, stamp, registration and other taxes, levies, duties, cost, and charges whatsoever imposed, assessed, levied or collected by the United States or any political subdivision or taxing authority thereof or therein, together with interest thereon and penalties with respect thereto, if any, on or in respect of this Note (such taxes, levies, duties, costs and charges being herein collectively called "Taxes").

2.      The Holder of this Note is entitled, at its option, at any time after the issuance of this Note, to convert all or any lesser portion of the Outstanding Principal Amount and accrued but unpaid Interest into Common Stock at a conversion price equal to $0.04 per share (the "Conversion Price".) (The Common stock into which the Note is converted shall be referred to in this agreement as "Conversion Shares"). The Issuer will not be obligated to issue fractional Conversion Shares. The Holder may convert all or any part of this Note into Common Stock by submitting to the Company the form of conversion notice attached to the Note as Exhibit A, executed by the Holder of the Note evidencing such Holder's intention to convert all or any part of the Note. If the Borrower is unable to issue any shares under this provision due to the fact that there is an insufficient number of authorized and unissued shares available, the

1

Holder promises not to force the Borrower to issue these shares or trigger an Event of Default, provided that Borrower takes immediate steps required to get the appropriate level of approval from shareholders or the board of directors, where applicable to raise the number of authorized shares to satisfy the Notice of Conversion.

The Company shall at all times maintain a reserve with its transfer agent, shares of common stock in the amount of 5,000,000 shares.

The Company will not issue fractional shares or scrip representing fractions of shares of Common Stock on conversion, but the Company will round the number of shares of Common Stock issuable up to the nearest whole share. The date on which a Notice of Conversion is given shall be deemed to be the date on which the Holder notifies the Company of its intention to so convert by delivery, by facsimile transmission or otherwise, of a copy of the Notice of Conversion. Notice of Conversion may be sent by email to the Company, attn: CEO, CFO. The Holder will deliver this Note, together with original executed copy of the Notice of Conversion, to the Company within three (3) business days following the Conversion Date. At the Maturity Date, the Company will pay any unconverted Outstanding Principal Amount and accrued Interest thereon, at the option of the Company, in either (a) cash or (b) Common Stock valued at a price equal to the Conversion Price determined as if the Note was converted in accordance with its terms into Common Stock on the Maturity Date.

Notwithstanding the foregoing conversion privilege, in no event shall Issuer have the right to convert into, nor shall the Issuer issue to such Holder, shares of Common Stock to the extent that such conversion would result in the Holder and its affiliates together beneficially owning more than 9.99% of the then issued and outstanding shares of Common Stock. If the number of shares issued to Holder is greater than 4.99% of the total issued common stock of the company, the Issuer must notify the Holder immediately. For purposes hereof, beneficial ownership shall be determined in accordance with Section 13(d) of the Securities Exchange Act of 1934, as amended, and Regulation 13D-G thereunder.

3.     No provision of this Note shall alter or impair the obligation of the Company, which is absolute and unconditional, to the payment of the Outstanding Principal Amount of this Note at the Maturity Date, and in the coin or currency herein prescribed.

4.     If at any time or from time to time after the date of this Note, the Common Stock issuable upon the conversion of the Note is changed into the same or different numbers of shares of any class or classes of stock, whether by recapitalization or otherwise, then in each such event the Holder shall have the right thereafter to convert the Note into the kind of security receivable in such recapitalization, reclassification or other change by holders of Common Stock, all subject to further adjustment as provided herein. In such event, the formulae set forth herein for conversion and redemption shall be equitably adjusted to reflect such change in number of shares or, if shares of a new class of stock are issued, to reflect the market price of the class or classes of stock issued in connection with the above described transaction.

5.     Events of Default

    5.1.     A default shall be deemed to have occurred upon any one of the following events:

        5.1.1.     Withdrawal from registration of the Issuer under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), either voluntary or involuntary.

        5.1.2.     Issuer filing for bankruptcy protection under the federal bankruptcy laws, the calling of a meeting of creditors, or any act of insolvency under any state law regarding insolvency, without written notification to the Investor within five business days of such filing, meeting or action.

        5.1.3.     The Borrower fails to issue shares of Common Stock to the Holder (or announces or threatens in writing that it will not honor its obligation to do so) upon exercise by the Holder of the conversion rights of the Holder in accordance with the terms of this Note, fails to transfer or cause its transfer agent to transfer (issue) (electronically or in certificated form) any certificate for shares of Common Stock issued to

2

the Holder upon conversion of or otherwise pursuant to this Note as and when required by this Note, the Borrower directs its transfer agent not to transfer or delays, impairs, and/or hinders its transfer agent in transferring or issuing (electronically or in certificated form) any certificate for shares of Common Stock to be issued to the Holder upon conversion of or otherwise pursuant to this Note as and when required by this Note, or fails to remove (or directs its transfer agent not to remove or impairs, delays, and/or hinders its transfer agent from removing) any restrictive legend (or to withdraw any stop transfer instructions in respect thereof) on any certificate for any shares of Common Stock issued to the Holder upon conversion of or otherwise pursuant to this Note as and when required by this Note (or makes any written announcement, statement or threat that it does not intend to honor the obligations described in this paragraph) and any such failure shall continue uncured (or any written announcement, statement or threat not to honor its obligations shall not be rescinded in writing) for three (3) business days after the Holder shall have delivered a Notice of Conversion.

5.1.4.   Failure to pay the principal and unpaid but accrued interest on the Note when due.

5.1.5.   Any dissolution, liquidation, or winding up of Borrower or any substantial portion of its business.

5.1.6.   Any cessation of operations by Borrower or Borrower admits it is otherwise generally unable to pay its debts as such debts become due, provided, however, that any disclosure of the Borrower's ability to continue as a "going concern" shall not be an admission that the Borrower cannot pay its debts as they become due.

5.1.7.   The failure by Borrower to maintain any material intellectual property rights, personal, real property or other assets which are necessary to conduct its business (whether now or in the future).

5.1.8.   The Borrower effectuates a reverse split of its Common Stock without twenty (20) days prior written notice to the Holder.

5.1.9.   In the event that the Borrower proposes to replace its transfer agent, the Borrower fails to provide, prior to the effective date of such replacement, fully executed Irrevocable Transfer Agent Instructions in a form as initially delivered pursuant to the Purchase Agreement (including but not limited to the provision to irrevocable reserve shares of Common Stock in the Reserved Amount) signed by the successor transfer agent to Holder and the Borrower.

5.1.10.   The failure by Borrower to pay any and all Post-Closing Expenses as defined herein.

5.1.11.   From and after the initial trading, listing or quotation of the Common Stock on a Principal Market, an event resulting in the Common Stock no longer being traded, listed or quoted on a Principal Market; failure to comply with the requirements for continued quotation on a Principal Market; or notification from a Principal Market that the Borrower is not in compliance with the conditions for such continued quotation and such non-compliance continues for seven (7) trading days following such notification.

5.2.  Default remedies. Upon the occurrence and during the continuation of any Event of Default specified in Section 5.1. (solely with respect to failure to pay the principal hereof or interest thereon when due at the Maturity Date), the Note shall become immediately due and payable and the Borrower shall pay to the Holder, in full satisfaction of its obligations hereunder, an amount equal to the Default Sum (as defined herein). UPON THE OCCURRENCE AND DURING THE CONTINUATION OF ANY EVENT OF DEFAULT SPECIFIED IN SECTION 5.1., THE NOTE SHALL BECOME IMMEDIATELY DUE AND PAYABLE AND THE BORROWER SHALL PAY TO THE HOLDER, IN FULL SATISFACTION OF ITS OBLIGTAIONS HEREUNDER, AN AMOUNT EQUAL TO: (Y) THE DEFAULT SUM (AS DEFINED HEREIN)). Upon the occurrence and during the continuation of any Event of Default specified in Sections 5.1. (solely with respect to failure to pay the principal hereof or interest thereon when due on this

Note, 5.1.1, 5.1.2, 5.1.5, 5.1.6, 5.1.7, 5.1.8, 5.1.9, 5.1.10, 5.1.11 exercisable through the delivery of written notice to the Borrower by such Holders (the "Default Notice"), and upon the occurrence of an Event of Default specified in the remaining sections of Section 5.1. (other than failure to pay the principal hereof or interest thereon at the Maturity Date specified in Section 5.1. hereof), the Note shall become immediately due and payable and the Borrower shall pay to the Holder, in full satisfaction of its obligations hereunder, an amount equal to the greater of (i) 150% times the sum of (w) the then outstanding principal amount of this Note plus (x) accrued and unpaid interest on the unpaid principal amount of this Note to the date of payment (the "Mandatory Prepayment Date") plus (y) Default Interest, if any, on the amounts referred to in clauses (w) and/or (x) (the then outstanding principal amount of this Note to the date of payment plus the amounts referred to in clauses (x) and (y) shall collectively be known as the "Default Sum") or (ii) the "parity value" of the Default Sum to be prepaid, where parity value means (a) the highest number of shares of Common Stock issuable upon conversion of or otherwise pursuant to such Default Sum, treating the Trading Day immediately preceding the Mandatory Prepayment Date as the "Conversion Date" for purposes of determining the lowest applicable Conversion Price, unless the Default Event arises as a result of such breach in respect of a specific Conversion Date in which case such Conversion Date shall be the Conversion Date, multiplied by (b) the highest Closing Price for the Common Stock during the period beginning on the date of first occurrence of the Event of Default and ending one day prior to the Mandatory Prepayment Date (the "Default Amount") and all other amounts payable hereunder shall immediately become due and payable, all without demand, presentment or notice, all of which hereby are expressly waived, together with all costs, including, without limitation, legal fees and expenses, of collection, and the Holder shall be entitled to exercise all other rights and remedies available at law or in equity including, but not limited to the pursuit of immediate legal action against the Company in respect to the Default Amount.

If the Borrower fails to pay the Default Amount within five (5) business days of written notice that such amount is due and payable, then the Holder shall have the right at any time, so long as the Borrower remains in default (and so long and to the extent that there are sufficient authorized shares), to require the Borrower, upon written notice, to immediately issue, in lieu of the Default Amount, the number of shares of Common Stock of the Borrower equal to the Default Amount divided by the Conversion Price then in effect.

6.      Prepayment. At any time that the Note remains outstanding, upon three business days' written notice (the "Prepayment Notice") to the Holder, the Company may pay 140% of the entire Outstanding Principal Amount of the Note plus any accrued but unpaid Interest. If the Company gives written notice of prepayment, the Holder shall agree to withhold any attempts to convert the Convertible Note for a period of 48 hours beginning upon receipt of the Prepayment Notice. Should the Company fail to make the Prepayment within the 48 hours, the Holder shall regain its right to convert the Note into shares of Common Stock of the Company.

7.      The Company covenants that until all amounts due under this Note are paid in full, by conversion or otherwise, unless waived by the Holder or subsequent Holder in writing, the Company shall:

give prompt written notice to the Holder of any Event of Default or of any other matter which has resulted in, or could reasonably be expected to result in a materially adverse change in its financial condition or operations;

give prompt notice to the Holder of any claim, action or proceeding which, in the event of any unfavorable outcome, would or could reasonably be expected to have a Material Adverse Effect (as defined below) on the financial condition of the Company;

at all times reserve and keep available out of its authorized but unissued Common Stock, for the purpose of effecting the conversion of this Note into Common Stock, such number of its duly authorized shares of Common Stock as shall from time to time be sufficient to effect the conversion of the Outstanding Principal Amount of this Note into Common Stock.

"*Material Adverse Effect*" means (i) any condition, occurrence, state of facts or event having, or insofar as reasonably can be foreseen would likely have, any material adverse effect on the legality, validity or enforceability of the Transaction Documents or the transactions contemplated thereby, (ii) any condition, occurrence, state of facts or

4

event having, or insofar as reasonably can be foreseen would likely have, any effect on the business, operations, properties or financial condition of the Company that is material and adverse to the Company and its Subsidiaries, taken as a whole, and/or (iii) any condition, occurrence, state of facts or event that would, or insofar as reasonably can be foreseen would likely, prohibit or otherwise materially interfere with or delay the ability of the Company to perform any of its obligations under any of the Transaction Documents to which it is a party.

8.     Upon receipt by the Company of evidence from the Holder reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this Note,

(i)     in the case of loss, theft or destruction, upon provision of indemnity reasonably satisfactory to it and/or its transfer agent, or

(ii)     in the case of mutilation, upon surrender and cancellation of this Note, then the Company at its expense will execute and deliver to the Holder a new Note, dated the date of the lost, stolen, destroyed or mutilated Note, and evidencing the outstanding and unpaid principal amount of the lost, stolen, destroyed or mutilated Note.

9.     If any term in this Note is found by a court of competent jurisdiction to be unenforceable, then the entire Note shall be rescinded, the consideration proffered by the Holder for the remaining Debt acquired by the Holder not converted by the Holder in accordance with this Note shall be returned in its entirety and any Conversion Shares in the possession or control of the Investor shall be returned to the Issuer.

10.     The Note and the Settlement Agreement between the Company and the Holder (including all Exhibits thereto) constitute the full and entire understanding and agreement between the Company and the Holder with respect to the subject hereof. Neither this Note nor any term hereof may be amended, waived, discharged or terminated other than by a written instrument signed by the Company and the Holder.

11.     This Note shall be governed by and construed in accordance with the internal laws of the State of California, without regard to the principles of conflicts of laws.  By executing this Note, the Company agrees to submit to the exclusive jurisdiction of and agrees to the venue of the state courts located in the County of San Diego, State of California.

IN WITNESS WHEREOF, the Company has caused this instrument to be duly executed by an officer thereunto duly authorized, as of the date first written above.

Probility Media Corporation

By: _____
Name: Evan Mark Levine
Title: Chief Executive Officer

## EXHIBIT A
## NOTICE OF CONVERSION
### (To be executed by the Holder in order to convert the Note)

**TO: PROBILITY MEDIA CORPORATION**

The undersigned hereby irrevocably elects to convert $_____of the principal amount of the Note (defined below) into Shares of Common Stock of Probility Media Corporation, according to the conditions of the Convertible Note dated as of June \_\_\_\_, 2017 (the "Note"), as of the Conversions Date written below.

**Conversion Date:** _____

**Applicable Conversion Price:** _____

**Signature:** _____

**Name:** _____

**Address:**

**Amount to be converted:** $ _____

**Amount of Note unconverted:** $ _____

**Conversion Price:** $ _____

**Number of shares of Common Stock to be issued including as payment of interest, if applicable:** _____

**Please issue the shares of Common Stock in the following name and to the following address:** _____

**Issue to the following account of the Holder:** _____

**Authorized Signature:** _____

**Name:** _____

**Title:** _____

**Phone Number:** _____

**Broker DTC Participant Code:** _____

**Account Number:** _____

6

Exhibit E

Alan L. Atlas (State Bar No. 141552)
440 Citracado Parkway, #11
Escondido, California 92025
Office: (760) 294-0727
Cell: (619) 888-5575
Email: alanlatlas@aol.com

Attorney for Plaintiff Mesa Strategies, Inc.

Rob D. Cucher (State Bar No. 219726)
315 S. Beverly Drive, Suite 310
Beverly Hills, CA 90212
Office: (310) 795-5356
Facsimile: (310) 837-1996
Email: cucherlaw@msn.com

Attorney for Defendant Probility Media Corporation

**F I L E D**
Clerk of the Superior Court

**JUN 20 2017**

By: Anthony Shirley, Deputy

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

### COUNTY OF SAN DIEGO
### CENTRAL DIVISION

| | |
|---|---|
| MESA STRATEGIES, INC., a Nevada corporation,<br><br>Plaintiff,<br><br>vs.<br><br>PROBILITY MEDIA CORPORATION, also known as Probility Media Group, Inc., and formerly known as Panther Biotechnology, Inc., a Nevada corporation, and DOES 1-10 inclusive,<br><br>Defendants. | Case No.:  37-2017-00019738 -CU-BC-CTL<br><br>Assigned for All Purposes to:<br>Hon. Randa Trapp<br><br>[PROPOSED] ORDER APPROVING SETTLEMENT OF CLAIMS<br><br>IMAGED FILE<br><br>Date:  June 20, 2017<br>Time:  8:30 am<br>Dept.:  C-70<br><br>Trial Date: None Set |

The Joint Ex Parte Application for Order Approving Settlement of Claims filed by

Plaintiff Mesa Strategies, Inc. ("Plaintiff") and Probility Media Corporation (" Defendant")

came on for hearing on June 20, 2017 at 8:30 am in Department C-70 of the above-entitled

court, the Honorable Randa Trapp presiding.

1

1        The Court having considered the application and supporting papers, the oral

2 arguments of counsel, having been presented with a Settlement Agreement and Release and

3 good cause appearing therefor,

4     **IT IS HEREBY ORDERED AS FOLLOWS:**

5     1.     The Settlement Agreement and Release, attached hereto as Exhibit A and

6 incorporated herein by reference, is approved in its entirety;

7     2.     Plaintiff owns bona fide outstanding claims against Defendant, and the terms

8 and conditions of the issuance and exchange of such claims for free-trading shares of common

9 stock of Defendant, as set forth in the Settlement Agreement and Release, are approved after a

10 hearing upon the fairness of such terms and conditions at which Plaintiff, the only person to

11 whom it is proposed to issue securities in such exchange, appeared by counsel.

12     3.     The Court shall retain jurisdiction to enforce the terms of this Order by motion

13 under California Code of Civil Procedure Section 664.6.

14     **IT IS SO ORDERED.**

15

16 Dated: June 20, 2017                       

17                                       Hon. Randa Trapp
                                      Judge of the Superior Court

2

Exhibit F



NUMBER

1236

1236

**RULE 144 - RESTRICTED SHARES**

The shares represented by this certificate have not been registered under the Securities Act of 1933 (the "Act"), and are Restricted Securities as that term is defined in Rule 144 under the Act, and requires written release from either the issuing company or their attorney prior to legend removal.

SHARES

1000000

# PROBILITY MEDIA CORPORATION

INCORPORATED UNDER THE LAWS OF THE STATE OF NEVADA

CUSIP NO. 74274K 10 9

PAR VALUE $0.001
COMMON STOCK

**THIS CERTIFIES THAT**   MESA STRATEGIES INC   0199   144

is the owner of   1000000

FULLY PAID AND NON-ASSESSABLE SHARES OF THE COMMON STOCK PAR VALUE OF $0.001 EACH OF

## PROBILITY MEDIA CORPORATION

transferable on the books of the Corporation in person or by duly authorized attorney upon surrender of this Certificate properly endorsed. This Certificate is not valid until countersigned by the Transfer Agent and registered by the Registrar. Witness the facsimile seal of the Corporation and the facsimile signatures of its duly authorized officers.

DATED:   06/21/2017

Countersigned and Registered:

By

SIGNATURE STOCK TRANSFER, INC.
(Addison, Texas) Transfer Agent

Authorized Signature

COST BASIS
ON FILE

CEO

COO

CFO

PROBILITY MEDIA CORPORATION
CORPORATE
Seal
NEVADA

The following abbreviations, when used in the inscription on the face of this certificate, shall be construed as though they were written out in full according to applicable laws or regulations:

| | | | | |
|---|---|---|---|---|
| TEN COM (TIC) | - as tenants in common | UNIF GIFT MIN (TRANS) ACT_____ | | Custodian _____ |
| TEN ENT | - as tenants by the entireies | (UGMA) (UTMA) | (Cust) | (Minor) |
| JT TEN (J/T) | - as joint tenants with right of | | | under Uniform Gifts (Transfer) to Minors |
| | survivorship and not as tenants | | Act _____ | |
| | in common | | (State) | |

Additional abbreviations may also be used though not in the above list.

For Value Received _____ *hereby sell, assign and transfer unto*

PLEASE INSERT SOCIAL SECURITY OR SOME OTHER
IDENTIFYING NUMBER OF ASSIGNEE

_____

_____

_____

PLEASE PRINT OR TYPEWRITE NAME AND ADDRESS OF ASSIGNEE

_____

_____

_____  *Shares*

*of the Capital Stock represented by the within Certificate, and do hereby irrevocably constitute and*

*appoint* _____  *Attorney*

*to transfer the said Stock on the books of the within-named Corporation with full power of substitution in the premises.*

*Dated* _____

**X** _____

**SIGNATURE GUARANTEE**
(BY BANK, BROKER, CORPORATE OFFICER)

NOTICE: THE SIGNATURE TO THIS AGREEMENT MUST CORRE-
SPOND WITH THE NAME AS WRITTEN UPON THE FACE OF THE
CERTIFICATE, IN EVERY PARTICULAR, WITHOUT ALTERATION
OR ENLARGEMENT, OR ANY CHANGE WHATEVER.

NUMBER

1237

1237

PAR VALUE $0.001
COMMON STOCK

RULE 144 - RESTRICTED SHARES

The shares represented by this certificate have not been registered under the Securities Act of 1933 (the "Act"), and are Restricted Securities as that term is defined in Rule 144 under the Act, and requires written release from either the issuing company or their attorney prior to legend removal.

# PROBILITY MEDIA CORPORATION

INCORPORATED UNDER THE LAWS OF THE STATE OF NEVADA

SHARES

1000000

CUSIP NO. 74274K 10 9

**THIS CERTIFIES THAT**   MESA   STRATEGIES   INC   0199   144

is the owner of   1000000

FULLY PAID AND NON-ASSESSABLE SHARES OF THE COMMON STOCK PAR VALUE OF $0.001 EACH OF

## PROBILITY MEDIA CORPORATION

transferable on the books of the Corporation in person or by duly authorized attorney upon surrender of this Certificate properly endorsed. This Certificate is not valid until countersigned by the Transfer Agent and registered by the Registrar. Witness the facsimile seal of the Corporation and the facsimile signatures of its duly authorized officers.

DATED:   06/21/2017

Countersigned and Registered:

SIGNATURE STOCK TRANSFER, INC.
(Addison, Texas) Transfer Agent

By

Authorized Signature

COST BASIS NO ON FILE

CEO

COO

CFO

PROBILITY MEDIA CORPORATION
CORPORATE
Seal
NEVADA

The following abbreviations, when used in the inscription on the face of this certificate, shall be construed as though they were written out in full according to applicable laws or regulations:

TEN COM (TIC) - as tenants in common

TEN ENT      - as tenants by the entireties

JT TEN (J/T)  - as joint tenants with right of
              survivorship and not as tenants
              in common

UNIF GIFT MIN (TRANS ACT) _____    Custodian _____
(UGMA) (UTMA)                 (Cust)              (Minor)
                              under Uniform Gifts (Transfer) to Minors
                              Act _____
                                    (State)

Additional abbreviations may also be used though not in the above list.

For Value Received _____ *hereby sell, assign and transfer unto*

PLEASE INSERT SOCIAL SECURITY OR SOME OTHER
IDENTIFYING NUMBER OF ASSIGNEE

PLEASE PRINT OR TYPEWRITE NAME AND ADDRESS OF ASSIGNEE

*Shares*

*of the Capital Stock represented by the within Certificate, and do hereby irrevocably constitute and*

*appoint* _____  *Attorney*

*to transfer the said Stock on the books of the within-named Corporation with full power of substitution in the premises.*

*Dated* _____

X _____

**SIGNATURE GUARANTEE**
(BY BANK, BROKER, CORPORATE OFFICER)

NOTICE: THE SIGNATURE TO THIS AGREEMENT MUST CORRE-
SPOND WITH THE NAME AS WRITTEN UPON THE FACE OF THE
CERTIFICATE, IN EVERY PARTICULAR, WITHOUT ALTERATION
OR ENLARGEMENT, OR ANY CHANGE WHATEVER.

Exhibit G

# STOP TRANSFER RESOLUTION

**CORPORATE RESOLUTION TO PLACE OR RELEASE A CORPORATE STOP TRANSFER (PLEASE TYPE)**

PROBILITY MEDIA CORP

**COMPANY NAME (SECURITIES NAME)**

COMMON STOCK

**CLASS OF STOCK**

RESOLVED, THAT SIGNATURE STOCK TRANSFER, INC., STOCK TRANSFER AGENT FOR THE ABOVE CLASS OF STOCK FOR THE ABOVE COMPANY, IS AUTHORIZED BY THE COMPANY TO PLACE/RELEASE A COMPANY STOP ON THE CERTIFICATE(S) LISTED BELOW.

PRESENTLY OUTSTANDING CERTIFICATE(S) TO BE STOPPED/RELEASED (PLEASE TYPE)

| REGISTERED NAME | CERTIFICATE NUMBER | NUMBER OF SHARES | CERTIFICATE DATE | RESTRICTED OR FREE TRADING |
|---|---|---|---|---|
| MESA STRATEGIES, INC. | 1236 | 1,000,000 | 6/21/17 | RESTRICTED |
| MESA STRATEGIES, INC. | 1237 | 1,000,000 | 6/21/17 | RESTRICTED |

THE ABOVE COMPANY AUTHORIZES SIGNATURE STOCK TRANSFER, INC. TO PLACE THE FOLLOWING COMPANY STOP ON THE ABOVE CERTIFICATE(S):

__X__ STANDARD STOP –     REQUIRES WRITTEN RELEASE FROM COMPANY PRIOR TO TRANSFER. (11/11/1111)

_____ CONTROL PERSON –     REQUIRES WRITTEN OR ORAL RELEASE FROM COMPANY PRIOR TO TRANSFER. (10/10/1010)

_____ COMPANY NOTIFICATION –     INFORMAL STOP TO NOTIFY THE COMPANY ONCE A TRANSFER COMMENCES. REQUIRES NO APPROVAL PRIOR TO TRANSFER. (12/12/1212)

THE ABOVE COMPANY AUTHORIZES SIGNATURE STOCK TRANSFER, INC. TO RELEASE THE STOP PLACED ON THE ABOVE CERTIFICATE(S) BY THE COMPANY:

_____ RELEASE OF STOP –     REMOVAL OF A CORPORATE STOP TRANSFER PLACED BY THE COMPANY. NOTE THIS DOES NOT RELEASE THE STOCK RESTRICTION (IF ANY).

I, THE UNDERSIGNED, QUALIFIED OFFICER OF THE ABOVE NAMED COMPANY, DO HEREBY INDEMNIFY SIGNATURE STOCK TRANSFER, INC. AND THEIR EMPLOYEES AGAINST ANY AND ALL ACTIONS TAKEN BY THE ABOVE COMPANY, AND CERTIFY THAT THIS IS A TRUE COPY OF A RESOLUTION, SET FORTH AND ADOPTED ON THE BELOW DATE, AND THAT THE SAID RESOLUTION HAS NOT BEEN IN ANY WAY RESCINDED, ANNULLED, OR REVOKED BUT THE SAME IS STILL IN FULL FORCE, AND EFFECT.

X _____          STEVEN M. PLUMB

**OFFICER'S SIGNATURE**          **OFFICER'S NAME PRINTED**

CHIEF FINANCIAL OFFICER          7/13/17

**TITLE OF OFFICER**          **DATE**

713-780-0806          800-861-1175

**TELEPHONE NUMBER**          **FACSIMILE NUMBER**

**PLEASE NOTE** – It is the responsibility and liability of the company to notify the shareholder of the placement / removal of a stop transfer.

Exhibit H

# The Loev Law Firm, PC

CORPORATE, SECURITIES, PUBLIC/PRIVATE OFFERINGS, CONTRACTS, MERGERS & ACQUISITIONS, LITIGATION

David M. Loev
John S. Gillies
Timothy J. Henderson*
Christian, Smith & Jewell**

6300 West Loop South, Suite 280
Bellaire, Texas 77401

Telephone (713) 524-4110
Facsimile (713) 524-4122
www.loevlaw.com

\* Of Counsel, Board Certified Civil Trial Law (Texas)
\*\* Of Counsel

July 28, 2017

Mr. Allan Ligi
Mesa Strategies, Inc
18145 Old Coach Drive
Poway, California 92064-6632

**VIA EMAIL AT
ALLANX100@YAHOO.COM**

Re:      **Probility Media Corporation**

Dear Mr. Ligi:

Our firm serves as counsel to Probility Media Corporation, a Nevada corporation (the "Company", which term as used herein includes the company's subsidiaries).

We have been advised that Mr. Lawrence Isen ("Isen") was the Company's sole contact in negotiating the settlement and assignment with Mesa Strategies, Inc. ("Mesa"). We have been advised that the Company did not have any direct contact with any representatives of Mesa. We have also been advised that Isen represented to the Company that you were the President of Mesa. Our client relied upon the oral representations of Isen that the shares represented by the settlement agreement would be sold into the open market and that Isen would help build a robust market for the Company's shares via social media broadcasts and the use of electronic mailing lists with the goal of encouraging individuals to purchase the Company's common stock.

It is now apparent to the Company from the complaint filed against Isen by the Securities and Exchange Commission (SEC) and others on July 12, 2017[1], the indictment filed against Isen by the U.S. Attorney's Office[2] and Isen's resulting arrest on charges of securities fraud, that Isen was planning to utilize the illegal methods outlined in the SEC complaint and indictment in order to create a market for the Company's common stock. Had the Company been aware that Isen was planning to utilize illegal methods to encourage individuals to purchase its common stock, our client would have never agreed to the settlement or filed the declarations with the Court.

The Company retained Isen's firm, FSC, LLC, to assist the Company with investor relations and identifying sources of capital. The settlement agreement with Mesa was entered into largely due to the fact that the Company had entered into the agreement with Isen's firm. Based upon Isen's representations, our client agreed to a below market conversion price in order to

---

[1] https://www.sec.gov/litigation/complaints/2017/comp-pr2017-124.pdf
[2] https://www.justice.gov/usao-edny/pr/corporate-insiders-and-managers-long-island-boiler-room-indicted-orchestrating-147

Mesa Strategies Inc.
July 28, 2017
Page 2 of 2

facilitate the transaction. Prior to entering into the settlement agreement, the Company was raising funds at $0.15 per share. The Company agreed to a below market conversion price of $0.04 per share at Isen's insistence and in reliance upon his oral representations. The Company would not have agreed to this conversion price otherwise. The Company has since cancelled the contract with Isen.

Mesa has submitted one conversion notice for 2,000,000 shares of common stock under the note agreement to date. It is our understanding that Mesa is attempting to lift the restrictions on the stock certificates it has received. The Company believes that the restrictions on the shares should not be lifted since the settlement was based upon representations that the Company now has reason to believe were false, misleading and potentially fraudulent.

The Company is prepared to rescind the settlement agreement and the issuance of the shares if the Company is not able to reach a mutually agreed amendment to the settlement with Mesa. Accordingly, the Company is requesting that Mesa (a) accept a conversion price of $0.15 per share, (b) return one of the two stock certificates issued and accept a new certificate for 333,333 shares, and (c) agree to a two year lock up/leak out agreement, which calls for no sales during the first year and allows the holder to sell 10% of the average market volume per month for the following twelve months. The Company believes that this is equitable because the conversion price would be at the same price other early investors received and it is still well below the Company's recent trading price of $0.60 per share.

We hope to resolve this quickly and amicably, provided that if we don't hear back from you by close of business on Wednesday, August 9, 2017, the Company will take legal action to rescind the prior settlement agreement and cancel the shares issued previously, due to Mr. Isen's misrepresentations and planned future illegal activities. If the Company is forced to go back to court it will also seek damages, attorney fees and court costs and where applicable punitive damages. Hopefully this recourse is not necessary; however, the Company has its own interests to protect and will do so vigorously if necessary.

This letter shall not serve as a waiver of any legal and/or equitable right or remedy available to the Company, all of which are herein expressly reserved.

Yours very truly,

David M. Loev

# Exhibit I

# ALPINE SECURITIES
*Stock Brokerage & Investment Company*

September 5, 2017

VStock Transfer, LLC
18 LAFAYETTE PLACE
WOODMERE, NY 11598

## Transfer Instructions

CUSIP:   74274K109          Security Name:  PROBILITY MEDIA CORP

### Certificates to Cancel

| Description: | Date: | Certificates: | Denomination: |
|---|---|---|---|
| MESA STRATEGIES | 6/21/2017 | 1237 | 1,000,000 |

### Certificates to Issue

| Account Name: | ID: | Denominations: | Fees: |
|---|---|---|---|
| ALPCO | 87-0403873 | | |
| 39 Exchange Place | | 1,000,000 | |
| Salt Lake City, UT 84111 | | **\*UNRESTRICTED\*** | 35.00 |
| | | RESTRICTION REMOVAL: | 35.00 |
| | | CANCEL FEE: | 10.00 |
| **Totals:** | | 1,000,000 | 80.00 |

Instructions: RULE 144 FREE UP
Account #: 492697776
TCN #: 492697776 248 2017

## *** Please call if Payment is incorrect***          MP

### Please remit certificates after transfer via FedEx Priority Overnight back to:

Alpine Securities
39 Exchange Place
Salt Lake City, UT 84111
Tel# 801-355-5588
**FedEx # 121560747**

39 Exchange Place  |  Salt Lake City, UT 84111
p (801) 355-5588  |  f (801) 355-5742  |  toll free (800) 274-5588  |  www.alpine-securities.com
Member FINRA/SIPC

Exhbit I - page 1



NUMBER

1237

RULE 144 - RESTRICTED SHARES
The shares represented by this certificate have not been registered under the Securities Act of 1933 (the "Act"), and are Restricted Securities as that term is defined in Rule 144 under the Act, and requires written release from either the issuing company or their attorney prior to legend removal.

SHARES

1,000,000

# PROBILITY MEDIA CORPORATION

INCORPORATED UNDER THE LAWS OF THE STATE OF NEVADA

CUSIP NO. 74274K 10 9

PAR VALUE $0.001
COMMON STOCK

**THIS CERTIFIES THAT**      MESA  STRATEGIES  INC   0191

is the owner of      1000000

FULLY PAID AND NON-ASSESSABLE SHARES OF THE COMMON STOCK PAR VALUE OF $0.001 EACH OF

## PROBILITY MEDIA CORPORATION

transferable on the books of the Corporation in person or by duly authorized attorney upon surrender of this Certificate properly endorsed. This Certificate is not valid until countersigned by the Transfer Agent and registered by the Registrar. Witness the facsimile seal of the Corporation and the facsimile signatures of its duly authorized officers.

DATED:      06/21/2017

Countersigned and Registered:

SIGNATURE STOCK TRANSFER, INC.
(Addison, Texas) Transfer Agent

By

Authorized Signature

CEO

COO

CFO

Exhibit 1 - page 2

Certification of Corporate Authorization (General)

(See Rules 198 and 199 of Rules of Board of Governors of New York Stock Exchange)

I, _ALLAN LIGI_ , being duly constituted Secretary of

_MESA STRATEGIES INC_ , a corporation organized and existing under and by virtue

of the Laws of the State of _NEVADA_ (hereinafter called this Corporation) do hereby

certify that the following is a true and complete copy of resolutions duly adopted at a meeting of the Board of

Directors of this Corporation, duly called and held on _6-21-17_ , at which a quorum was present and voting:

that said resolutions are still in full force and effect and have not been rescinded; and that said resolutions are not

in conflict with the Charter or By-Laws of this Corporation:

RESOLVED: That any of the following officers, to wit: _ALLAN LIGI_
_AND Jordan Jared Booker_ of this
Corporation be, and they hereby are, fully authorized and empowered to transfer, convert, endorse, sell,
assign, set over and deliver any and all shares of stock, bonds, debentures, notes, subscription warrants,
stock purchase warrants, evidences of indebtedness or other securities now or hereafter standing in the
name of or owned by this Corporation, and to make, execute and deliver, under the corporate seal of this
Corporation or otherwise, any and all written instruments of assignment and transfer necessary or proper
to effectuate the authority hereby conferred.

FURTHER RESOLVED: That whenever there shall be annexed to any instrument of
assignment and transfer, executed pursuant to and in accordance with the foregoing resolution,
a certificate of the Secretary or an Assistant Secretary of this Corporation in office at the date of such
certificate, and such certificate shall set forth these resolutions and shall state that these resolutions are in
full force and effect, and shall also set forth the names of persons who are then officers of this
Corporation, then all persons to whom such instrument with the annexed certificate shall thereafter come,
shall be entitled, without further inquiry or investigation and regardless of the date of such certificate, to
assume and to act in reliance upon the assumption that the shares of stock or other securities named in
such instrument were theretofore duly and properly transferred, endorsed, sold, assigned, set over and
delivered by this Corporation and that with respect to such securities and authority of these resolutions
and of such officers is still in full force and effect,

I further certify that the following is a true and correct list of the present officers of this
Corporation:

_ALLAN LIGI_ President _ALLAN LIGI_ Secretary

_ALLAN LIGI_ Vice Pres. _ALLAN LIGI_ Treasurer

The Company and its Board of Directors further irrevocably undertakes and agrees that Alpine Securities
Corp. may rely on the actions authorized, authority granted and representations made in the foregoing
resolutions until such time and the Corporation notifies Alpine Securities Corp. in writing that said
resolutions have been modified, amended and/or revoked.

Date _6-22-17_

_____
(Signature of Secretary)

(Seal)                                           Signature Guaranteed:

Exhibt I - page 3



### ALPINE SECURITIES
*Stock Brokerage & Investment Company*

Re: Removal of Restrictive Legend Pursuant to Rule 144(b)

*Probility Media Corp*
Issuer (the "Company")

*Mesa Strategies Inc*                    *49269776*
Full Name of Shareholder                 Account Number

*1,000,000*        *1237*
Total Shares       Certificate No(s)

**To Whom It May Concern:**
    This letter is submitted to you and the Company in connection with my request that the restrictive legend on the certificate(s) representing the above identified securities (the "Securities") be removed pursuant to rule 144 promulgated under the Securities Act of 1933 ("Rule 144"). In connection therewith, the undersigned represents and warrants to you and the Company as follows:

1. The undersigned is not and has not been during the preceding three months, an "affiliate" of the Company as that term is defined in paragraph (a) (1) of Rule 144.

2. The undersigned has fully paid for, beneficially owned, and held the shares of the Company for a period of
                                                *(SEE OPINION)*

     ☒ Six Months (if issuer is an SEC reporting company) or

     ☐ One Year in accordance with paragraph (d) of rule 144 as amended on 2/15/2008

3. These certificates are not issued from a Shell / Blank Check Company as defined by the SEC.

The undersigned is familiar with Rule 144 promulgated under the Securities Act of 1933 and agrees that you and the Company may rely upon the above statements.

Sincerely,

_____         _____*P-2-17*_____
Signature of Shareholder                 Date

*Alan Ligi*
(Print Name)

_____         _____
Signature of Joint Shareholder (if applicable)   Date

_____
(Print Name)

39 Exchange Place | Salt Lake City, UT 84111
p (801) 355-5588 | f (801) 355-5742 | toll free (800) 274-5588 | alpine-securities.com
Member FINRA & SIPC

Updated March 2017

Exhibit I - page 4



# ALPINE SECURITIES
*Stock Brokerage & Investment Company*

## BROKER REPRESENTATION LETTER

In order to induce ___Probility Media Corporation___ (the "Company") and its transfer agent to transfer the following securities which are owned by ___Mesa Strategies Inc___ ("Seller"), the undersigned certifies that pursuant to instructions received by the undersigned it has sold or is about to sell for Seller's Account the following securities, in a manner satisfying the requirements of Section(g), Rule 144 of the Securities Act of 1933.

| CLASS OF SECURITIY | CERT NO. | NO. OF SHARES | REGISTERED NAME | NAME TO WHICH SECURITY WILL BE TRANSFERRED | DATE OF SALE |
|---|---|---|---|---|---|
| Common | 1237 | 1,000,000 | Mesa Strategies Inc | ALPCO | TBD |

The Undersigned represents that:

1. The undersigned did no more or will do no more than execute the sell order as agent for Seller and will receive no more than the usual customary broker's commission:

2. The undersigned neither solicited nor arranged for the solicitation of customer's orders to buy the above securities in anticipation of or in connection with the transaction, other than inquiries to other brokers or dealers who had indicated an interest within 60 days preceding the date of receipt of the sell order:

3. The undersigned, after reasonable inquiry (including, as may be warranted review of supporting documentation, and as applicable, any opinion of counsel with respect to Rule 144 and a Form 144, if any, completed by Seller), is not aware of any circumstance indicating that Seller is an underwriter with respect to or is participating in a distribution of such securities; and

4. The undersigned, after such reasonable inquiry, is not aware of any facts indicating that the information supplied by Seller to the undersigned in connections with the sale of the above described securities was not complete and accurate as of the date of the sale of such securities.

Very truly yours,

Alpine Securities (Broker/Dealer)

By: _____     Date: ___8/1/17___

___JOSHUA BOYER, OPERATIONS PRINCIPAL___ (print or type name and title)

39 Exchange Place | Salt Lake City, UT 84111
p (801) 355-5588 | f (801) 355-5742 | toll free (800) 274-5588 | alpine-securities.com
Member FINRA & SIPC

Exhbit I - page 5

# NICHOLAS F. COSCIA, ESQ.

Attorney at Law
P.O. Box 789
Cardiff-by-the-Sea, CA 92007
(619) 993-3361
Email: Nick@CosciaSEC.com

June 26, 2017

Signature Stock Transfer, Inc.
14673 Midway Rd., Suite 220
Addison, TX. 750001
Attn: Jason Bogutsky

Alpine Securities Corporation
39 Exchange Place
Salt Lake City, UT 84111

Re: Issuance of 1,000,000 shares of $0.001 par value common stock (the "Shares") of Probility Media Corporation (the "Company") to Mesa Strategies, Inc. (the "Holder") pursuant to Section 3(a)(10) of the Securities Act of 1933 (the "Act") (the "Transaction").

Dear Mr. Bogutsky:

The Holder has requested us to review and consider the Transaction with respect to the application of Section 3(a) (10) of the Act to it.

We have also been asked to note that, based upon our investigation and review of the Documents, as defined hereinafter, we are of the opinion that the Company was not, at the time of the Settlement and Release entered into between the Company and the Holder as a part of the Transaction, and is not now a "shell company" as that term is defined in Rule 144 (i). Under Rule 144(i) a "shell company" is generally defined as a company that has no or nominal operations and either nominal assets, assets consisting of cash and/or cash equivalents and nominal other assets.

Specifically, the Company has requested our opinion as to whether under the facts set forth herein the Shares are exempt from the registration requirements of Section 5 of the Act by virtue of the exemption set forth in Section 3(a)(10) of the Act.

In relevant part, Section 3(a)(10) of the Act provides an exemption from the registration requirements of Section 5 of the Act for securities: (i) which are issued in

Signature Stock Transfer, Inc.
June 26, 2017 page 2

exchange for a bona fide claim, (ii) where the terms of the issuance and exchange are found, after a hearing open to everyone to whom the securities would be issued in connection with the proposed transaction, by a court or government entity expressly authorized by law to hold such a hearing, to be fair to those receiving shares, (iii) notice of the hearing is provided to those to receive shares and they are afforded the opportunity to be heard, (iv) the issuer advises the court prior to its hearing that it intends to rely on the exemption provided in Section 3(a)(10) of the Act, and (v) where there was no improper impediments to the appearance of interested parties at the hearing.

As counsel with respect to these requests, we have reviewed and relied upon certain representations of the Holder (the "Representations") and on documents provided to us by the Holder relating to the Transaction and on filings made by the Company with the United States Securities and Exchange Commission (the "SEC"), including, but not limited to:

(1) That certain Secured Convertible Promissory Note by and between the Company and Typenex Co-Investment, LLC a Utah limited liability company ("TCIL") in the original face amount of $1,200,000.00 dated August 20, 2015 ( the " Note");

(2) That certain Note Purchase Agreement by and between the TCIL and the Holder dated May 12, 2017 (the "NPA");

(3) That certain Assignment Agreement by and between TCIL and the Holder dated May 12, 2017;

(4) That certain 10% Convertible Note by and between the Company and the Holder dated June 9, 2017;

(5) That certain Settlement Agreement and Release by and between the Company and the Holder dated June 9, 2017 ( the "Settlement Agreement");

(6) The summons and complaint, service package and all pleadings and Exhibits thereto filed in Mesa Strategies, Inc, a Nevada corporation. v. Probility Media, Inc ., a Nevada corporation, et al. San Diego County Superior Court, Central Division case No. 37-2017-0001179738-CU-BC-CTL ("Mesa v.PMI") ;

(7) The Order Approving Settlement of Claims issued and executed by the Honorable Randa Trapp in Mesa v. PMI on June 20, 2017 (the "Order"); and

(8) The Company's annual report on Form 10 -K for the fiscal year ended May 31, 2016 filed with the SEC on September 13, 2016 and quarterly report on Form 10-Q for the fiscal quarter ended April 30, 2017 filed on June 19, 2017 and all intervening reports filed with the SEC.

As part of the Representations the Holder has advised us and permitted us to rely on, without us independently investigating any of the Representations, each of the following in connection with our issuance of the opinions expressed herein that: a. under

Signature Stock Transfer, Inc.
June 26, 2017 page 3

of the Order and pursuant to Section 4 of the Settlement Agreement the Court approved the issuance of the Shares to the Holder; b. In accordance with the terms of the Settlement, Agreement the Court was advised of Company's intention to rely upon the exemption to the registration requirements of Section 5 of the Act set forth in Section 3(a)(l0) of the Act to support the issuance of the Shares and the Court held a fairness hearing regarding the issuance (the "Hearing"); c. .As noted in the Order, the Hearing was held on June 20, 2017 upon the consent of the parties and the parties had adequate notice of and the ability to be heard at the Hearing; d. The complete terms of the Settlement Agreement were disclosed at the Hearing; e. As set forth in the Order, the Court found that the terms and conditions of the exchange were fair to the Shareholder within the meaning of Section 3(a)(10) of the Act; and, f. neither the Holder or any of its affiliates have ever been and are not now Officers, Directors, Control Persons, Promoters or owners of Ten Percent (10%) or more of the Company's equity securities or any other securities convertible into more than Ten Percent (10%) or more of any class of the Company's securities.

Based upon all of the foregoing, it is our opinion that the subject Shares: (i) may be issued under the exception to the registration requirements of Section 5 of the Act as provided in Section 3(a)(10) of the Act; and (ii) may be issued free of any restrictive legend and any existing restrictive legend(s) may be removed.. Furthermore, we are of opinion that at this time and as of the date of the execution of the Settlement Agreement, the Company was not a "shell company" as the term is defined in Rule 144(i).

The opinions expressed herein represent our reasonable professional judgment as to the matters of law addressed herein, based upon the facts presented or assumed, and are not guarantees that a court reviewing the Transaction will reach any particular result. This opinion letter is limited to the matters stated herein, and no opinion is implied or may be inferred beyond the matters expressly stated. The opinions set forth herein are based expressly on the facts stated herein, and may not be relied upon in the event that other facts, not presently known to us, come to light. Opinion letters of counsel are not binding upon the Securities and Exchange Commission (SEC) or the Courts, and to the extent that persons relying upon this letter may have knowledge of facts and circumstances that are contrary to those upon which this opinion is based, this opinion would not be applicable. I am admitted to practice law in the State and Federal Courts of California. The opinions expressed above are limited to the Federal Laws of the United States of America and no opinion is provided regarding any federal or state law not specifically referenced herein.

The opinions set forth herein are expressed as of the date hereof and remain valid so long as the Representations and Documents we have examined and relied upon as noted above are unchanged and the assumptions we have made, as noted above, are valid. If any facts or documents are determined to be incorrect, misstated, or misrepresented, then the opinion or opinions expressed herein may not continue to be valid. Furthermore, the opinions herein are rendered as of the date hereof, and we disclaim any undertaking to advise you hereafter of developments hereafter occurring or

Signature Stock Transfer, Inc.
June 26, 2017 page 4

coming to our attention, whether or not the same would (if now existing and known to us) cause any change or modification herein.

The Company, any broker-dealer, any clearing firm and the Holder are authorized to present this letter and to rely on this opinion in selling the shares of common stock and in registering transfer thereof. No other use of this opinion is authorized. This opinion may not be relied upon by any other party for any other purpose and may not be reproduced or distributed (except to governmental or regulatory agencies as required by regulation or law) without the prior written permission of the undersigned.

Please call the undersigned if you have any questions

Very truly yours,

Nicholas F. Coscia, Esq.

# SUPERIOR COURT OF CALIFORNIA,
## COUNTY OF SAN DIEGO
### CENTRAL

## MINUTE ORDER

DATE: 06/20/2017                TIME: 08:30:00 AM        DEPT: C-70

JUDICIAL OFFICER PRESIDING: Randa Trapp
CLERK: Anthony Shirley
REPORTER/ERM: Not Reported
BAILIFF/COURT ATTENDANT: S. Parriott

CASE NO: **37-2017-00019738-CU-BC-CTL**  CASE INIT.DATE: 05/31/2017
CASE TITLE: **Mesa Strategies Inc vs. Probility Media Group Inc [IMAGED]**
CASE CATEGORY: Civil - Unlimited        CASE TYPE: Breach of Contract/Warranty

**EVENT TYPE**: Ex Parte

**APPEARANCES**
ALAN L ATLAS, counsel, present for Plaintiff(s).
Rob D Cucher, counsel, present for Defendant(s) telephonically.

**Plaintiff's Joint Ex Parte Application to Approve Settlement**

The Court hears arguments of counsel.

The Court's tentative ruling is to grant the request.  The clerk will telephone attorney Atlas with the Court's final ruling before the end of the day.

1:30 pm  The Ex Parte Application is granted.  The Court signs the proposed order

Judge Randa  Trapp

ELECTRONICALLY FILED
Superior Court of California,
County of San Diego

**06/12/2017** at 10:01:00 AM
Clerk of the Superior Court
By Cody Newlan,Deputy Clerk

1   Alan L. Atlas (State Bar No. 141552)
    440 Citracado Parkway, #11
2   Escondido, California 92025
    Office: (760) 294-0727
3   Cell: (619) 888-5575
    Email: alanlatlas@aol.com
4
5   Attorney for Plaintiff Mesa Strategies, Inc.

6   Rob D. Cucher (State Bar No. 219726)
    315 S. Beverly Drive, Suite 310
7   Beverly Hills, CA 90212
    Office: (310) 795-5356
8   Facsimile: (310) 837-1996
    Email: cucherlaw@msn.com
9
    Attorney for Defendant Probility Media Corporation
10

11              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

12                       **COUNTY OF SAN DIEGO**
                          **CENTRAL DIVISION**
13

| | |
|---|---|
| MESA STRATEGIES, INC., a California corporation, | Case No.: 37-2017-00019738 -CU-BC-CTL |
| Plaintiff, | Assigned for All Purposes to: Hon. Randa Trapp |
| vs. | **DECLARATION OF STEVEN PLUMB IN SUPPORT OF JOINT EX PARTE APPLICATION FOR ORDER APPROVING SETTLEMENT OF CLAIMS** |
| PROBILITY MEDIA CORPORATION, also known as Probility Media Group, Inc., and formerly known as Panther Biotechnology, Inc., a Nevada corporation, and DOES 1-10 inclusive, | [Cal. Corp. Code §25017(f)(3)] |
| Defendants. | IMAGED FILE |
| | Date: June 20, 2017 Time: 8:30 am Dept.: C-70 |
| | Trial Date: None Set |

25  ///
26  ///
27  ///
28
                                    1
DECLARATION OF STEVEN PLUMB IN SUPPORT OF JOINT EX PARTE APPLICATION FOR ORDER
APPROVING SETTLEMENT OF CLAIMS
                                              Exhbit I - page 11

## DECLARATION OF STEVEN PLUMB

I, Steven Plumb, hereby declare:

1.     I am the Chief Financial Officer of Probility Media Corporation ("PROBILITY"), the defendant in this action. I have personal knowledge of the facts set forth herein and, if called to testify as a witness, could and would testify truthfully and competently thereto.

2.     I submit this Declaration in support of the Joint Ex Parte Application For Order Approving Settlement of Claims filed jointly by PROBILITY and Mesa Strategies, Inc. ("MESA"). PROBILITY and MESA each fully support the Application and ask that the Court grant it in its entirety.

3.     PROBILITY is an online provider of compliance, career advancement and training content for tradesmen and technical experts in a wide variety of professions with its corporate offices located in Houston, Texas. PROBILITY is a public company whose stock is traded over-the-counter under the trading symbol "PBYA." MESA is a creditor of PROBILITY, located in Poway, California. MESA purchased a convertible note issued by PROBILITY to Typenex Co-Investment, LLC dated August 20, 2015 (the "Typenex Note"). The Typenex Note and the documents assigning the Typenex Note to MESA are attached as exhibits to the Complaint.

4.     The amount owed to MESA by PROBILITY under the Typenex Note is $188,250 plus interest at 10% on that amount from May 12, 2017. As part of the settlement negotiated by the parties, MESA has advanced an additional $11,750 to PROBILITY so that the total amount currently owed by PROBILITY to MESA is $200,000 plus interest, attorney fees, costs, and expenses.

5.     I acknowledge, on behalf of PROBILITY, that the claims owned by MESA are bona fide outstanding obligations of PROBILITY, for due and proper consideration provided to PROBILITY in good faith.  Based upon MESA's ownership of the Typenex Note and the additional amount advanced to PROBILITY by MESA, PROBILITY

2

acknowledges that it is obligated to pay MESA the full amount of the claims contained in the Settlement Agreement and Release which is being submitted jointly herewith, without counterclaim or right of offset.

6. PROBILITY has engaged in substantial settlement discussions with MESA concerning satisfaction of the claims. PROBILITY desires to satisfy MESA's claims in exchange for shares of PROBILITY common stock. As a result of those discussions and based upon PROBILITY's financial situation, in full and final settlement of the claims, PROBILITY has agreed to issue, and MESA has—subject to Court approval—agreed to settle the claims on the terms and conditions set forth in the Settlement Agreement and Release.

7. Under the terms of the Settlement Agreement and Release, PROBILITY will issue MESA a convertible note in the principal amount of $200,000 (the "New Note") in substitution for the Typenex Note. The New Note may be converted by MESA, in whole or in part, into shares of PROBILITY common stock at a price of $0.04 per share, which I believe is a fair price for the following reasons:

a. In February 2017, the Securities and Exchange Commission deemed that PROBILITY was a shell company. PROBILITY will remain in shell status until November 8, 2017. Because of this, there is presently no meaningful market or market price for PROBILITY's common stock. Most days there are no trades in PROBILITY'S common stock.

b Being deemed a shell company by the Securities and Exchange Commission has caused PROBILITY great difficulty raising capital to finance its operations and stay in business. Fortunately, PROBILITY has been able to raise some capital in the form of high interest rate merchant cash advances and funds from friends and family.

c. PROBILITY continues to lose a substantial amount of money and had only $111,561 in cash at the end of the last quarter.

8.      The Settlement Agreement and Release is contingent upon court approval. Because of PROBILITY's financial situation, a delay of days or weeks in obtaining court approval may effectively put PROBILITY out of business.

9.      It is my belief that the terms and conditions of the settlement of the claims, as set forth in the Settlement Agreement and Release, are fair, reasonable and adequate to MESA.   Further, the board of directors of PROBILITY has considered the proposed settlement and has resolved that its terms and conditions are fair to, and in the best interests of PROBILITY and its stockholders.  Accordingly, PROBILITY and I respectfully ask that the Court find that the terms and conditions of the issuance and exchange of PROBILITY stock for the claims are fair, and that the Court approve the Settlement Agreement and Release in its entirety and enter the proposed Order as requested.

10.     If this Court approves the Settlement Agreement and Release, PROBILITY intends to rely on exclusion from the definition of a "sale" of securities set forth in Section 25017(f)(3) of the California Corporations Code, and the securities registration exemption set forth in Section 3(a)(10) of the federal Securities Act of 1933, as amended.

I declare under the penalty of perjury pursuant to the laws of the State of California the foregoing is true and correct.

Dated: June 9, 2017

_____
Steven Plumb

4

DECLARATION OF STEVEN PLUMB IN SUPPORT OF JOINT EX PARTE APPLICATION FOR ORDER
APPROVING SETTLEMENT OF CLAIMS

Exhibit J

# Regulatory Notice

# 09-05

## Unregistered Resales of Restricted Securities

**FINRA Reminds Firms of Their Obligations to Determine Whether Securities are Eligible for Public Sale**

### Executive Summary

FINRA reminds firms[1] of their responsibilities to ensure that they comply with the federal securities laws and FINRA rules when participating in unregistered resales of restricted securities. These responsibilities are particularly important in situations where the surrounding circumstances place the firm on notice that it may be participating in illegal, unregistered resales of restricted securities, such as when a customer physically deposits certificates or transfers in large blocks of securities and the firm does not know the source of the securities.

Recent FINRA investigations have revealed instances in which firms failed to recognize certain "red flags" that signaled the possibility of an illegal, unregistered distribution. This *Notice* identifies situations in which firms should conduct a searching inquiry to comply with their regulatory obligations under the federal securities laws and FINRA rules. FINRA also has reviewed procedures provided by a number of large, medium and small firms that are designed to address compliance. This *Notice* describes and discusses those procedures.

Questions concerning this *Notice* should be directed to:

➤ Gary L. Goldsholle, Vice President and Associate General Counsel, Office of the General Counsel, at (202) 728-8104;

➤ Joseph E. Price, Vice President, Corporate Financing, at (240) 386-4623; or

➤ Lisa Jones Toms, Counsel, Corporate Financing, at (240) 386-4661.

### January 2009

**Notice Type**
➤ Guidance

**Suggested Routing**
➤ Compliance
➤ Registered Representatives
➤ Trading
➤ Training

**Key Topic(s)**
➤ Unregistered Resale of Restricted Securities
➤ Unregistered Distributions

**Referenced Rules & Notices**
➤ NASD Rule 2710
➤ NASD Rule 2720
➤ NASD Rule 2810
➤ NASD Rule 3010
➤ SEC Rule 144
➤ Section 4(1) of the Securities Act
➤ Section 4(2) of the Securities Act
➤ Section 4(4) of the Securities Act



1

## Background & Discussion

Firms play a critical role in helping prevent illegal, unregistered resales of restricted securities into the public markets. It is a violation of the federal securities laws for a firm to offer or sell a security without an effective registration statement or an applicable exemption from the Securities Act of 1933 (Securities Act). In addition, such sales may violate NASD Rules 2710 (Corporate Financing Rule – Underwriting Terms and Arrangements)[2], 2720 (Distribution of Securities and Affiliates – Conflicts of Interest) and 2810 (Direct Participation Programs).[3]

All firms must have procedures reasonably designed to avoid becoming participants in the potential unregistered distribution of securities. The nature of those procedures and the required level of firm inquiry concerning the customer and the source of the securities will depend on the particular circumstances. In addition, firms may not rely solely on others, such as clearing firms, transfer agents, or issuers' counsel, to fulfill these obligations. Firms' specific obligations are discussed in more detail below.

The Securities Act prohibits the sale of securities unless the sale is made pursuant to an effective registration statement, or falls within an available exemption from registration. Before selling securities in reliance on an exemption, a firm must take reasonable steps to ensure that the transaction qualifies for the exemption, regardless of whether the sale is for its own accounts or on behalf of customers. This includes taking whatever steps necessary to ensure that the sale does not involve an issuer, a person in a control relationship with an issuer, or an underwriter with a view to offer or sell the securities in connection with an unregistered distribution.[4]

Section 4(1) of the Securities Act provides an exemption for the routine trading of already-issued securities. It does not, however, exempt sales by an issuer, or a control person of the issuer, or an underwriter or dealer. Section 4(2) of the Securities Act exempts sales made by an issuer not involving a public offering. Whether a sale is one that involves a public offering, however, is a question of fact which requires an inquiry regarding the surrounding circumstances, including such factors as the relationship between the seller and the issuer, and the nature, scope, size, type and manner of the offering. Section 4(4) of the Securities Act provides an exemption for unsolicited brokers' transactions. However, this exemption is available only if a broker is not aware, after a reasonable inquiry, of circumstances indicating that the selling customer is participating in a distribution of securities.

Recently, FINRA has investigated and brought several enforcement actions concerning unregistered distributions.[5] A common theme in these cases was that firms resold large amounts of low-priced equity securities in over-the-counter transactions. Among the allegations in these cases are that the inquiries necessary to uncover the facts of the unregistered distribution were not done or were inadequate, and the firms lacked proper supervisory controls to ensure that their written procedures were being followed. More specifically, in some instances, firms failed to take steps to determine when or how their customers had received the share certificates at issue, whether their customers were control persons of the issuers, or what percentage of the outstanding shares of these companies their customers owned. In some instances, physical certificates for shares were repeatedly deposited into accounts and then sold by firms that participated in unregistered distributions.

## Red Flags and the Duty to Make an Inquiry

Firms typically serve as the channel of distribution through which issuers, affiliates and promoters can access the public securities markets. Firms that do not adequately supervise or manage their role in such distributions run the risk of participating in an illegal, unregistered distribution. As recent investigations have shown, problems can arise when firms fail to recognize or take appropriate steps when confronted with "red flags" that signal the possibility of an illegal, unregistered distribution.

The following are examples of red flags (these are by no means comprehensive and should not be considered a "roadmap" for compliance purposes):

➤ A customer opens a new account and delivers physical certificates representing a large block of thinly traded or low-priced securities;

➤ A customer has a pattern of depositing physical share certificates, immediately selling the shares and then wiring out the proceeds of the resale;

➤ A customer deposits share certificates that are recently issued or represent a large percentage of the float for the security;

➤ Share certificates reference a company or customer name that has been changed or that does not match the name on the account;

➤ The lack of a restrictive legend on deposited shares seems inconsistent with the date the customer acquired the securities or the nature of the transaction in which the securities were acquired;

➤ There is a sudden spike in investor demand for, coupled with a rising price in, a thinly traded or low-priced security;

➤ The company was a shell company when it issued the shares;

➤ A customer with limited or no other assets under management at the firm receives an electronic transfer or journal transactions of large amounts of low-priced, unlisted securities;

➤ The issuer has been through several recent name changes, business combinations or recapitalizations, or the company's officers are also officers of numerous similar companies;

➤ The issuer's SEC filings are not current, are incomplete, or nonexistent.

As noted above, these examples are merely illustrative. There are many other situations that may signal that a firm should take a closer look at the circumstances of a proposed resale transaction.

Regarding the duty of firms to determine whether restricted securities are eligible for public sale, the SEC has said that:

> [A] dealer who offers to sell, or is asked to sell a substantial amount of securities must take whatever steps are necessary to be sure that this is a transaction not involving an issuer, person in a control relationship with an issuer or an underwriter. For this purpose, it is not sufficient for him merely to accept "self-serving statements of his sellers and their counsel without reasonably exploring the possibility of contrary facts."(footnote omitted)

> The amount of inquiry called for necessarily varies with the circumstances of particular cases. A dealer who is offered a modest amount of a widely traded security by a responsible customer, whose lack of relationship to the issuer is well known to him, may ordinarily proceed with considerable confidence. On the other hand, when a dealer is offered a substantial block of a little-known security, either by persons who appear reluctant to disclose exactly where the securities came from, or where the surrounding circumstances raise a question as to whether or not the ostensible sellers may be merely intermediaries for controlling persons or statutory underwriters, then searching inquiry is called for.

> The problem becomes particularly acute where substantial amounts of a previously little known security appear in the trading markets within a fairly short period of time and without the benefit of registration under the Securities Act of 1933. In such situations, it must be assumed that these securities emanate from the issuer or from persons controlling the issuer, unless some other source is known and the fact that the certificates may be registered in the names of various individuals could merely indicate that those responsible for the distribution are attempting to cover their tracks.[6]

## Inquiry Obligations under Securities Act Rule 144

A firm that distributes securities for its own account or on behalf of a customer may be considered a statutory underwriter. Securities Act Rule 144 establishes a non-exclusive "safe harbor" from being deemed an underwriter if the securities are sold in compliance with its requirements. Unregistered securities that are not freely transferable are considered "restricted securities" when they are acquired in a private transaction or are acquired by a control person of the issuer.[7]

The SEC recently revised Rule 144 and made substantial changes to the requirements governing resales of restricted securities.[8] The amendments, which became effective on February 15, 2008, continue to impose a one-year holding period prior to any public resale on restricted securities of companies that are not subject to the Exchange Act reporting requirements. The amendments eliminated the sales volume and manner of sale limitations on resales made by non-affiliates. Revised Rule 144 also includes more stringent restrictions on the resale of shares issued by shell companies. Accordingly, firms should review whether the company that issued the subject shares was a shell company when the shares were issued.

Before reselling restricted securities, firms must take reasonable steps to ensure that the transaction complies with Rule 144 or another available exemption. The factors set forth in the Notes to Rule 144(g) serve as a pragmatic guideline in determining what questions firms should ask their customers before engaging in an unregistered resale of securities:[9]

➤ How long has the customer held the security?

➤ How did the customer acquire the securities?

➤ Does the customer intend to sell additional shares of the same class of securities through other means?

➤ Has the customer solicited or made any arrangement for the solicitation of buy orders in connection with the proposed resale of unregistered securities?

➤ Has the customer made any payment to any other person in connection with the proposed resale of the securities? and

➤ How many shares or other units of the class are outstanding, and what is the relevant trading volume?

Firms should also try to physically inspect share certificates, if possible, as an opportunity to identify red flags and deter risks from forgery and fraudulent certificates.

**09-05**   **January 2009**

## Supervisory Procedures and Controls for Unregistered Resales of Securities

NASD Rule 3010 (Supervision) requires a firm to establish a supervisory system and corresponding written procedures to supervise its businesses and associated persons' activities. Accordingly, firms that accept delivery of large quantities of low-priced OTC securities, in either certificate form or by electronic transfer, and effect sales in these securities, should have written procedures and controls in place to prevent participation in an illegal, unregistered distribution of securities.

To help firms evaluate their procedures for supervising these resale transactions, FINRA has reviewed the procedures of a number of large, medium and small firms. The procedures noted below are not intended to be a comprehensive roadmap for compliance and supervision with respect to unregistered resales of restricted securities, but rather highlight measures that some firms are using to ensure better compliance with their obligations. While a particular practice may work well for one firm, the same approach may not be effective or economically feasible for another. Firms must adopt procedures and controls that are effective given their size, structure and operations.

The procedures we surveyed varied depending on the firms' business models; nevertheless, the most comprehensive ones tended to include a mandatory, standardized process that requires formal approval of the proposed resale transaction and thorough accompanying documentation that:

➤ Clearly communicates each step in the review, approval and post-approval process through the various stages of background inquiry, information gathering, required documentation, review, final approval, execution and recordkeeping of the transaction;

➤ Assigns clear "ownership" of each step of the transaction review, approval and execution process to the responsible representative, principal, legal or compliance specialist, business unit or department; and

➤ Is easily accessible to the personnel involved in the process, often through internal Web-based applications that are clear, instructive and encourage process standardization.

Standardized procedures should be accompanied by supervisory controls to ensure that a reasonable and meaningful investigation of the surrounding circumstances is conducted and that the information obtained is evaluated to identify whether a proposed resale transaction could amount to an illegal, unregistered distribution of a restricted security on behalf of an underwriter, an issuer, or a control person of the issuer. As a general matter, the procedures and controls should apply to not only proposed resales, but also the transfer of securities from one account to another by journal or book entry.

Among the compliance procedures FINRA reviewed are:

**A.      Initial Assessment and Review**

A number of firms had procedures that required a comprehensive initial review of the proposed resale, which includes gathering information concerning how, when, and under what circumstances a customer obtained the securities; whether the securities are registered pursuant to an effective Securities Act registration statement; how much of the stock is owned by or under the control of the customer; whether the stock was paid for by the customer; what relationship, if any, the customer has with the issuer or its control persons; and how much stock has been sold by the customer. Some procedures also contained brief descriptions of how holders of unregistered securities may acquire them, such as via private placements, corporate reorganizations, business combinations and stock options plans, and explained that the requirements for resales of such securities can vary depending on the nature of the transaction and the status of the seller, *i.e.*, whether the seller is considered an affiliate of the issuer.

Some firms prohibited their representatives from accepting large blocks of securities in certificate form or required supervisory approval before a transfer of restricted securities would be accepted.

Many firms required the results of the initial review to be documented and held the persons performing the review accountable for completion of the fact-gathering and documentation process. As part of this process, firm procedures required the use of questionnaires completed by the selling customer regarding the proposed resale transaction, form letters completed by the customer and registered representative, and other standardized documentation depending on the transaction.

Some firms deferred the documentation requirements to the person or department responsible for approval. Most firms required the completed documentation to be reviewed for any unusual circumstances and for completeness before submitting it for formal approval of the transaction. This assessment may also alert the firm to unusual or suspicious circumstances that may trigger other compliance procedures (such as Anti-Money Laundering (AML) reporting) or additional approvals given the size or nature of the transaction.

**B.      Formal Review and Approval**

Most of the procedures we reviewed required formal approval by a person, unit or department that is independent of the initial assessment and review of the proposed resale transaction. The person or department responsible for such approval was required to document the steps taken and was accountable for the final approval. For many firms, the final approval process is more than a verification of the adequacy of the documentation. It included an investigation of the customer's and issuer's background; a formal process to confirm the seller's affiliation status and the conditions upon which the shares can be resold; verification that the issuer is current in its filings and the issuer's information is publicly available; and a thorough review of the opinion of counsel, restricted stock legend, offering materials or prospectus, and other documents for reasonableness of the information and representations. It also took into account any previous sales by the customer through any accounts at the firm. Approval from a designated principal or legal and compliance specialist generally is required in these instances *before* executing or submitting the trade for execution. The approval document also specifies whether there are any conditions to the resale, such as volume, manner of sale or other applicable requirements.

**C.      Recordkeeping Obligations and Post-Approval Review**

Because of the manner of sale and other requirements that apply to unregistered resales of restricted securities by affiliates, some firms' procedures included steps to monitor executions of approved transactions to ensure they comply with applicable volume or manner of sale requirements. Other firms have a process in place, post-approval of the resale transaction, to examine repeated resales by the same account or accounts under common control and to review and monitor aggregated resales in the same securities.

Some procedures we reviewed did not assign specific recordkeeping obligations. Other procedures designated a registered representative at the firm as the person responsible for retaining all documents related to the resale as opposed to having another entity such as the firm's legal or compliance group or securities transfer unit designated as primarily responsible for document retention or, at least, to receive and retain copies of the documentation related to the resale.

## Other Considerations

**A.        Reliance on Third Parties**

In considering their obligations, firms should be aware that there are limitations on their ability to discharge those obligations by relying on others. FINRA, the SEC and the courts have repeatedly held that firms cannot rely on outside counsel, clearing firms, transfer agents, issuers, or issuer's counsel to discharge their obligations to undertake an inquiry. Moreover, the fact that securities have been issued by a transfer agent without a restrictive legend, or have been put into trading status by a clearing firm, does not mean that those securities can be resold immediately and without limitation under the Securities Act.[10]

**B.        AML Compliance**

A firm must also ensure that its AML compliance program adequately addresses red flags that may be associated with unregistered resales conducted through the firm.[11] In recent investigations, FINRA has found that firms that participated in unregistered resales of restricted securities also may have ignored a number of red flags that indicate not only that the resale was part of an unregistered distribution, but also that action may have been required under AML reporting requirements.[12] Failure to conduct appropriate inquiry and respond to red flags may have consequences under both the federal securities laws and AML requirements.

## Conclusion

Firms must have written procedures that are reasonably designed to avoid becoming participants in the illegal, unregistered resale of restricted securities into the public markets. As noted above, these procedures and the required level of firm inquiry depend on the facts and circumstances of the proposed resale. FINRA urges firms to pay careful attention to these obligations and the implementation of these procedures.

**09-05**   January 2009

## Endnotes

1   This *Notice* refers to broker-dealers and their associated persons collectively as "firms" unless otherwise specified.

2   NASD Rule 2710 is being re-designated as FINRA Rule 5110. See SR-FINRA-2008-039.

3   *See, e.g.*, FINRA's Corporate Financing Rules (NASD Rules 2710, 2720 and 2810), which apply to public offerings, and NASD Rule 2110, which requires firms to act under just and equitable principles of trade.  Regulation M under the Exchange Act and other FINRA and SEC rules may also apply to an unregistered public distribution in addition to civil liabilities under the Securities Act.

4   The term "underwriter" is broadly defined in the Securities Act to include any person or entity that purchases securities from an issuer with a view to distribute, or offers or sells for an issuer in connection with a distribution, and any person or entity participating, directly or indirectly, in a distribution of securities. The term "issuer" includes any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer. *See* Sec. 2(a)(11), Securities Act of 1933. Whether a customer is acting as an underwriter, is a control person, or is acting on behalf of an underwriter or control person, depends on the particular facts and circumstances of the transaction.

5   *See, e.g., Network 1 Financial Securities, Inc.* NASD AWC No. EAF0400940001, July 11, 2007; *NevWest Securities Corporation*, NASD AWC E0220040112-01, March 21, 2007, and related case SEC v. CMKM Diamonds, Inc., *et. al*, U.S. Dist. Court for the District of Nevada, Civil Action No. 08- CV 0437 (Lit. Rel. No. 20519 / April 7, 2008); and *Cardinal Capital Management, Inc.* NASD AWC E072003004201, July 22, 2005. In addition, FINRA has numerous ongoing investigations involving allegations of unregistered distributions.  *Barron Moore, Inc.*, Disc. Proceeding No. 2005000075703, July 21, 2008.

6   *See*, Securities Act Rel. No. 4445, 1962 SEC LEXIS 74 (February 2, 1962); *see also* Section 21(a) Report, *Transactions in the Securities of Laser Arms Corp. by Certain Broker-Dealers*, 50 S.E.C. 489 (1991).

7   *See* Preliminary Note to Securities Act Rule 144. 17 CFR 230.144. The term "restricted securities" is defined in Rule 144(a)(3), and includes securities acquired directly or indirectly from the issuer or an affiliate of the issuer in a transaction or chain of transactions not involving a public offering.

8    Securities Act Release No. 8869, 72 FR 71546 (December 17, 2007).

9   Securities Act  Rule 144(g).  17 CFR 230.144(g).

©2009. FINRA. All rights reserved. *Regulatory Notices* attempt to present information to readers in a format that is easily understandable. However, please be aware that, in case of any misunderstanding, the rule language prevails.

10 Recent investigations have uncovered fact patterns in which firms inappropriately relied on stock certificates issued without restrictive legends or certificates accompanied by false attorney opinions, or assumed that their clearing agent had the responsibility to determine if shares could be sold without restriction. FINRA has noted in previous guidance that firms are still responsible for the discharge of their obligations, even if they rely on third parties to perform certain activities and functions related to their business operations and regulatory responsibilities. Additionally, FINRA guidance makes clear that firms may not contract supervisory and compliance activities away from their direct control. *See Notice to Members 05-48* (Members' Responsibilities When Outsourcing Activities to Third-Party Service Providers).

11 *See* NASD Rule 3011 (Anti-Money Laundering Compliance Program) and *Notice to Members 02-21* (Guidance to Member Firms Concerning Anti-Money Laundering Compliance Programs Required by Federal Law).

12 *See, e.g, NevWest Securities Corporation*, and related case SEC v. CMKM Diamonds, Inc., *et. al*, U.S. Dist. Court for the District of Nevada, Civil Action No. 08- CV 0437 (Lit. Rel. No. 20519 / April 7, 2008) (failure to take action in response to the suspicious circumstances surrounding accounts controlled by certain customers, including the practice of depositing penny stocks, liquidating them and wiring the proceeds to bank accounts.) *Barron Moore, Inc.*, Disc. Proceeding No. 2005000075703, July 21, 2008.